UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
Case No. 11-2031

_____

PATCO CONSTRUCTION CO., INC.

Plaintiff - Appellant

v.

PEOPLE'S UNITED BANK

Defendant - Appellee


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

_____


**BRIEF OF APPELLANT
PATCO CONSTRUCTION CO., INC.**


Daniel J. Mitchell
Eben M. Albert-Knopp
BERNSTEIN SHUR
100 Middle Street
Portland, ME 04104-5029
(207) 671-5002
Attorneys for Plaintiff - Appellant
Patco Construction Co., Inc.

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
Case No. 11-2031

PATCO CONSTRUCTION CO., INC.

Plaintiff - Appellant

v.

PEOPLE'S UNITED BANK

Defendant - Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

**APPELLANT'S CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellant Patco Construction Co., Inc. ("Patco"), pursuant to

Federal Rule of Appellate Procedure 26.1(a), hereby states that it has no parent

corporation and there is no publicly held corporation that owns 10% or more of

Patco's stock.

Dated: December 16, 2011          Respectfully submitted,

                                  /s/ Daniel J. Mitchell
                                  Daniel J. Mitchell
                                  Eben M. Albert-Knopp
                                  BERNSTEIN SHUR
                                  100 Middle Street
                                  Portland, ME 04104-5029
                                  Attorneys for Plaintiff
                                  Patco Construction Company, Inc.

i

# TABLE OF CONTENTS

APPELLANT'S CORPORATE DISCLOSURE STATEMENT.............................. i

TABLE OF CONTENTS.................................................................. ii

TABLE OF AUTHORITIES ........................................................... iv

REASONS WHY ORAL ARGUMENT SHOULD BE HEARD...........................v

JURISDICTIONAL STATEMENT ....................................................1

STATEMENT OF THE ISSUES.........................................................2

STATEMENT OF THE CASE............................................................3

STATEMENT OF FACTS .................................................................5

SUMMARY OF THE ARGUMENT ...................................................13

STANDARD OF REVIEW ..............................................................16

    A. The Applicable Statutory Standards Of U.C.C. Article 4A ........................16

ARGUMENT .............................................................................18

I.    The District Court Erred When It Determined That The Bank's
Security Procedures Were Commercially Reasonable Under
Article 4A of the UCC in May of 2009 ......................................18

    A. The Recommended Decision Failed Properly To Consider The
Security Implications Of The Bank's Decision To Trigger
Challenge Questions On Every ACH Transaction ..................................19

    B. The Bank's Security Procedures Did Not Take Into Account
The Circumstances Of Patco Known To The Bank, Contrary To
The Express Direction Of Article 4A .......................................41

C.   The District Court Failed To Consider That The Bank Made Configuration Decisions On Patco's Accounts In A Haphazard Manner ..........................44

D.   The Bank Should Have Manually Reviewed Suspect Transactions And Implemented Other Controls In May Of 2009, But Failed To Do So ........46

II.   The District Court Erred In Concluding That Patco And The Bank Agreed To All Of The Security Measures Implemented By The Bank, And That The Bank Acted In Compliance With Those Security Procedures ...........................................................................50

III.   The District Court Erred In Concluding That Patco's Common-Law Counts Were Preempted By Article 4A.......................................................55

CONCLUSION .............................................................................................57

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................58

CERTIFICATE OF SERVICE ............................................................................59

ADDENDUM ................................................................................................60

# TABLE OF AUTHORITIES

**Cases**

*Douglas v. U.S. Dist. Court for the Cent. Dist. of Cal.*, 495 F.3d 1062
  (9th Cir. 2007) ................................................................................ 53, 54

*Grabowski v. Bank of Boston*, 997 F. Supp. 111 (D. Mass. 1997) ..........................17

*Harold H. Huggins Realty v. FNC, Inc.*, 575 F. Supp. 2d 696
  (D. Md. 2008) ..................................................................................53

*Miss. Public Employees' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5
  (1st Cir. 2011)..................................................................................16

*Regatos v. N. Fork Bank*, 257 F. Supp. 2d 632 (S.D.N.Y. 2003)............................16

*Regions Bank v. The Provident Bank*, 345 F.3d 1267 (11th Cir. 2003) ..................55

*Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265
  (S.D.N.Y. 2006) ................................................................................55

**Statutes**

11 M.R.S.A. § 4-1202.................................................................................*Passim*

11 M.R.S.A. § 4-1203 .................................................................................36

11 M.R.S.A. § 4-1204 ................................................................................ 16, 17

**REASONS WHY ORAL ARGUMENT SHOULD BE HEARD**

This appeal presents an issue of first impression in the First Circuit, including unique questions concerning the application of Article 4A of the Uniform Commercial Code to instances of cyber fraud and theft. Few cases have interpreted Article 4A's mandate that banks adopt commercially reasonable security procedures for authenticating payment orders, and those cases that have involved substantially different facts. The factual record in this case is detailed, and the legal issues presented by the record are nuanced. Appellant Patco Construction Co., Inc. ("Patco") respectfully submits that oral argument will significantly aid the Court in its decisional process and will facilitate full consideration of all facts and legal arguments pertinent to the critical issues before the Court. Accordingly, Patco respectfully requests oral argument on this appeal.

# JURISDICTIONAL STATEMENT

Patco is a Maine corporation with a principal place of business in Sanford, Maine. Plaintiffs' Statement of Undisputed Material Facts ("PSMF") ¶ 1 [Appendix ("App.") 152]; Second Amended Complaint ¶ 1 [App. 16]. Defendant People's United is a federal savings bank with a principal place of business in Connecticut. Plaintiffs' Opposing Statement of Material Facts ("POSMF") ¶ 4 [App. 237]. The amount in controversy exceeds $75,000. *See* Recommended Decision at 6 [Addendum ("Add.") 6] (noting that the fraudulent withdrawals in this case totaled $588,851, of which the Bank blocked $243,406). The District Court had jurisdiction pursuant to 28 U.S.C. § 1332.

Patco appeals from a final decision of the District Court dated August 4, 2011, granting a motion for summary judgment of People's United Bank ("People's United" or the "Bank") and denying Patco's motion for summary judgment. *See* Order Affirming the Recommended Decision of the Magistrate Judge ("Order") [Add. 71]; Judgment [D. Ct. Docket No. 134]. The District Court's Judgment disposes of all parties' claims. *See* Order [Add. 71]; Judgment [D. Ct. Docket No. 134]. Patco timely filed its notice of appeal on September 6, 2011. *See* Notice of Appeal [App. 14]. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

1

## STATEMENT OF THE ISSUES

1. Did the District Court err in determining that the security procedures of the Bank, as they existed in May of 2009, were commercially reasonable pursuant to Article 4A of the Uniform Commercial Code of Maine and Connecticut?

2. Did the District Court err in determining that Patco agreed to the Bank's security procedures, within the meaning of Article 4A of the Uniform Commercial Code of Maine and Connecticut?

## STATEMENT OF THE CASE

Patco brought this suit in Maine Superior Court, York County, by Complaint dated September 18, 2009. By Notice of Removal filed on October 9, 2009 [D. Ct. Docket No. 1], People's United removed this matter to the United States District Court for the District of Maine.

Patco filed a Second Amended Complaint (the "Complaint") on April 23, 2010 [App. 16]. The Second Amended Complaint included six counts, each arising out of a series of fraudulent withdrawals from Patco's commercial checking account at the Bank in May of 2009:

- Count I – Liability Pursuant to U.C.C. §4A-210, *et. seq.* ("Article 4A");

- Count II – Negligence;

- Count III – Breach of Contract;

- Count IV – Breach of Fiduciary Duty;

- Count V – Unjust Enrichment; and

- Count VI – Conversion.

On August 27, 2010, Patco filed a Motion for Summary Judgment [D. Ct. Docket No. 74] on Count I of its Second Amended Complaint. On that same day, the Bank cross-moved for summary judgment on the entirety of Patco's Second Amended Complaint [D. Ct. Docket No. 62]. On May 27, 2011, Magistrate Judge John H. Rich III filed a Recommended Decision on Cross-Motions for Summary

Judgment [Add. 1] (the "Recommended Decision" or "RD"), which recommended that the District Court grant the summary judgment of People's United and deny that of Patco.

Patco filed an Objection to the Recommended Decision on June 13, 2011 [D. Ct. Docket No. 122], and People's United responded to Patco's Objection on June 27, 2011 [D. Ct. Docket No. 126]. A hearing was held before the Honorable D. Brock Hornby on August 3, 2011 [D. Ct. Docket No. 132]. On August 4, 2011, the District Court issued an Order Affirming the Recommended Decision of the Magistrate Judge [Add. 71], which – with minimal discussion – granted the motion for summary judgment of People's United, denied Patco's motion for summary judgment, and mooted the Parties' other outstanding motions. Patco timely filed a Notice of Appeal on September 6, 2011 [D. Ct. Docket No. 135].

**STATEMENT OF FACTS**[1]

The facts pertinent to the District Court's decision are laid out in full in Patco's Statement of Undisputed Material Facts [App. 152], in its Opposing Statement of Material Facts and Statement of Additional Material Facts [App. 236], and in its Reply Statement of Material Facts [App. 391], all which are incorporated herein by reference, as well as in the Magistrate Judge's Recommended Decision [Add. 1]. Those facts are not restated herein except to provide the following brief summary.

Patco is a family-owned small business; it is a second generation commercial, industrial, and residential developer and contractor located in Sanford, Maine. RD at 4. Patco has been in business since 1985. *Id.* at 5. In that year, Patco began banking with Ocean Bank (then Ocean National Bank). *Id.* At the time, Ocean Bank was an independent southern Maine based community bank. *Id*. Ocean Bank was later acquired by the Chittenden family of banks, based in Burlington, Vermont. *Id.* Prior to the fraudulent withdrawals that are the subject of this dispute, the Chittenden banks including Ocean Bank were acquired by People's United, a large regional bank based in Bridgeport, Connecticut. *Id.* People's United operates a number of other banks including Maine Bank & Trust,

---

[1] Documents relating to the Bank's security procedures and the activity in Patco's account have been filed under seal in the Appendix, consistent with the approach used by the parties in the District Court.

5

where Patco also had an account in May of 2009. *Id.* Ocean Bank was a division of People's United at the time of the fraudulent withdrawals at issue in this case (People's United and Ocean Bank, collectively, the "Bank"). *Id.*

On Thursday, May 7, 2009, unknown third parties used stolen login credentials of one of Patco's employees to login to Patco's checking account at the Bank and initiate an ACH[2] payment order in the amount of $56,594 from Patco's account. RD at 36. The payment order was signficantly unlike Patco's ordinary transactions in many important ways. The payment was directed to the accounts of numerous individuals to whom Patco had never before transferred money.[3] *Id.* The perpetrators logged in from a computer that Patco had never before used, and which consequently was not recognized by the Bank's system. *Id.* The payment order originated from an Internet Protocol ("IP") address that Patco had never before used. *Id.* The amount of the payment order was significantly higher than the payments Patco ordinarily made to third parties. PSMF ¶ 59 [App. 160].[4]

As a result of the unusual characteristics of this transfer, the Bank's system flagged this transaction as uncharacteristic, highly suspicious, and potentially

---

[2] The Automated Clearing House or "ACH" network is an electronic network between financial institutions for the exchange of payment instructions on behalf of customers. Declaration of George F. Thomas ("Thomas Dec.") ¶ 6 [App. 138].

[3] Patco typically transferred funds only among its own accounts and to the same handful of employees. PSMF ¶¶ 9, 14 [App. 53–54].

[4] The Bank's denial of this Statement of Fact referenced transfers among Patco's own accounts, not payment orders to third parties. *See* Defendant's Opposing Statement of Material Facts ("DOSMF") ¶ 59 [App. 1124].

fraudulent. The Bank's risk scoring engine – which compared the characteristics of transactions to customers' ordinary transactions and generated a risk score between 0 and 1000, with higher numbers indicating riskier transactions – reported an unprecedentedly high risk score of 790. RD at 19, 36. By way of comparison, for the time period for which records are available, Patco's ordinary transactions generated risk scores never exceeding 214, and which ranged as low as 10. *Id.* at 36. RSA Security – the company that designed the security components of Ocean Bank's system – stated that any transaction triggering a risk score over 750 is a high-risk transaction, worthy of additional authentication. *Id.* at 19. Beyond the unprecedented risk score of 790, the Bank's risk-scoring system further reported that the device initiating the May 7, 2009 payment order was a "Very high risk non-authenticated device." *Id.* at 36. It reported that the transaction amount was "High risk." *Id.* It reported that, among other things, the IP address used was anomalous, meaning it was not an address from which Patco ordinarily – or, in this case, ever – initiated transactions. *Id.*; *see also* RD at 6 (noting that Patco always originated transactions from a single, static IP address). RSA Security cautioned that any transaction triggering the "Very high risk non-authenticated device" warning is a "*very high-risk* transaction." RD at 36 (emphasis added).

Armed with this substantial information that highly suspicious and potentially fraudulent transactions were being initiated on Patco's accounts, the

7

Bank could have done one of several things. Its personnel could have manually reviewed the transaction to determine whether it appeared legitimate, as they do today. RD at 33. It did not do so. The Bank could have called or emailed Patco to verify that the transactions were indeed authorized. *Id.* It did not. The Bank could have held off on processing the transactions until it received confirmation that Patco had indeed authorized the transfer of funds. *Id.* It did not.

Instead, the Bank did *nothing whatsoever*. The high risk score did not trigger any enhanced authentication. RD at 36–37. Bank personnel did not review this transaction or make any effort to determine its legitimacy. *Id.* The Bank provided no contemporaneous notice to Patco. *Id.* at 38. The Bank batched and processed the transaction as usual, and it was paid out of Patco's account the very next day. *Id.* at 37.

On Friday, May 8, 2009, unknown third parties again initiated an ACH payment order from Patco's account, this time for $115,620.26—over twice the amount of the previous day's transaction. RD at 37. As before, the perpetrators wired money to multiple individual accounts to whom Patco had never before sent funds. *Id.* The perpetrators again used a device that was not recognized by Ocean Bank's system. *Id.* The payment order again originated from an IP address that Patco had never before used. *Id.* The transaction was far larger than Patco's ordinary transactions to third parties. *Id.* Once again, despite these unusual

8

characteristics, the Bank took no action whatsoever. It batched and processed the transaction as usual, and paid it on Monday, May 11, 2009. *Id.* By this time, the Bank had had two opportunities to identify and take *some* action to forestall the fraud that was occurring on Patco's account. Twice the Bank's system had reported that highly unusual, potentially fraudulent transactions were being initiated on its account, and twice the Bank had taken no action whatsoever.

The Bank's inaction continued for most of the following week. On May 11, 12, and 13, unknown perpetrators again initiated fraudulent withdrawals on Patco's accounts, this time in the amounts of $99,068.00, $91,959.00, and $113,647.00, respectively. RD at 37. Like the prior fraudulent transactions, these transactions were uncharacteristic in that they sent money to numerous individuals to whom Patco had never before sent funds, were for far greater amounts than Patco's ordinary third-party transactions, were sent from computers that were not recognized by Ocean Bank's system, and originated from IP addresses that were not recognized as valid IP addresses of Patco. *Id.* As a result of these unusual characteristics, the transactions continued to generate risk scores that were far higher than usual. *Id.* at 38. For instance, the May 13, 2009 withdrawal generated a risk score of 785, well above the 750 that RSA Security warns is a "high risk" transaction. *Id.* The perpetrators' mere login on May 11, 2009 generated a risk score of 720. *Id.*; *cf. id.* at 36 (noting that the documents produced by the Bank

9

never show a risk score for Patco's legitimate transactions exceeding 214). Despite the unusually high scores, the Bank's system triggered no enhanced authentication, and the Bank took no action whatsoever. *Id.* at 38. The Bank's personnel did not review the transactions to determine their legitimacy or take any other action, and instead continued to process the transactions as usual. *Id.*

Patco did not receive any notice of the transfers for a full six days after the withdrawals began. RD at 38. Portions of the transfers, beginning with the first transfer initiated on May 7, 2009, were returned to the Bank because certain account numbers to which the perpetrators tried to transfer money were invalid. *Id.* As a result, the Bank sent routine return notices to the home of Mark Patterson, one of Patco's principals, via U.S. mail. *Id.* The first such notice arrived on the evening of May 13. *Id.* The next morning, on May 14, 2009, Patco immediately called the Bank to inform it that Patco had not authorized the transactions. *Id.* Also on the morning of May 14, 2009, the perpetrators initiated a further fraudulent transaction in the amount of $111,963.00. *Id.* at 38–39. Incredibly, the next day, the Bank initially processed this payment order even though Patco had already notified it of the fraudulent withdrawals. *Id.* at 39. The Bank subsequently was able to block a portion of this transaction, only thanks to Patco's prompt notification. *Id.*

At the end of the string of thefts, the amount of money fraudulently withdrawn from Patco's account totaled $588,851.26, of which $243,406.83 was subsequently blocked or recovered. RD at 39. This left Patco's total direct loss from the fraudulent withdrawals at $345,444.43.

The thefts could have been avoided. The Bank's system was designed to harness the power of the risk-scoring system and included a device identification system to trigger an additional layer of authentication – challenge questions – whenever the Bank's system detected unusual or suspicious transactions. RD at 17–19. In May of 2009, bank personnel did not monitor the risk-scoring reports, nor did the Bank conduct any other regular review of transactions that generated high risk scores. *Id.* at 32–33. Thus, the only result of a high risk score or an unidentified device was that a customer would be prompted to answer his or her challenge questions. *Id.* at 19.

Prior to the frauds at Patco, however, the Bank had made the unusual and misguided decision to trigger challenge questions on *every* ACH transaction, regardless of risk. RD at 24. In so doing, the Bank unwittingly created a major vulnerability in its system. For one, this configuration deprived the risk-scoring system of any functionality whatsoever. Furthermore, by asking the challenge questions on every ACH transaction, the Bank gave cyber criminals equipped with keyloggers – malicious software designed to capture the keystrokes of users when

11

entering information into banking websites – the ability to capture *all* information necessary to compromise an account *every time* the customer initiated an ACH transaction, which in Patco's case happened at least weekly. *See* Declaration of Sari Stern Greene ("Greene Dec.") ¶ 25 [App. 35]; Supplemental Declaration of Sari Stern Greene ("Greene Supp. Dec.") ¶¶ 2–3 [App. 224–25]. As will be discussed below, challenge questions should instead be asked selectively, when unusual or suspicious activity is detected, so that they are unlikely to be asked after a keylogger is installed on a customer's computer and before it can be removed. Under the Bank's system as it was configured in May of 2009, in the event a customer's computer became infected with a keylogger, it was virtually assured that the customer would be prompted to answer its challenge questions before the malware could be removed from the customer's computer, thus providing the perpetrator with virtually guaranteed access to the answers to those questions and the ability to compromise the customer's account at will. As discussed below, the Bank's misguided configuration therefore undermined the effectiveness of the challenge questions as an authentication security procedure, and created an unreasonable and unnecessary risk of loss on Patco's accounts.

## SUMMARY OF THE ARGUMENT

For several key reasons, the District Court erred in concluding as a matter of law that the Bank's security procedures were commercially reasonable within the meaning of Article 4A of the U.C.C.

First, the District Court failed to give sufficient consideration to the security implications of the Bank's decision to trigger challenge questions on every ACH transaction. In June 2008, when the Bank lowered the dollar amount rule trigger for ACH transactions from $100,000 to just $1 in one fell swoop, it undermined the effectiveness of the challenge questions as a security procedure. As the Bank and its security-system vendor recognized in several key pieces of documentary evidence, for challenge questions to be effective they must be asked selectively, when unusual or uncharacteristic activity is detected. Challenge questions that are always asked become little more than extensions of a customer's password and offer little or no additional protection. Moreover, the Bank's own expert opines that keylogging malware, which was the source of other frauds at the Bank prior to the one suffered by Patco, renders challenge questions ineffective as a security measure. If this is true, it was incumbent on the Bank to implement some other procedure reasonably tailored to address this widely known threat, such as manual reviews of suspect transactions. The Bank started manually reviewing suspect transactions *after* the loss suffered by Patco.

13

Second, contrary to the express direction of Article 4A, the Bank's security procedures did not take into account the circumstances of Patco that were known to the Bank. The transactions Patco initiated using the Bank's eBanking system were very predictable. Indeed, a core component of the system – the risk scoring engine –was specifically designed to monitor these transactions and provide an alert to the Bank, in the form of the elevated risk score, when a transaction appeared atypical and suspicious. *This in fact happened* with respect to the fraudulent withdrawals at issue in this case—the system registered unprecedentedly high risk scores on these transactions. Unfortunately, however, *the Bank ignored these warnings* over the course of several days. The District Court erred insofar as it found the Bank's security procedures to be commercially reasonable even though the Bank ignored these red flags provided by its own system.

Third, the District Court gave insufficient weight to the relatively haphazard manner in which the Bank went about making the important decision to lower the dollar amount rule trigger for ACH transactions from $100,000 to just $1. The Bank ignored the direction provided by the creator of the security system to change such rules slowly, in several stages, because the changes could have a powerful impact on security. Moreover, the Bank apparently was unaware until later in this litigation that the trigger had even been lowered from $100,000 to $1; instead, it thought the trigger had been set at $5,000 and was lowered to $1,000, which

14

simply was wrong. These facts do not hang with the picture of a Bank that was appropriately careful regarding its security procedures.

Fourth, the District Court overlooked the fact that the Bank, even after it became aware of other instances of fraud on its system involving keylogging malware that occurred in 2008, failed to implement other readily available security controls that were in wide use in the banking industry by May 2009, such as manual reviews of suspect transactions, tokens, and out-of-band authentication. In fact, *today* the Bank uses *all three* of these controls to supplement its challenge question system. Given the Bank's unorthodox choice to prompt challenge questions on *every* ACH transaction, its lack of other controls rendered its security procedures not commercially reasonable.

The District Court also erred in its conclusion that Patco had agreed to the use of all the security procedures touted by the Bank. Such agreement is a prerequisite to the Bank's ability to shift the risk of loss to Patco, its customer, under Article 4A. The District Court improperly concluded that Patco had agreed even to those security procedures that were *invisible to it* and of which it indisputably had no notice.

Finally, it was error for the District Court to conclude that Patco's common law counts premised on negligence, breach of contract and breach of fiduciary duty (Counts II-IV) were preempted by Article 4A.

15

**STANDARD OF REVIEW**

Whether a bank's security procedures are commercially reasonable is a question of law. 11 M.R.S.A. §4-1202(3); *see also Regatos v. N. Fork Bank*, 257 F. Supp. 2d 632, 646 (S.D.N.Y. 2003). Questions of law are reviewed by this Court *de novo. Miss. Public Employees' Ret. Sys. v. Boston Scientific Corp.*, 649 F.3d 5, 30 (1st Cir. 2011).

### A. The Applicable Statutory Standards Of U.C.C. Article 4A

Under the default rule of Article 4A of the U.C.C., the risk of loss from fraudulent payment orders is on the bank. 11 M.R.S.A. §4-1204; *Regatos*, 257 F. Supp. 2d at 640 ("[T]he default rule of the UCC is that the bank will bear the loss of any unauthorized funds transfer."). The bank may shift the risk of loss to the customer by demonstrating that a payment order was either: (1) authorized; or (2) verified pursuant to a commercially reasonable security procedure. *Id.* §4-1202.

A payment order is verified if the bank and the customer (i) agreed that the bank would use security procedures to verify the authenticity of payment orders; (ii) the bank implemented commercially reasonable security procedures; and (3) the bank accepted the payment order at issue in good faith and in compliance with the agreed-upon security procedures. *Id.* Under Article 4A, the "commercial reasonableness" of a security procedure is to be evaluated in light of "the circumstances of the customer known to the bank, *including the size, type and*

16

*frequency of payment orders normally issued by the customer* to the bank." 11 M.R.S.A. §4-1202(3) (emphasis added). The Court may also consider:

(1) "[T]he wishes of the customer expressed to the bank";

(2) "[A]lternative security procedures offered to the customer"; and

(3) "[S]ecurity procedures in general use by customers and receiving banks similarly situated."

11 M.R.S.A. §4-1202(3). If the bank fails to demonstrate that the payment order was either actually authorized or verified pursuant to a commercially reasonable security procedure, the bank must refund to the customer – with interest – any amounts retained to fund the fraudulent payment orders. 11 M.R.S.A. §4-1204.

The obligations of the bank to provide commercially reasonable security procedures to its customers cannot be varied by agreement, nor can the remedies that flow from the bank's failure to do so. 11 M.R.S.A. §4-1202(6). The bank therefore cannot contract away its obligation under Article 4A to provide commercially reasonable security procedures. *Id.*; *see also Grabowski v. Bank of Boston*, 997 F. Supp. 111, 120 (D. Mass. 1997) (recognizing that under Article 4A the "rights and obligations relating to authorized and verified payment orders 'may *not* be varied by agreement'") (emphasis in original).

17

## ARGUMENT

I. **The District Court Erred When It Determined That The Bank's Security Procedures Were Commercially Reasonable Under Article 4A of the UCC in May of 2009**

"It is apparent, in the light of hindsight, that the Bank's security procedures in May 2009 were not optimal." RD at 66. This was the Magistrate Judge's conclusion after reviewing the Bank's security procedures and considering their inability to prevent the frauds at issue in this case. The Magistrate Judge went on, however, to discount the significant vulnerabilities in the Bank's security procedures and their failure to safeguard Patco's funds, holding in effect that the Bank's system was *good enough* to pass muster under the commercial reasonableness standard. Patco respectfully contends that the District Court failed to give proper weight and consideration to the demonstrable flaws in the Bank's system, and therefore erred in concluding that the Bank's security procedures were commercially reasonable.

As Patco explained at length in the briefing on its motion for summary judgment and in response to the Bank's motion, by asking challenge questions on every ACH transaction, the Bank's system was highly vulnerable to keylogging malware, the likely culprit here. The proof of the ineffectiveness of the Bank's system is in the actual sequence of events in this case: the Bank sat idly by while significant frauds were perpetrated on Patco's account over the course of six full

18

days, while its system reported the highly suspicious nature of the transactions, yet while the Bank took *no* unusual steps to authenticate the transactions. The Bank's misguided configuration, combined with its failure to implement any other systems or policies to prevent unauthorized access, left Patco's commercial checking account at the Bank unreasonably susceptible to fraud by keylogging malware. The undisputed facts of this case thus demonstrate that the Bank should bear the loss under Article 4A of the UCC, and the District Court erred in holding otherwise.

### A. The Recommended Decision Failed Properly To Consider The Security Implications Of The Bank's Decision To Trigger Challenge Questions On Every ACH Transaction

The principal error in the District Court's decision was its determination that the Bank's security procedures were not adversely impacted by the Bank's decision to ask challenge questions – the Bank's central authentication security procedure – on every ACH transaction. RD at 64. As noted in the Recommended Decision, Ocean Bank's security procedures for authenticating online banking customers consisted of: a company ID and password, individual user IDs and passwords, and the so-called "Premium" authentication product by Jack Henry & Associates ("Jack Henry") which revolved around the use of challenge questions. RD at 13, 17–20; *see also* Defendant's Statement of Material Facts ("DSMF") ¶¶ 71, 74–77 [App. 446–47]. Jack Henry is a provider of computer systems and

services to financial institutions and provided the Bank with its Internet banking platform known as "NetTeller." RD at 13. Jack Henry did not design the authentication components of the NetTeller product. *Id.* at 16. Rather, the security components of the Bank's system were designed by Cyota, Inc., an RSA Security company (collectively, "RSA Security"), and integrated into the NetTeller product. *Id.* In May of 2009, it was virtually universally recognized, as it is today, that user IDs and passwords alone do not constitute sufficient authentication security for high-risk transactions. PSMF ¶ 85 [App. 164]; Greene Dec. ¶¶ 10–11 [App. 31]; FFIEC Guidance at 4 [App. 847]. On the Bank's system, as designed by RSA Security, the challenge questions – e.g., "what is your mother's maiden name?" – supplemented user IDs and passwords as an additional layer of authentication.

As the system was originally configured, challenge questions could be triggered in one of several ways. First, an invisible device ID / "device cookie" system identified the computer from which users attempted to initiate transactions, and triggered challenge questions if a user attempted to initiate transactions from an unrecognized device. RD at 19. Second, as noted above, the risk scoring engine continually monitored legitimate transactions and built a profile of customer behavior, then assigned a risk score to each instance of user activity on an account. *Id.* at 18–19. As originally configured, the system triggered challenge questions when the risk score for a particular login attempt or ACH transaction

exceeded a predefined threshold. *Id.* The triggering of challenge questions was the sole authentication function of these systems – they did not cause any other action to be taken to authenticate customers. *Id.* at 19.

By May of 2009, however, the Bank was no longer using either the device ID or the risk-scoring engine to trigger challenge questions with regard to ACH transactions. Instead, the Bank had configured its system to rely exclusively on a third trigger – so-called challenge-question "rules" set by the Bank. The Bank's system allowed it to implement and configure challenge-question "rules" that triggered challenge questions whenever a predefined condition occurred. RD at 20, ¶ 5 and n.44. One such rule was a dollar-amount rule, which triggered challenge questions every time an ACH transaction was initiated in an amount exceeding a predetermined sum, set by the Bank. *Id.* In August of 2007, seven months after the Bank began using the challenge-question system, a dollar-amount rule was implemented on the Bank's system. *Id.* at 23. The Bank initially configured that rule to trigger challenge questions every time an ACH transaction was initiated in an amount exceeding $100,000. *Id.* at 24; PSMF ¶ 41 [App. 158]. For amounts lower than $100,000, the device-ID and risk-scoring systems continued to trigger challenge questions as appropriate.

Prior to the frauds at issue, however, the Bank made a crucial miscalculation in the configuration of the system. In June of 2008, it reconfigured the dollar-

amount rule to trigger challenge questions on every ACH transaction that exceeded *just $1*. RD at 24. In practice, this was every transaction. *Id.*; PSMF ¶¶ 44–45 [App. 158]. The Bank testified that it made this change in response to increased fraud in the ACH network, and specifically "after the occurrence of ACH frauds at Ocean Bank that targeted low dollar amount ACH transactions" which the Bank believed might "fly under the radar" if not for the low dollar-amount rule.[5] Declaration of Jeffrey R. Tarte ("Tarte Dec.") ¶ 32 [App. 482]. As will be discussed below, the entire justification for the Bank's change was misplaced, because even low-dollar amount frauds were being recognized and challenged by the device ID and risk scoring systems, and thus were not in any way "flying under the radar." The change in the Bank's system did affect security, but not in the way the Bank intended: by asking challenge questions on every transaction, the Bank greatly increased the ability of cyber criminals equipped with keyloggers to compromise customer accounts at any dollar amount, and thus undermined the effectiveness of the challenge questions as a security procedure.

The problem with the Bank's configuration was as follows. Challenge questions increase security only when unauthorized users are prompted to answer questions they cannot correctly answer. Greene Supp. Dec. ¶ 2 [App. 224]. Challenge questions provide no additional security against a fraudster who knows

---

[5] The Bank testified that either keylogging malware or internal fraud at the Bank were the likely causes of the prior frauds. RD at 25.

the answers to those questions.[6] Thus, for challenge questions to offer effective security, they must be configured so as to minimize the chances that a fraudster will be able to steal the answers to the questions. *Id.* First and foremost, this is achieved by asking those questions *selectively*, and therefore infrequently. *Id.* ¶¶ 2–3. Theft of login information including challenge questions is frequently accomplished through keyloggers, a kind of malware (aka a computer virus) inserted onto computers of Internet users without their knowledge. Keyloggers record the users' keystrokes when inputting information into banking websites. *Id.* ¶ 2. In May of 2009, keyloggers were widely regarded as one of the predominant threats facing the online banking community. *Id.* Because a keylogger records everything the customer inputs through his or her computer, asking challenge questions of legitimate users actually *increases* the opportunities of a fraudster to compromise the answers to those questions, and therefore *decreases* the effectiveness of such questions as a security procedure. *Id.* Indeed, challenge questions that are asked on *every* transaction offer virtually no additional protection beyond a mere user ID and password, since they are both always asked, and therefore a cyber criminal equipped with a keylogger can readily capture all necessary login information – user IDs, passwords, and the answers to the challenge questions – on any given transaction. *Id.*

---

[6] The term "fraudster," though seemingly informal, is used here because it is a term commonly used in industry-wide discussions of cyber-fraud.

Instead, challenge questions should be asked selectively, when unusual or uncharacteristic activity is detected. Greene Supp. Dec. ¶ 3 [App. 224–35]. When configured in this manner, challenge questions are nearly always prompted when criminals attempt to initiate fraudulent transactions, but are very rarely prompted for legitimate users. *Id.* Thus, while a user whose computer is infected with a keylogger might surrender his or her user ID and password when logging in to a financial institution, the answers to the user's challenge questions would not be captured and the fraudster would be unable to proceed when prompted to answer those questions. *Id.* This is how the Bank's system, as originally configured, was designed to operate. *Id.*

Indeed, challenge questions increase security precisely because – when properly configured – they protect a customer in the event a fraudster gains access to the customer's user ID and password. Greene Supp. Dec. ¶ 3 [App. 224–35]. Compared to IDs and passwords alone, the primary advantage of challenge questions is not simply that they are one more piece of information the fraudster must have – as the Bank has repeatedly and over-simplistically asserted throughout this case – but rather that they constitute a piece of information the fraudster is *unlikely* to capture even in the event the fraudster is able to compromise the customer's other login information. *Id.* Thus, when challenge questions are prompted on every transaction, they lose their primary advantage because a

24

fraudster with the ability to compromise login credentials via a keylogger will always capture *all* such information. *Id.* Challenge questions that are always asked function no more than as a redundant second password, and offer no additional protection against keyloggers. *Id.* In May of 2009, it was virtually universally recognized – as it is today – that a system offering a level of protection no greater than user IDs and passwords alone was not commercially reasonable for high-risk transactions. PSMF ¶ 85 [App. 164]; Greene Dec. ¶¶ 10–11 [App. 31]; FFIEC Guidance at 4 [App. 847].

Indeed, the Bank's own documents – as well as those of Jack Henry and RSA Security – all categorically assert that legitimate users should be prompted to answer challenge questions *rarely*, in the context of unusual or suspicious transactions. *See, e.g.*, Greene Dec. ¶ 21 [App. 33–34] and Exhibit 3 thereto [App. 56]. For instance, a document created by the Bank to explain its new security system contained numerous statements to this effect, including: (1) "The new security may – *very infrequently* – prompt you to verify your identity before continuing"; (2) "[Y]ou will only be asked for more information when unusual or uncharacteristic behavior is detected. *This should be a very rare occurrence*"; and (3) "If we detect any activity that does not seem like your typical behavior, we will prompt you to verify your identity . . . . This will only happen on rare occasions." Greene Dec. Exh. 3 [App. 56]. In a document provided to the Bank by Jack Henry

entitled "Best Practices for Financial Institutions Deploying Strong Authentication," Jack Henry states: "We expect *less than 1% of transactions* will receive the highest authentication [i.e. challenge questions]." Greene Dec. ¶ 21(d) and Exh. 8 [App. 95] (emphasis added). RSA security itself – the company that designed the security components of Jack Henry's system – emphasized the importance of asking challenge questions selectively *for security purposes*. For instance, an RSA Product Data Sheet on the challenge-question system expressly stated: "Due to the risk-based nature of the challenge, customers are very seldom requested to provide answers to their challenge questions. This approach significantly increases the protection and effectiveness of the challenge questions method as it makes it more difficult to 'phish' the customer." Greene Second Supp. Dec. ¶ 2 and Exh. 1 [App. 383, 386] (emphasis added).

For its part, the Bank has never produced a single piece of documentary evidence that stands for the proposition that challenge questions are no less secure when asked on every transaction. Nor has the Bank ever produced a single shred of evidence from RSA Security that agrees with its conclusory assertion that challenge questions provide effective security when asked on every transaction. This absence is striking.

This has not stopped the Bank from repeatedly attempting to justify its decision to lower the dollar-amount threshold by arguing that challenge questions

are no less secure when always asked. *See, e.g.*, Declaration of Peter A. Makohon ("Makohon Dec.") ¶ 24 [App. 606]. The crux of the Bank's argument is its assertion that once a keylogger is installed on a system, it will capture the answers to challenge questions the next time they are prompted, no matter when such a prompt occurs, and thus the system will at some point be compromised. *Id.* This gross oversimplification obscures a simple reality and in fact proves Patco's point.

The Bank apparently believes there is no security advantage to be gained from delaying a fraudster's ability to compromise an account for months, years, or even indefinitely. The Bank fails to acknowledge is that once malware is installed onto a computer, it does not forever after necessarily *remain* on that computer. Patco, for instance, like most computer users in the world today, runs anti-virus software on its computers which is specifically designed to identify and eradicate viruses and malware – which could include banking Trojans – from its computers. *See* Greene Supp. Dec. ¶¶ 4–6 [App. 225]; POSMF ¶¶ 237–38 [App. 324] (responses to DSMF ¶¶ 237–38). Patco's employee responsible for IT, Jonathan Bell, testified that he personally updated Patco's anti-virus software on a regular basis. *Id.* ¶ 237. Mr. Bell checked for anti-virus updates weekly, and applied those updates when they were available. *Id*. ¶ 238. Patco, like many computer users, thus took the measures necessary to find and eradicate malware from its machines. If malware is removed from a machine before a legitimate user is prompted to

answer challenge questions, no fraud can be perpetuated on the system.[7] When such prompts occur only rarely, as they are intended, the likelihood that malware will be removed from a machine before the legitimate user is prompted to answer his or her challenge questions is greatly increased. Greene Supp. Dec. ¶¶ 4–6 [App. 225].

The Bank's own expert stated that a "banking Trojan, once present on a victim machine, makes the use of security challenge questions ineffective, as the answers are typically captured by the banking Trojan's keylogger functionality, and will continue to be captured *until the malware is removed from the system*." Makohon Dec. ¶ 25 [App. 607]. This proves Patco's point. Mr. Makohon recognizes that malware will likely at some point be removed from the machine in question, and that the answers to a user's challenge questions will be compromised if they are asked prior to this point. By configuring challenge questions to be asked *every time* a customer initiates a transaction, therefore, the Bank virtually

---

[7] Furthermore, as Patco has repeatedly argued, delaying the fraudster may prevent fraud against the Bank's customers in other ways. Greene Supp. Dec. ¶ 6 [App. 225]. For instance, a customer might replace or reformat the compromised machine before the challenge questions are triggered. *Id.* Fraudsters might be hindered by law enforcement authorities before they are able to compromise the customer's account. *Id.* The fraudster may not actually access and utilize stolen login information where months or years have elapsed since the time of the initial infection of the customer's computer and the triggering of the challenge questions. *Id.* The Bank's configuration allowed for none of these possibilities.

guaranteed that challenge questions would be asked before the malware was removed, and thus that the answers to those questions would be compromised.

Indeed, the above quote by Mr. Makohon demonstrates the Bank's ironic but critical assertion, repeated throughout this case, that challenge questions *are not effective security against keylogging malware*. *See* Makohon Dec. ¶ 25 [App. 607] ("[a] banking Trojan . . . makes the use of security challenge questions ineffective"); Defendant's Opposition to S/J Motion at 23–24 [App. 909–10] (noting that the system would have been compromised even with a higher dollar amount rule). In light of this key concession by the Bank, the District Court's finding that the Bank's exclusive reliance on challenge questions was nevertheless commercially reasonable is simply unsupportable, given the Bank's misguided configuration thereof.

To wit, the District Court found that there were seven authentication security procedures utilized by Ocean Bank: (1) user IDs and passwords; (2) challenge questions; (3) risk profiling; (4) the device ID system / device cookies; (5) the dollar-amount rule; (6) a subscription to RSA's eFraud Network; and (7) the ability to review reports. RD at 17–20. As the District Court noted, procedures 3, 4 and 5 served only to trigger challenge questions on selected high-risk transactions, therefore each of these procedures ceased to have any function when the Bank configured its system to ask challenge questions on *every* ACH transaction,

29

regardless of risk.  *Id.*  Similarly, procedure 7 was not utilized by the Bank as an authentication security procedure in May of 2009, as the Bank was not then reviewing reports of suspicious activity as it does today.  RD at 32–33.

The sixth procedure listed by the Court, the eFraud Network, worked in the background to block transactions that had IP addresses or other characteristics known to be associated with prior instances of fraud.  RD at 20.  However, the Bank presented *no* information to the District Court regarding the effectiveness of the eFraud Network, such as the number of transactions that have in fact been blocked by it, or the frequency with which perpetrators actually use the same IP address in more than one instance of fraud.  Indeed, as the Bank recognizes, IP addresses are readily "spoofed," meaning that fraudsters can conceal the actual address from which they are operating and have done so since at least 2005.  Makohon Dec. ¶ 20 [App. 604] (noting that IP blocking controls have repeatedly been bypassed); FFIEC Guidance at 12 [App. 855] (IP addresses have been spoofed since at least 2005, the date of the FFIEC Guidance).  Thus, there was no information in the District Court's record to support a conclusion that the Bank's security procedures were commercially reasonable because of its subscription to the eFraud Network.

In sum, the Bank's authentication security procedures in May of 2009 consisted of:   (1) user IDs and passwords, which are widely regarded as

30

insufficient, without more, for high-risk transactions; (2) the challenge questions, which the Bank and its expert affirmatively assert are "ineffective" security against keyloggers, a predominant threat facing the online banking community (Makohon Dec. ¶ 25 [App. 607]; Greene Supp. Dec. ¶ 2 [App. 224]); and (3) the eFraud Network, the effectiveness of which is speculative at best (*see* RD at 20). If the Bank truly believed that challenge questions were ineffective against keyloggers, it had a responsibility to implement some other procedure reasonably tailored to address this threat, such as by conducting manual reviews of suspect transactions. *See* FFIEC Guidance at 1 [App. 844] (noting that banks should used effective authentication methods that are appropriate to the risks associated with Internet banking); *cf.* Makohon Dec. ¶ 25 [App. 607] ("[a] banking Trojan . . . makes the use of security challenge questions ineffective"). On this showing, however, there was no firm basis for the District Court to decide that the Bank's security procedures were commercially reasonable.

The District Court based its determination primarily on two factors: (1) that Jack Henry's system *permitted* its bank customers to set the Dollar Amount Rule at any level; and (2) that even at settings of up to $16,000, the Dollar Amount Rule would still have prompted Patco to answer challenge questions on many transactions. RD at 64–65. For the reasons discussed below, the District Court

31

erred in concluding that either of these factors render the Bank's security procedures commercially reasonable.

Regarding the former, the District Court appears to have accepted Jack Henry's self-serving and unsubstantiated statement – to the exclusion of substantial, documentary evidence to the contrary – that *any* configuration would result in effective operation of its challenge-question system. RD at 64. Jack Henry went so far as to state that the modification of the dollar-amount rule was purely a matter of business discretion, with no impact on security. Declaration of Debra Edwards ¶ 26 [App. 641]. For all the reasons discussed above, these assertions are insupportable. Moreover, they were directly contradicted by statements from RSA Security itself. For instance, an RSA Rules Management User Guide, which discussed the use of rules such as the dollar-amount rule, included the following prominent warning:

> **Warning:** Decision rules must be edited **carefully**, slowly, with great caution. These rules are very powerful, directly affecting the customer experience of genuine users *as well as playing a major role in fraud prevention.*

Greene Dec. ¶ 24 [App. 34] (italics added; bold in original). Even more damaging to the Bank's position is the aforementioned statement in an RSA product data sheet regarding the challenge question system, which unambiguously stated under the heading "Minimal Exposure," that "[d]ue to the risk-based nature of the

32

challenge, customers are very seldom requested to provide answers to their challenge questions. This approach *significantly increases the protection and effectiveness of the challenge questions method* as it makes it more difficult to 'phish' the customer." Greene Second Supp. Dec. ¶ 2 and Exh. 1 [App. 383, 386] (emphasis added). RSA further stated that a rule that was "triggered indiscriminately" – like the Bank's configuration of the dollar-amount rule here – was a "bad rule" that could be "discarded and deleted at once." Greene Dec. ¶ 24 [App. 34]. Jack Henry itself promoted challenge questions in its marketing materials as an "additional authentication method *used when transaction appears risky."* *Id.* ¶ 21(b) [App. 33]. As noted above, Jack Henry further stated that it expected that "*less than 1%* of transactions will receive the highest authentication [i.e. challenge questions]." *Id.* ¶ 21(d) [App 34].[8]

Indeed, the Bank repeatedly contradicted *itself* on this point. Besides its numerous prior statements that challenge questions should be asked infrequently, discussed earlier, the Bank testified in the context of this case that it lowered the dollar-amount rule *for security purposes*, in response to alleged low-dollar amount frauds on its system. RD at 65; DSMF ¶¶ 101, 104–05 [App. 451–52].

---

[8] Numerous other statements by the Bank, by Jack Henry, and by RSA Security, all standing for the proposition that challenge questions should be asked infrequently, are discussed in Sari Greene's various Declarations. *See* Greene Dec. ¶¶ 21, 24 [App. 33–35]; Greene Supp. Dec. ¶ 15 [App. 228–29]; Greene Second Supp. Dec. ¶ 2 [App. 383].

Furthermore, the Bank argued that it initially chose the $100,000 setting for the dollar-amount rule in part for security reasons, in response to "current information regarding ACH fraud known in the banking industry at that time . . . ." *Id.* ¶ 101 [App. 451]. The Bank's decision to alter the dollar-amount rule for security purposes cannot be squared with its simultaneous assertion that the particular setting of the Dollar Amount Rule is purely a matter of business discretion, with *no* impact on security. For these reasons, as well as all those discussed above, the District Court's reliance on the fact that Jack Henry's system merely *allowed* the Bank to set the dollar-amount threshold at any level was misplaced.[9]

The District Court's second rationale for finding the Bank's configuration of the dollar amount rule to be commercially reasonable was its conclusion that:

> [T]he premise that the adjustment in question materially altered the properties of the Premium Product security system is flawed. As the Bank argues, even if the Dollar Amount Rule had been set at the Jack Henry default of $1,000, or, for that matter, $16,000, Patco still would have been prompted on most of the occasions on which it made ACH transfers to answer challenge questions, providing virtually the same level of opportunity for

---

[9] Furthermore, Patco's expert – who advises numerous community banks throughout New England on their security procedures – testified that she was not aware of any other banks that had configured their system to prompt challenge questions on every transaction. Greene Supp. Dec. ¶ 33 [App. 234]. The Bank's own expert himself testified that while $700 billion Wachovia utilized challenge questions, that bank did not utilize *any* dollar-amount threshold to trigger those questions on its system. Makohon Depo. at 221:8–12 [App. 825]. Rather, Wachovia's challenge questions were triggered selectively, when unusual activity was detected. *Id.* at 220:4–9 [App. 824].

interception of its answers to challenge questions as when the threshold was set at $1.

RD at 65. This reasoning is flawed, inasmuch as it assumes that $1,000 and $16,000 are appropriate settings for the dollar-amount rule. The Bank has wholly failed to demonstrate that these are appropriate thresholds at which to trigger challenge questions. Indeed, as soon as Jack Henry rolled out the Dollar Amount Rule to customers in August 2007, the Bank *immediately* raised the Dollar Amount Rule to $100,000. RD at 23–24; Greene Dec. ¶ 22 [App. 34]. At that time, the Bank determined that $100,000 was the appropriate trigger. RD at 24. The arbitrary suggestion of a hypothetical $16,000 setting for the Dollar Amount Rule was proffered by the Bank in its motion papers, and appears to be based simply on the fact that the majority of Patco's ACH transactions between February and May of 2009 exceeded that amount. *See* Defendant's Additional SMF ¶ 6 [App. 1149] (noting that seven of Patco's twelve ACH transactions during this time exceeded $16,000, while only four exceeded $24,000). The Bank chose this number because it was convenient for its argument, not because it has any significance from a security perspective. The District Court erred in placing so much reliance on this hypothetical proposition, because it is without any real significance.

Indeed, the hypothetical $16,000 setting is far lower than the *actual* $100,000 setting chosen by the Bank as the appropriate setting in August of 2007. The Bank can point to only one legitimate transaction by Patco between February

and May of 2009 that would have exceeded a $100,000 threshold.[10] Defendant's Additional SMF ¶ 7 [App. 1149]. This transaction occurred on March 3, 2009, over two months prior to the unauthorized withdrawals.[11] *Id.* The lack of high dollar-amount transactions during this time illustrates Patco's point – without the unreasonably low setting for the Dollar Amount Rule, the challenge questions would not have been triggered on Patco's account for months or longer at a time. Until one of Patco's legitimate transactions again triggered the challenge questions – which, in the Bank's own words, should be a "very rare occurrence" – there would be no way for a perpetrator to compromise Patco's account.[12]

The above discussion demonstrates another critical point. The Bank has wholly failed to explain how it was commercially reasonable to implement a one-size-fits-all setting of the dollar-amount rule in the first instance. *See* Greene

---

[10] Importantly, this was a transfer of funds among Patco's own accounts, not a transfer to third parties. *See* Defendant's Additional SMF ¶ 7 [App. 1149]. The Bank expressly recommended that Patco accomplish large transfers among its accounts in this manner, via ACH. PSMF ¶¶ 101–02 [App. 165].

[11] The District Court mistakenly stated that this transaction occurred on *May* 3, 2009, just a few days before the fraudulent withdrawals from Patco's account. RD at 35. It did not, it occurred on *March* 3, 2009, over two months before the unauthorized withdrawals. Defendant's Additional SMF ¶ 7 [App. 1149].

[12] To the extent the District Court suggests it was Patco's burden to prove the level at which the Bank should have set the threshold and its proper temporal duration, *see* Recommended Decision at 65–66, this improperly would shift the burden of proof to Patco. *Cf.* 11 M.R.S.A. § 4-1203 cmt. 3 ("The burden of making available commercially reasonable security procedures is imposed on receiving banks . . . ."). More to the point, however, Patco has never criticized the $100,000 setting for the dollar-amount rule. If the Bank had retained the $100,000 threshold, Patco would not likely be before the Court today.

Second Supp. Dec. ¶ 3 [App. 383–84]; *cf.* 11 M.R.S.A. §4-1202(3) (noting that security procedures should take into account "the circumstances of the customer . . . including the size, type and frequency of payment orders normally issued by the customer to the bank"). The Bank's insistence on a singular, generic dollar-amount rule, without any differentiation based on the nature of the transactions ordinarily initiated by customers, runs counter to the express direction of Article 4A.[13] *Cf.* 11 M.R.S.A. §4-1202(3).

In this regard, it should be noted that prior to August of 2007, there was *no* Dollar Amount Rule in effect on the Bank's system. PSMF ¶ 42 [App. 158]. The Bank has not set forth a compelling reason that a dollar-amount rule on Patco's account was appropriate in the first instance, particularly considering that the transaction-monitoring system already took transaction amount into account in any

---

[13] The District Court also referred to the fact that Patco's data security expert, Sari Greene, initially told Patco in an email dated May 26, 2009 – the same day she had been formally retained by Patco to advise it on IT issues in the aftermath of the fraudulent withdrawals – that the Bank's security seemed to conform to generally accepted banking practices. RD at 64; Greene Supp. Decl. ¶¶ 29–30 [App. 233]. As Ms. Greene explained, however, she made that statement at a time when she had conducted only a very preliminary and cursory review of the Bank's security procedures, and when she was not yet aware of critical details of those procedures including the Bank's configuration of its challenge-question system. Greene Supp. Decl. ¶¶ 29–30 [App. 233]. Ms. Greene's views changed significantly once she gained specific information about the underlying technical characteristics of the Bank's authentication security procedures, particularly its configuration of the dollar-amount rule. *Id.* Placed in proper context, Ms. Greene's first-blush statement is not a significant consideration in this case.

event.  *See, e.g.*, RD at 36 (noting that the transaction monitoring system reported that the May 7, 2009 transaction was for a "High risk transaction amount").

A further basis on which the Bank attempted to justify its decision to lower the dollar-amount threshold was its alleged concern that, without such a threshold, frauds in low dollar amounts might "fly under the radar."  Makohon Dec. ¶ 23 [App. 606].  The Bank's argument is completely unfounded because the transactions to which the Bank refers, despite their low dollar amounts, nevertheless triggered the challenge questions as a result of the device ID and profiling systems, and thus were not in fact "flying under the radar."  Greene Supp. Dec. ¶ 7 [App. 226]; Patco's Additional SMF ¶ 3 [App. 331; response at App. 1166].  The Bank's system recognized these transactions as unusual and challenged them appropriately, as it was designed to do.  *Id.*

The Bank's other justifications for lowering the dollar-amount threshold similarly fail. Mr. Makohon, to support his erroneous argument that asking challenge questions on every transaction is no less secure than asking them selectively, simplistically analogizes the Bank's security system to an "obstacle course" that is made more difficult by the mere addition of more obstacles. *See* Makohon Dec. ¶ 24 [App. 606].  This rudimentary analogy is inapt, because challenge questions as a hurdle offer little or no additional security if the fraudster already knows – because he is able to capture – the answers to those questions.

38

Greene Supp. Dec. ¶ 8 [App. 226]. Effective security is achieved only when appropriate attention is given to ensuring the *integrity* of security procedures, such that the obstacles employed – no matter the number – actually succeed in obstructing the fraudster. *Id.* In the context of challenge questions, this necessarily includes minimizing the fraudster's opportunity to compromise those questions through the use of keyloggers. *Id.* Unfortunately, in this case, the Bank did precisely the opposite.[14] *Id.*

Similarly, it was error for the Magistrate Judge to conclude that the Bank's system incorporated "multifactor" authentication in any meaningful way in May of 2009. RD at 63 (discussing multifactor authentication); *cf.* Greene Dec. ¶¶ 13, 17–18 [App. 31–33]; Greene Supp. Dec. ¶¶ 12–13 [App. 227–28]. The Magistrate Judge stated that the system employed by the Bank was "a multifactor authentication system, relying on at least two factors: something the user knows (ID and password) and something the user has (device identification specific to the user's personal computer and its use of the bank's application)." RD at 63. However, as already discussed, the alleged second factor – the device identification system – operated only as a trigger for the challenge questions. The Bank rendered that factor useless when it configured its system to prompt challenge questions on

---

[14] Furthermore, asking challenge questions on every transaction did not *add* any hurdle to the system. The hurdle already existed, it was simply configured in such a way as to differentiate between legitimate users and fraudsters, and challenge only the latter. Greene Supp. Dec. ¶ 8 [App. 226].

every ACH transaction regardless of the outcome of the device ID system.[15]

PSMF ¶¶ 38, 44–45 [App. 157–58]; Greene Decl. ¶¶ 18, 25, 32 [App. 32, 35, 36]; Greene Supp. Decl. ¶ 13–14 [App. 228].

In short, the District Court erred in determining that the Bank's decision to ask challenge questions on every ACH transaction did not materially undermine security on Patco's accounts. In this regard, Patco urges the Court to compare the declarations of the Parties' respective experts in this case. While those of Patco's expert are thoroughly reasoned and logically sound, those of the Bank's expert do not bear scrutiny.[16]

---

[15] The Magistrate Judge's reliance on the device ID system as an additional factor is particularly misplaced considering that, as noted above, the fraudulent withdrawals at issue were initiated from entirely new devices never before used by Patco, and yet in response the Bank's system triggered no additional authentication. *See* RD at 37–37.

[16] The Magistrate Judge also erred in stating that the imprudently high ACH limit set by the Bank on Patco's account has "no bearing on the instant analysis" because it is not a security procedure under Article 4A. RD at 57, n.132. First, ACH limits place a control on the amount of funds that can be transferred out of an account by unauthorized parties, and therefore ACH limits that are set at an appropriate level for a customer *are* a security procedure in that they are one method of verifying that a payment order is that of a customer, since fraudsters will often initiate transactions for unusually high amounts as they did here. 11 M.R.S.A. § 4-1201; Thomas Decl. ¶ 11 [App. 139]; PSMF ¶¶ 59, 66, 70, 72 [App. 160–62]. Second, Patco introduced evidence that, among other things: (1) the Bank set Patco's ACH limit at an imprudently high level; (2) the Bank expressly recommended that Patco accomplish large transfers among its accounts via ACH, thereby necessitating the high limit; and (3) the Bank failed to warn Patco of possible risks of raising the ACH limit. Thomas Decl. ¶¶ 10–11 [App. 138–39]; Patco's S/J Motion at 26–27, n.37 [D. Ct. Docket No. 74]. Given that Patco was left with an imprudently high potential exposure to ACH fraud as a result, the

**B. The Bank's Security Procedures Did Not Take Into Account The Circumstances Of Patco Known To The Bank, Contrary To The Express Direction Of Article 4A**

As noted above, Article 4A expressly directs the Court to consider commercial reasonableness in light of the "circumstances of the customer known to the bank, including the size, type and frequency of payment orders normally issued by the customer to the bank." 11 M.R.S.A. § 4-1202(3); Patco's S/J Motion at 23 [D. Ct. Docket No. 74]. The Bank completely failed to consider the known circumstances of Patco here. The transactions Patco initiated using eBanking were very predictable. Patco used eBanking primarily to make payroll payments to certain employees through the ACH network. *Id.* at 5–6. These payroll payments were typically made weekly, generally on Fridays. *Id.* at 5; PSMF ¶ 10 [App. 153]. The highest payroll transaction Patco ever made using eBanking was $36,634.74. PSMF ¶ 11 [App. 153]. These transactions were always initiated from one of several computers housed at Patco's offices in Sanford, Maine, and originated from a single static IP address. RD at 6.

Prior to May of 2009, Patco also used eBanking to move money among accounts it owned. Primarily, Patco would transfer money from its accounts at Maine Bank & Trust – also an affiliate of People's United – into its Ocean Bank

Court can and should consider the ACH limit when determining whether the other security procedures employed by the Bank were commercially reasonable. *See* 11 M.R.S.A. § 4-1202(3).

checking account. RD at 6; PSMF ¶ 14 [App. 154]. These transactions almost always transferred money *into* Patco's account at Ocean Bank, as opposed to transferring money out of Patco's Ocean Bank account. *Id.* ¶ 15. The Bank expressly recommended that Patco accomplish these transfers in this manner. PSMF ¶ 101–02 [App. 165].

Contrary to the plain text of Article 4A, the Bank configured its system such that it *ignored* these very predictable characteristics of Patco's ordinary payment orders, and therefore missed a critical opportunity to prevent the frauds at issue. The Bank had the capability to take Patco's ordinary circumstances into account; in fact, its system was expressly *designed* to do so. As noted above, a core component of the Bank's eBanking system was the risk-scoring module which compared data on customers' use of eBanking to a profile of the user based on his past behavior, and assigned a risk score to every transaction. RD at 18–19. For the entire period of time for which records exist in this case, Patco's legitimate transactions never produced a risk score in excess of 214. RD at 36. They ranged as low as 10. *Id.* RSA Security, the company that designed the security components of the Bank's system, considers any transaction generating a risk score

over 750 to be a high-risk transaction, worthy of additional authentication.[17] *Id.* ¶ 35.

When the first unauthorized withdrawal was initiated on Patco's account, the Bank's system reported an unprecedented risk score of *790.* RD at 36. The Bank's system reported that the device initiating the transaction was a "*Very high risk* non-authenticated device," that the transaction amount was "*High risk*," that the IP address used was anomalous, and that the cookie age was suspicious. *Id.* These risk scores and warnings are not surprising considering that the fraudulent withdrawals: (1) originated from computers Patco had never before used, and from IP addresses that were not Patco's ordinary IP address; (2) sent funds to numerous new ACH payee accounts, to which Patco had never before transferred funds; (3) were initiated on multiple consecutive days, as opposed to weekly or periodically like Patco's ordinary transactions; and (4) were for uncharacteristically high dollar amounts. RD at 36–38; Greene Supp. Dec. ¶ 27 [App. 232]. In fact, the perpetrators of the fraud in this case created *thirty five* new ACH payee accounts for these fraudulent transactions, to which Patco had never before transferred funds. Greene Supp. Dec. ¶ 27 [App. 232]; *see also* McDowell Dec. at Exh. 2 [App. 148] (email attaching listing of thirty-five payee accounts). Despite the high risk scores and unusual characteristics of the fraudulent payment orders, no

---

[17] Indeed, the Bank's challenge questions were originally configured to be triggered any time the risk score for a transaction exceeded 750. RD at 19.

eyebrows were raised at the Bank, and the Bank took *no* unusual action to authenticate the transactions or determine whether they were in fact authorized by Patco. The Bank batched and processed the payment orders as normal over the course of five days.

The Bank's failure to take *any* action in the face of transactions that were entirely uncharacteristic in their size, frequency, location of origination, and payees – particularly where the Bank was equipped to consider such characteristics but failed to do so – demonstrates that the Bank's security procedures failed to abide by Article 4A's plain mandate. *See* 11 M.R.S.A. § 4-1202(3). The District Court erred inasmuch as it found the Bank's security procedures to be commercially reasonable despite the fact that the Bank completely ignored the suspect characteristics of the transactions at issue.

### C. The District Court Failed To Consider That The Bank Made Configuration Decisions On Patco's Accounts In A Haphazard Manner

The District Court appears to take the view that the Bank's security procedures were implemented and configured with reasonable care and attention by the Bank. *See* RD at 63 ("The Jack Henry Premium Product was the result of a careful effort at compliance with the 2005 FFIEC Guidance."). This is incorrect, as the undisputed evidence in this case shows that the Bank made crucial configuration decisions in a decidedly haphazard manner.

As Patco noted in its motion papers, the Bank did not consult any outside Internet-security professionals in deciding to lower the Dollar Amount Rule to $1, nor did Jack Henry or RSA Security recommend that the Bank set the threshold so low.[18] RD at 24. Instead, that decision was left to Kim Maxwell, a manager in People's United Bank's cash management department, rather than anyone in its information technology or security departments. PSMF ¶ 47 [App. 158]. When deposed, Ms. Maxwell, who was *designated by the Bank* to testify on the subject, could not even properly remember at what level she had set the threshold for challenge questions to be triggered. Maxwell Depo., at 139:22–25, 142:8–9, 143:2–21 [App. 187–88]; Patco's S/J Motion at 22 [D. Ct. Docket No. 74]. Ms. Maxwell and other bank employees repeatedly testified that prior to May of 2009, the Bank had lowered the Dollar Amount Rule from $5,000 to $1,000, and that in May of 2009 the threshold remained set at $1,000. Maxwell Depo., 139:22–25, 142:8–9, 143:2–21 [App. 187–88]; Tarte Depo. at 38:20–39:3 [App. 375–76]. This simply was not true. The dollar amount threshold had *never* been set to $5,000, and in May of 2009 the system was configured to ask challenge questions

---

[18] In fact, the Bank ignored RSA Security's instruction that decision rules be "added or edited slowly, in several stages . . . through multiple off-line design-test-production cycles, with gradual introduction of a new rule into full production mode." Greene Dec. Exh. 11 [App. 111]. The Bank simply lowered the Dollar Amount Rule from $100,000 to $1 in one fell swoop, on June 6, 2008. PSMF ¶ 43 [App. 158].

every time a transaction exceeded just \$1, not \$1,000.[19]  RD at 24; Maxwell Continued Depo. at 19:20–20:4 [App 378].  Considering the central importance of the challenge questions to the Bank's overall security procedures, the Bank's ignorance of its security settings so soon after crucial configuration decisions were made is remarkable.

### D. The Bank Should Have Manually Reviewed Suspect Transactions And Implemented Other Controls In May Of 2009, But Failed To Do So

The District Court correctly acknowledged that "the Bank's security procedures in May 2009 were not optimal."  RD at 66–67.  The District Court then went on to examine other security controls discussed by Patco – manual reviews of suspect transactions, tokens, and out-of-band authentication – and concluded that the use of these other systems "would have improved the security of the Bank's system and might have minimized the loss that occurred in May 2009 . . . ."  *Id.* at 66 (emphasis added).  However, the District Court then concluded that, "in so arguing, Patco in effect demands that Ocean Bank have adopted the best security procedures then available.  As the Bank observes . . . that is not the law."  *Id.* at 66–67.  In this respect, the District Court erred.

---

[19] Ms. Maxwell recanted her testimony when presented with documents from her own department demonstrating the actual settings of the Dollar Amount Rule, which were produced by the Bank only late in discovery.  Maxwell Cont. Depo., 19:20-20:4 [App. 378].

For one, Patco never argued that the Bank needed to adopt each of the above security procedures in order to have a commercially reasonable system. *See* Patco's S/J Motion at 27–31 [D. Ct. Docket No. 74]; Patco's Reply at 5–6 [D. Ct. Docket No. 109]. Rather, Patco's point was simply that each of these other controls were widely available, could have been implemented by the Bank, and any one of them would have helped to mitigate the unreasonable risk of fraud that was created by the Bank's unusual and misguided configuration of its dollar-amount rule. It was the Bank's misguided configuration of its challenge-question system – *combined with* the lack of any of these other controls – that rendered the Bank's security procedures commercially unreasonable in this instance.

As Patco argued in its motion for summary judgment, the Bank decided to rely on challenge questions *to the exclusion* of these other controls. Given the greater susceptibility of challenge questions to keylogging and similar attacks, it was of particular importance that the Bank configure its challenge-question security procedures appropriately to ensure Patco's funds were adequately safeguarded. It failed to do so, and further failed to offer any of the additional controls discussed above that would have offered significantly greater protection against the kind of fraud experienced by Patco in this case. Even after the Bank became aware of other instances of fraud on its system that occurred in 2008, it

failed to take any action to implement other controls on its system. RD at 32–34; PSMF ¶¶ 86–87, 92–94 [App. 164].

Indeed, as Patco's expert noted, manual reviews of suspect transactions had become a common practice in the banking industry by May of 2009. Greene Supp. Dec. ¶ 26 [App. 232]. The Bank had the ability to conduct manual reviews of suspect transactions through its system's reporting functions. RD at 32–33. Importantly, after the fraud at Patco occurred, the Bank began conducting such reviews. *Id.* at 33. Now, transactions that generate high risk scores are personally reviewed by Bank personnel to determine their legitimacy. *Id.* If the Bank cannot verify a transaction, the Bank will call the customer before it is processed. *Id.* Had the Bank conducted such reviews in May of 2009, it quickly would have noticed the unusual characteristics of the fraudulent withdrawals at issue. Greene Supp. Dec. ¶ 26 [App. 232].

Patco's expert further testified that of the three clients she had using the Jack Henry NetTeller product prior to May of 2009, each also employed manual reviews or an out-of-band technique as an additional security measure. Greene Supp. Dec. ¶ 33. As far back as 2005, RSA Security cautioned against the use of challenge questions alone to the exclusion of any other controls like out-of-band authentication, stating that challenge questions were "quicker and simpler to adopt" but were "less secure," and should be used only "in the short term, as the

48

first phase of a full project . . . ." Greene Dec. ¶ 36 and Exh. 6 [App. 37, 79].

Indeed, it is highly relevant that the Bank now utilizes all three of the controls

discussed by Patco – tokens, manual reviews of suspect transactions, and out-of-

band authentication – to supplement its challenge-question system. RD at 32–34;

PSMF ¶ 88–89, 101 [App. 164–65]. Each of these other controls offers an

important advantage over challenge questions alone, in that a compromise of one

link in the security chain – for example the end user's machine – will not result in

immediate compromise of the entire system. Greene Supp. Dec. ¶ 11 [App. 227].[20]

Pursuant to Article 4A, the Court, in determining commercial

reasonableness, should consider "security procedures in general use . . . by

---

[20] The Magistrate Judge appears to forgive the Bank's failure to adopt other security procedures because *inter alia* the Bank determined that Jack Henry's offered version of out-of-band authentication was ineffective. RD at 66 ("Ocean Bank had concluded (reasonably, in my view) that Jack Henry's offered version of out-of-bank authentication did not offer significantly greater security.") This is important for at least two reasons. First, it implicitly recognizes that the security procedures offered by Jack Henry – while marketed as part of the "most robust and effective solution available" – were in fact inadequate in material respects. *See* RD at 16. Other implementations of out-of-band authentication did not suffer the same infirmities as the Jack Henry version did. Greene Supp. Dec. ¶ 25 [App. 231–32]. Second, under Article 4A, it is the responsibility of *the Bank* to implement commercially reasonable security procedures. *See* Maxwell Depo., Exhibit 15 at 6 [App. 371] (Frequently Asked Questions on FFIEC Guidance, which stated: "The [financial] institution remains ultimately responsible for the adequate authentication of transactions . . . . This responsibility includes ensuring that the authentication techniques chosen by its service providers are appropriate for the institution's services."). The Bank may not disclaim liability by asserting that it simply relied on its chosen vendor, or that it failed to adopt more effective security procedures due to shortcomings in its chosen vendor's variant thereof. *Id.*

receiving banks similarly situated." 11 M.R.S.A. § 4-1202(3). Thus, the existence of other, more effective controls is undoubtedly a factor the Court can and should consider in deciding whether the Bank's security procedures were commercially reasonable in this case. Where other banks implemented such controls, and where the Bank concedes that challenge questions were ineffective security against keylogging malware, the Bank's failure to provide these other controls contributed to a set of security procedures that were not commercially reasonable in this case. Patco does not demand the *best* security procedures, only commercially reasonable ones, which the Bank failed to provide.[21]

## II. The District Court Erred In Its Conclusion That Patco And The Bank Agreed To All Of The Security Measures Implemented By The Bank, And That The Bank Acted In Compliance With Those Security Procedures

The District Court correctly noted that Patco, in its memorandum in support of its Motion for Summary Judgment, argued it had not agreed to security procedures, or alternatively that the few security procedures to which it had agreed, standing alone, were not commercially reasonable. RD at 50; Patco's S/J Motion

---

[21] Patco also objects to the Magistrate Judge's conclusion that it did not request email alerts for eBanking, even though Patco had requested "email notifications" prior to the time the Bank offered automated email alerts through its eBanking system. RD at 59–60, n.132–33. The Magistrate Judge's proffered distinction between "email notifications" and "email alerts" is a distinction without a difference, and the Bank's subsequent implementation of automated email alerts does not render Patco's prior request for email notifications irrelevant for Article 4A purposes.

at 31–34 [D. Ct. Docket No. 74]. The District Court went on to find that Patco agreed to the key "visible" components of the Bank's security procedures – usernames, passwords, and challenge questions – through its use of them. RD at 50–51. Even if this were true, usernames, passwords, and challenge questions asked on every ACH transaction – standing alone – do not constitute commercially reasonable security procedures, for all the reasons discussed above. In apparent recognition of this point, the District Court went on to make the following observation:

> While other aspects of the Premium Product security system, such as device authentication, IP Geo location, transaction monitoring, and the risk-profiling engine, were invisible to Patco, they were integrated with, and largely operated in the service of, the visible portions of the system. Thus, Patco fairly can be said to have agreed to the use of the Premium Product security system *in toto*.

RD at 51. Respectfully, this rationale goes too far. The District Court recognized that these other aspects of the system were *invisible* to Patco and pointed to no evidence in the record that Patco was aware of the existence of these procedures, even generally. *Id.* No such evidence exists. The District Court points to no authority for the proposition that a party may be held to agree to something of which it has no knowledge and which is in fact invisible to it.

Furthermore, even if the District Court is somehow correct that Patco agreed to other aspects of the Bank's system such as device identification, transaction

monitoring, and the risk profiling engine, Patco is entitled to summary judgment because the evidence is undisputed that the Bank *did not comply with* these other procedures in processing the fraudulent transactions. Under Article 4A, the Bank may escape liability only where it acted in compliance with the agreed-upon security procedures. 11 M.R.S.A. § 4-1202(2). As noted above, the Bank configured its system such that the device-ID, transaction-monitoring, and risk-scoring systems triggered absolutely no additional authentication and had no role in the Bank's security procedures. It is for this reason that the fraudulent transactions were able to escape the Bank's attention despite that they originated from devices and IP addresses that Patco had never before used, sent funds to numerous new ACH payee accounts to which Patco had never before transferred funds, were for uncharacteristically high amounts, and triggered unprecedented risk scores. RD at 36–38. Thus, the District Court's conclusion that the Parties agreed the Bank would use the risk-scoring engine, the device-ID system, and transaction monitoring to authenticate transactions on Patco's account in fact mandates summary judgment in favor of Patco, because the undisputed evidence in this case demonstrates that the Bank was not using *any* of these additional procedures to authenticate transactions in May of 2009.

The District Court goes on to state that "[i]n addition, by virtue of the posting online of the Modified eBanking Agreement, Patco effectively agreed to

monitor its commercial accounts daily." RD at 51–52. While the District Court

recognized that Patco never actually saw the Modified eBanking Agreement and

was never notified of it, the court nevertheless concluded that Patco was bound by

it. *Id.* There are a number of problems with this conclusion. For one, it seeks to

impose an affirmative, burdensome duty on Patco – carrying with it the possibility

of significantly altering the substantive rights and liabilities between the parties –

without Patco even having any actual notice of the change. This is entirely unlike

the modification at issue in *Harold H. Huggins Realty v. FNC, Inc.*, cited by the

District Court, which involved only the removal of an arbitration provision without

imposing any affirmative obligations or varying the parties' contractual duties.

*Harold H. Huggins Realty v. FNC, Inc.*, 575 F. Supp. 2d 696, 702–03 (D. Md.

2008).[22]

Furthermore, the District Court distinguishes *Douglas v. United States*

*District Court for the Central District of California* on the grounds that there is no

indication that the agreement in that case contained a unilateral-modification

clause. *See* RD at 52, n.126 (*citing Douglas v. U.S. Dist. Court for the Cent. Dist.*

*of Cal.*, 495 F.3d 1062 (9th Cir. 2007)). However, the District Court gives

insufficient weight to the contract issues discussed by the *Douglas* case, which

[22] The holding in *Huggins* also relied on the principle that modification provisions
in contracts should be construed strictly against their drafters. *Huggins*, 575 F.
Supp. 2d at 706–07. That principle would favor Patco's position in this case.

apply with equal force here. *See Douglas*, 495 F.3d at 1066 n.1. For instance,

without some specific notice of an amendment to an agreement, a party would not

know when to check for possible changes to the agreement or what to look for

when it did. *See* Patco's Opposition at 21–22 [D. Ct. Docket No. 99]; *cf. Douglas*,

495 F.3d at 1066 n.1.[23] Patco would have had to check the Bank's website on a

daily basis to see whether the Bank had posted changes to the agreement at issue.

Even worse, without any direction as to the content of possible changes, Patco

would have had to compare whatever agreement was posted that day *line-by-line*

with the last version Patco had in its possession to attempt to discern whether any

changes had been made. This result is commercially untenable. The Court should

not find the unilateral modification at issue here effective to add an affirmative,

daily obligation on Patco *without notice* where the Bank attempts now to use that

---

[23] Ms. Greene pointed out that the standard in the banking industry is to provide some form of individual notice to customers (such as regular mail or email) of account agreement changes that modify security procedures. Greene Supp. Dec. ¶ 31 [App. 233]. Ms. Greene noted that Ocean Bank easily had this capability since it sent an individual notice by mail to customers (including Patco) in October 2009 to apprise them of changes to their ACH Agreement. *Id.* The Bank did not provide any testimony from its expert, Mr. Makohon, to contradict the proposition that customers must receive some form of notice of account agreement changes. *See, e.g.,* Makohon Dec. ¶ 15 [App. 15] (stating that providing notices to customers is standard in the industry). The District Court should not have disregarded this aspect of the record.

modification to alter significantly the substantive rights and liabilities of the parties.[24]

### III. The District Court Erred In Concluding That Patco's Common-Law Counts Were Preempted By Article 4A

The District Court also erred in finding that Counts II–IV of Patco's Complaint were displaced by Article 4A. RD at 67–68. Article 4A is not the exclusive means by which a plaintiff can seek to redress an alleged harm arising from a funds transfer. *Regions Bank v. The Provident Bank, Inc.,* 345 F.3d 1267, 1274-75 (11th Cir. 2003); *see also Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265 (S.D.N.Y. 2006) ("Nowhere does Article 4A expressly or impliedly preclude common law claims for conversion."). Rather, where Article 4A applies, the "only restraint is that 'resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities *inconsistent* with those stated in this Article.'" *Regions Bank v. The Provident Bank*, 345 F.3d at 1275 (emphasis in original) (quoting U.C.C. § 4A-102 cmt., codified in Maine at

---

[24] In addition, Patco objects to the District Court's conclusion that the obligation to monitor accounts daily applied to both ACH debit and ACH credit transactions. RD at 52 n.127. Patco presented uncontroverted expert testimony that the contract language at issue would not impose a general obligation to monitor accounts in order to detect fraudulent ACH credit transactions, like those at issue. Thomas Dec. ¶ 9 [App. 138]. Furthermore, while Patco did not always monitor its eBanking account on a daily basis, it had numerous other financial controls in place. *See* POSMF ¶¶ 206, 208 [App. 314]. In addition, Patco's internal security was comparable to that of any business of Patco's size, configuration, and line of business, and in some respects was better. Greene Dec. ¶ 41 [App. 38–39]; Greene Supp. Dec. ¶ 36 [App. 234–35].

11 M.R.S.A. § 4-1102 cmt.). Here, Patco's negligence, breach of contract and breach of fiduciary duty claims seek no relief inconsistent with Article 4A. Thus, the District Court erred in finding that Patco's common-law counts were preempted.

# CONCLUSION

WHEREFORE, based upon the foregoing argument, authorities, and the entire record before the Court, Appellant Patco Construction Co., Inc. respectfully requests that the Court reverse the District Court's order denying Patco's Motion for Summary Judgment and granting that of Appellee People's United Bank, and enter summary judgment in favor of Appellant Patco Construction Co., Inc. on Count I of Patco's Complaint.

Dated:  December 16, 2011      Respectfully submitted,

/s/ Daniel J. Mitchell
Daniel J. Mitchell
Eben M. Albert-Knopp
BERNSTEIN SHUR
100 Middle Street
Portland, ME 04104-5029

Attorneys for Appellant Patco
Construction Company, Inc.

# CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,826 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2007 in 14-point Times New Roman type style.

Dated:  December 16, 2011                           /s/ Daniel J. Mitchell
                                                             Daniel J. Mitchell
                                                             Attorney for Appellant Patco
                                                             Construction Co., Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing ***Brief of Appellant*** with the Clerk of Court using the CM/ECF system which will automatically send notice of the filing to all counsel of record in this matter.

Dated:  December 16, 2011　　　　　　　/s/ Daniel J. Mitchell
　　　　　　　　　　　　　　　　　　　Daniel J. Mitchell

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
Case No. 11-2031

PATCO CONSTRUCTION CO., INC.

Plaintiff - Appellant

v.

PEOPLE'S UNITED BANK

Defendant - Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

**ADDENDUM**

TABLE OF CONTENTS

ITEM                                                                                                          PAGE

Recommended Decision on Cross-Motions for Summary Judgment ............ 1

Order Affirming Recommended Decision .................................................... 71

11 M.R.S.A §4-1202 ................................................................................... 73

11 M.R.S.A §4-1203 ................................................................................... 75

UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| *PATCO CONSTRUCTION COMPANY, INC.,* | ) ) ) |
| *Plaintiff* | ) ) |
| *v.* | )   *No. 2:09-cv-503-DBH* ) |
| *PEOPLE'S UNITED BANK d/b/a OCEAN BANK,* | ) ) ) |
| *Defendant* | ) ) |

**RECOMMENDED DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Defendant People's United Bank d/b/a Ocean Bank ("Ocean Bank" or "Bank") moves for summary judgment as to all six counts of the operative complaint of Patco Construction Company, Inc. ("Patco"), and Patco cross-moves for summary judgment as to Count I. *See* Defendant People's United Bank's Motion for Summary Judgment ("Defendant's S/J Motion") (Docket No. 62) at 1; Plaintiff's Motion for Summary Judgment ("Plaintiff's S/J Motion") (Docket No. 74) at 1. Ocean Bank also moves to exclude the expert testimony of George F. Thomas and to strike Patco's jury demand, while Patco moves to exclude in part the expert testimony of Peter A. Makohon. *See* Defendant People's United Bank's *Daubert/Kumho* Motion To Exclude Expert Testimony of George F. Thomas ("Defendant's Motion To Exclude") (Docket No. 64); Defendant People's United Bank's Motion To Strike Plaintiff's Jury Trial Demand ("Defendant's Motion To Strike") (Docket No. 66); Plaintiff's Motion To Exclude Certain Testimony of Peter A. Makohon ("Plaintiff's Motion To Exclude") (Docket No. 77).

For the reasons that follow, I recommend that the court grant Ocean Bank's motion for summary judgment as to all counts of Patco's operative Second Amended Complaint and deny Patco's cross-motion for summary judgment as to Count I. This disposition, if adopted by the

1

court, would moot the parties' motions to exclude expert testimony and the Bank's motion to strike Patco's jury trial demand. Hence, I do not consider the latter three motions.

## I. Applicable Legal Standards

### A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)). "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni,* 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(c). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260

F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc.*, 328 F.3d 1, 6 (1st Cir. 2003). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." *Id.* (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.* Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

### B. Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id.* The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id.* The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in

3

which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Sánchez-Figueroa v. Banco Popular de P.R.*, 527 F.3d 209, 213-14 (1st Cir. 2008); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

## II. Factual Background

The parties' statements of material facts, credited to the extent either admitted or supported by record citations in accordance with Local Rule 56, reveal the following relevant facts.[1]

### A. The Parties

Patco is a family-owned second generation commercial, industrial, and residential developer and contractor located in Sanford, Maine. Plaintiff's Statement of Undisputed Material Facts ("Plaintiff's SMF") (Docket No. 75) ¶ 1; Defendant People['s] United Bank's Opposition to Plaintiff's Statement of Undisputed Material Facts ("Defendant's Opposing SMF")

---

[1] To the extent that I have incorporated one of the party's qualifications into the statement of the other, I have determined that the qualification is supported by the record citation(s) given.

4

(Docket No. 90) ¶ 1. Patco has been in business since 1985 and has built more than 300 commercial buildings and 400 residences. Statement of Material Facts in Support of Defendant People's United Bank's Motion for Summary Judgment ("Defendant's SMF") (Docket No. 67) ¶ 2; Plaintiff's Opposing Statement of Material Facts and Statement of Additional Material Facts ("Plaintiff's Opposing SMF") (Docket No. 100) ¶ 2. Patco's gross revenues, at their peak in 2005, were between $17 million and $18 million. *Id.* ¶ 3.[2]

When Patco first began banking with Ocean Bank, then Ocean National Bank, in 1985, Ocean Bank was an independent southern Maine-based community bank. Plaintiff's SMF ¶ 2; Defendant's Opposing SMF ¶ 2. Ocean Bank was later acquired by the Chittenden family of banks, based in Burlington, Vermont. *Id.* ¶ 3. The Chittenden banks, including Ocean Bank, subsequently became a division of People's United Bank, a regional bank based in Bridgeport, Connecticut. *Id.* ¶ 4. People's United Bank operates other local banks such as Maine Bank & Trust, where Patco also had an account in May 2009. *Id.* ¶ 5. Ocean Bank was a division of People's United Bank at the time that the allegedly unauthorized withdrawals at issue in this case occurred. *Id.* ¶ 6.

Ocean Bank permits its commercial customers to make electronic funds transfers *via* online banking, referred to at Ocean Bank as "eBanking." Defendant's SMF ¶ 5; Plaintiff's Opposing SMF ¶ 5. Ocean Bank allows its eBanking commercial customers to make electronic funds transfers through Ocean Bank via the Automated Clearing House ("ACH") network, a system used by banks to transfer funds electronically between accounts. *Id.* ¶ 6.

In or about September 2003, Patco added eBanking for Business to its account. *Id.* ¶ 8. Patco used eBanking primarily to make weekly payroll payments to certain employees through

---

[2] My recitation incorporates, in relevant part, Patco's qualification.

the ACH network. Plaintiff's SMF ¶ 9; Defendant's Opposing SMF ¶ 9. These transactions were always initiated from one of several computers housed at Patco's offices in Sanford, Maine, and originated from a single static Internet Protocol ("IP") address. *Id.* ¶ 12.[3] Each payroll transaction was accompanied by weekly ACH withdrawals for federal and state tax withholding as well as 401(k) contributions. *Id.* ¶ 13. Patco also used eBanking to transfer money from the accounts of Patco and related entities at Maine Bank & Trust, which maintains a branch in Sanford, Maine, into its Ocean Bank checking account. *Id.* ¶ 14.[4]

Beginning on May 7, 2009, unknown third parties initiated a series of withdrawals from Patco's account over the course of several days. Defendant's SMF ¶¶ 183-87; Plaintiff's Opposing SMF ¶¶ 183-87. The withdrawals totaled $588,851. *Id.* ¶ 188. Of this amount, Ocean Bank blocked $243,406 of the transfers. *Id.* ¶ 189.

### B. The Parties' Agreements

In September 2003, Patco entered into the following agreements with Ocean Bank: the eBanking for Business Agreement ("Original eBanking Agreement"), the Ocean Bank Automated Clearing House Agreement ("ACH Agreement"), and the Investment and Line of Credit Sweep Account (Managed Balance Agency Agreement) ("Sweep Agreement"). *Id.* ¶ 10.

---

[3] Ocean Bank qualifies this statement, asserting that Patco's ACH transactions made from February 13, 2009, through May 6, 2009, originated from a single IP address, and no information regarding the IP address used by Patco for ACH transactions is available outside of this time period because the logs go back only 90 days. Defendant's Opposing SMF ¶ 12; Supplemental Declaration of Jeffrey R. Tarte in Support of Defendant People's United Bank's Opposition to Plaintiff Patco Construction Company, Inc.'s Motion for Summary Judgment ("Suppl. Tarte Decl.") (Docket No. 93), Tab 1 to Defendant People's United Bank's Master Supplemental Appendix in Support of Its Oppositions to Plaintiff's Motions for Summary Judgment & To Exclude Certain Testimony of Peter A. Makohon ("Suppl. Appendix") (Docket No. 93), ¶ 6.

[4] Patco states that its transfers between Maine Bank & Trust and Ocean Bank stopped in 2008, Plaintiff's SMF ¶ 14, but Ocean Bank denies this, stating that its log reflects an ACH transfer from Patco's Maine Bank & Trust account to its Ocean Bank checking account in the amount of $204,724 on March 3, 2009, Defendant's Opposing SMF ¶ 14; Suppl. Tarte Decl. ¶ 9.

## 1. Original eBanking Agreement

On February 3, 2004, Ocean Bank sent a copy of the Original eBanking Agreement to Patco. *Id.* ¶ 11. The cover letter enclosing the Original eBanking Agreement stated: "Please familiarize yourself with the *eBanking for Business Agreement*. . . . If you have any questions, check the user guide online or the screen-by-screen icons." *Id.* ¶ 12 (emphasis in original).[5] Thomas McDowell, Patco's Chief Financial Officer, could not recall ever checking the user guide online. *Id.* ¶ 13.

Patco distributed a copy of the Original eBanking Agreement internally and required Patco employees McDowell, Vickie Kelly, Diana Pierce, Angie Pelham, Mike Patterson, Greg Patterson, and Mark Patterson to read and initial the Original eBanking Agreement. *Id.* ¶ 14.[6] McDowell identified this agreement and was among the individuals who wrote the date of review next to his name. *Id.* ¶ 15.[7] Mark Patterson, Patco's co-owner and Treasurer, reviewed the Original eBanking Agreement on or about September 30, 2003, and wrote the date of his review next to his name. *Id.* ¶ 16.[8] McDowell acknowledged that Patco accepted the terms and conditions of the Original eBanking Agreement when it logged into eBanking. *Id.* ¶ 18.

The Original eBanking Agreement stated that "use of the *Ocean National Bank's eBanking for Business* password constitutes authentication of all transactions performed by you or on your behalf." *Id.* ¶ 19 (emphasis in original).[9] The Original eBanking Agreement stated that Ocean Bank did not "assume[] any responsibilities" with respect to Patco's use of eBanking,

---

[5] My recitation incorporates Patco's qualification (mischaracterized as a denial).

[6] Patco qualifies this statement, asserting that employees did not initial the document but, rather, wrote the date of their review next to their name, and Mike Patterson did not review it. Plaintiff's Opposing SMF ¶ 14; Original eBanking Agreement (Docket No. 68), Tab 1A to Defendant People's United Bank's Master Appendix in Support of Its Motions for Summary Judgment, To Strike Plaintiff's Jury Trial Demand, & *Daubert/Kumho* Motion To Exclude Expert Testimony of George F. Thomas ("Appendix") (Docket No. 68), at 6672.

[7] My recitation incorporates Patco's qualification.

[8] My recitation incorporates Patco's qualification.

[9] My recitation incorporates Patco's qualification.

7

that "electronic transmission of confidential business and sensitive personal information" was at Patco's risk, and that Ocean Bank was liable only for its gross negligence, limited to six months of fees. *Id.* ¶ 20.[10] The Original eBanking Agreement also provided that "use of *Ocean National Bank's eBanking for Business* by any one owner of a joint account or by an authorized signor on an account, shall be deemed an authorized transaction on an account unless you provide us with written notice that the use of *Ocean National Bank's eBanking for Business* is terminated or that the joint account owner or authorized signor has been validly removed form [sic] the account." *Id.* ¶ 22 (emphasis in original).[11] McDowell admitted that he understood what this provision meant in 2004. *Id.* ¶ 23.

The Original eBanking Agreement stated: "We reserve the right to modify these terms and conditions at any time effective upon publication." *Id.* ¶ 24.[12] The Original eBanking Agreement also provided: "You are responsible for all transfers you authorize using *Ocean National Bank's eBanking for Business.*" *Id.* ¶ 25 (emphasis in original).[13] The Original eBanking Agreement provided in three separate sections that Patco had to contact Ocean Bank immediately when it discovered an unauthorized transaction. *Id.* ¶ 26.

## 2. Modified eBanking Agreement

Ocean Bank modified the Original eBanking Agreement and published the eBanking Agreement on the Bank's website. Defendant's SMF ¶ 28; Declaration of Jeffrey R. Tarte in Support of Defendant People's United Bank's Motion for Summary Judgment ("Tarte Decl.") (Docket No. 68), Tab 1 to Appendix, ¶ 10.[14] The Modified eBanking Agreement had been

---

[10] My recitation incorporates, in part, Patco's qualification.

[11] My recitation incorporates Patco's qualification.

[12] I omit the word "clearly," sustaining Patco's objection, Plaintiff's Opposing SMF ¶ 24, that it is argumentative.

[13] My recitation incorporates Patco's qualification.

[14] Patco's objection to this and other statements regarding the Modified eBanking Agreement on the ground of Tarte's lack of foundation as to personal knowledge, Plaintiff's Opposing SMF ¶¶ 28-31, is overruled. Tarte states *(continued on next page)*

published as of May 2009. Defendant's SMF ¶ 29; Tarte Decl. ¶ 10.[15] The Modified eBanking Agreement could be accessed any time a customer logged into eBanking. Defendant's SMF ¶ 31; Tarte Decl. ¶ 11.

The Modified eBanking Agreement stated: "[I[f you use Ocean Bank eBanking . . . each party agrees to the terms and conditions stated in the Agreement." Defendant's SMF ¶ 33; Modified eBanking Agreement (Docket No. 68), Tab 1B to Appendix, § II.[16] The Modified eBanking Agreement explicitly described the option to receive email alerts. Defendant's SMF ¶ 34; Plaintiff's Opposing SMF ¶ 34. The Modified eBanking Agreement provided that use of Patco's eBanking password constituted Patco's signature authorization. Defendant's SMF ¶ 35; Modified eBanking Agreement § XVI.

The Modified eBanking Agreement also provided: "If you choose to receive ACH debit transactions on your commercial accounts, you assume all liability and responsibility to monitor those commercial accounts on a daily basis. In the event that you object to any ACH debit, you

---

that he has personal knowledge of the information set forth in his affidavit, Tarte Decl. at 1, and that, in his role as the Bank's Vice President of Information Security, he was familiar with the security procedures in place at Ocean Bank at all relevant times, including in May 2009, *id.* ¶¶ 5-6. This sets forth sufficient foundation for his personal knowledge of the circumstances of the creation and publication of the Modified eBanking Agreement, which touched, *inter alia,* on information security. To the extent that Patco protests that Ocean Bank fails to set forth the date of the publication of the Modified eBanking Agreement, Plaintiff's Opposing SMF ¶ 28, Ocean Bank remedies that omission in its reply statement of material facts, asserting that the Modified eBanking Agreement was continuously available on the Bank's website from August 21, 2008, through May 2009, when the alleged fraudulent withdrawals occurred, Defendant People['s] United Bank's Reply to Plaintiff's Statement of Additional Undisputed Material Facts ("Defendant's Reply SMF") (Docket No. 118) ¶ 1; Second Supplemental Declaration of Jeffrey R. Tarte in Support of Defendant People's United Bank's Reply Memorandum in Support of Its Motion for Summary Judgment ("Second Suppl. Tarte Decl.") (Docket No. 119), Tab 1 to Defendant People's United Bank's Master Second Supplemental Appendix in Support of Its Motions for Summary Judgment, To Strike Plaintiff's Jury Trial Demand, & *Daubert/Kumho* Motion To Exclude Expert Testimony of George F. Thomas ("Second Suppl. Appendix") (Docket No. 119), ¶ 4.

[15] I have modified the Bank's statement that the agreement was "in effect in May 2009[,]" sustaining Patco's objection, Plaintiff's Opposing SMF ¶ 29, that this states a legal conclusion. Patco further purports to deny this and other statements on the ground that it had no notice of the existence or terms of the Modified eBanking Agreement in May 2009 and, therefore, that agreement was not effective between the parties. *Id.* ¶¶ 29-33, 35-37, 40, 44-45, 47. However, the first portion of Patco's statement is in the nature of a qualification rather than a denial, and the second portion constitutes legal argument.

[16] I have modified the Bank's characterization of this section of the agreement, sustaining Patco's objection, Plaintiff's Opposing SMF ¶ 33, that the characterization is argumentative.

agree to notify us of your objection on the same day the debit occurs." Defendant's SMF ¶ 38; Plaintiff's Opposing SMF ¶ 38.[17] Patco received ACH debits on its account such as 401(k) contributions and state tax payments. *Id.* ¶ 39. A monitoring requirement is typically found in most financial services' end-user agreements involving money transfer capabilities. Defendant's SMF ¶ 43; Declaration of Peter A. Makohon in Support of Defendant People's United Bank's Motion for Summary Judgment ("Makohon Decl.") (Docket No. 69), Tab 2 to Appendix, ¶ 14.[18] Several provisions of the Modified eBanking Agreement state that a user should contact Ocean Bank immediately if it suspects unauthorized activity in its accounts. Defendant's SMF ¶ 45; Modified eBanking Agreement §§ X, XI, XIII.A. Section XIII.A of that agreement states that "[c]ontacting Ocean Bank right away will help you reduce possible losses." Defendant's SMF ¶ 46; Modified eBanking Agreement § XIII.A.

### 3. Credit Sweep Agreement

Patco entered the Sweep Agreement with Ocean Bank on September 5, 2003. Defendant's SMF ¶ 48; Plaintiff's Opposing SMF ¶ 48. Under the Sweep Agreement, funds from Patco's account were transferred by Ocean Bank into a separate investment account. *Id.* ¶ 49. The Sweep Agreement authorized Ocean Bank to "transfer to the Sweep Account from the Line of Credit an amount necessary to maintain: (i) any target balance in the Sweep Account established pursuant to paragraph 5 below, and (ii) a zero (0) balance in the designated operating

---

[17] My recitation incorporates Patco's qualification (mischaracterized as a denial).

[18] Patco's objection that Makohon fails to establish that he has personal knowledge of the end-user agreements of "most" financial services institutions, Plaintiff's Opposing SMF ¶ 43, is overruled. Makohon states that during his 14 years working in the financial services sector for Wachovia, one of the top five financial institutions in the United States, he became familiar with the security procedures of hundreds of financial services organizations of all sizes, and that he is familiar with the security measures used by various financial institutions during the relevant time period. Makohon Decl. ¶¶ 4-6. Patco denies the Bank's further statement that a customer is in a superior position to notice any suspicious transactions on its own account, asserting that the Bank is in as good or a superior position to notice any suspicious transactions on accounts. *Compare* Defendant's SMF ¶ 43 *with* Plaintiff's Opposing SMF ¶ 43.

accounts." *Id.* ¶ 50.[19] Patco was aware, and voluntarily accepted, that Ocean Bank would draw upon its line of credit if its checking account had insufficient funds. *Id.* ¶ 51. The Sweep Agreement was in effect in May 2009. *Id.* ¶ 52.

### 4. ACH Agreement

The ACH Agreement was in effect in May 2009. *Id.* ¶ 53. The ACH Agreement also governed the terms of Patco's use of electronic funds transfers through Ocean Bank via the ACH network. *Id.* ¶ 54. The ACH Agreement is signed by Mark Patterson, who authenticated his signature on the agreement at his deposition. *Id.* ¶ 55. McDowell also testified that his initials appear on the ACH Agreement. *Id.* ¶ 56.[20]

The ACH Agreement provided that Patco was responsible for electronic transfers "purport[ed] to have been transmitted or authorized" by Patco, even if a transfer was not authorized by Patco, "provided Bank acted in compliance with the security procedure referred to in Schedule A[.]" *Id.* ¶ 57.[21] The ACH Agreement expressly limited Ocean Bank's liability to gross negligence. Defendant's SMF ¶ 58; ACH Agreement § 12(a).[22] The ACH Agreement further limited liability by providing that "[i]n no event shall Bank be liable for any consequential, special, punitive or indirect loss or damage which Customer may incur or suffer in connection with this Agreement[.]" Defendant's SMF ¶ 59; ACH Agreement § 12(b).[23] The ACH Agreement provided: "This Agreement (including Schedule A attached hereto), together with the Account Agreement, is the complete and exclusive statement of the agreement between

---

[19] My recitation incorporates Patco's qualification.

[20] My recitation incorporates Patco's qualification.

[21] Patco qualifies this statement, asserting that the security procedures provided in Schedule A do not, by their express terms, apply to eBanking transactions. Plaintiff's Opposing SMF ¶ 57; ACH Agreement (Docket No. 68), Tab 1C to Appendix, § 13(a) & Schedule A thereto.

[22] Patco purports to deny this statement; however its argument that the cited language is ineffective to vary obligations imposed by law, Plaintiff's Opposing SMF ¶ 58, does not controvert the underlying fact.

[23] Patco purports to deny this statement; however its argument that the cited language is ineffective to vary obligations imposed by law, Plaintiff's Opposing SMF ¶ 59, does not controvert the underlying fact.

Bank and Customer with respect to the subject matter hereof[.]"   Defendant's SMF ¶ 60; Plaintiff's Opposing SMF ¶ 60.[24]

### 5. ACH Limits

An ACH limit restricts a customer from exceeding a specified level of ACH activity in a single day.  Plaintiff's SMF ¶ 97; Defendant's Opposing SMF ¶ 97.  On behalf of the Bank, Kim S. Maxwell testified, "The limits are put in place after a discussion with the ACH originating customer to determine what their needs are and then those limits are established within the NetTeller system that restrict a customer from exceeding the limit that's been established in a single day."  *Id.* ¶ 98; [Rule] 30(b)(6) Deposition of People's United Bank (Kim S. Maxwell) ("Maxwell Dep.") (Docket No. 96) at 187.[25]

Patco's ACH limit was initially set at $100,000.  *Id.* ¶ 99.  Prior to May 2009, it had been raised twice, first to $500,000, then to $750,000.  *Id.* ¶ 100.  The ACH limit was increased multiple times at Patco's request, to meet its stated need to make ACH transactions of increasing amounts.  Defendant's SMF ¶ 191; Plaintiff's Opposing SMF ¶ 191.[26]  Apart from any statement made in the ACH Agreement, the Bank made no effort to apprise Patco of possible risks of raising the ACH limit.  Plaintiff's SMF ¶ 104; Defendant's Opposing SMF ¶ 104.[27]  The ACH Agreement contained no statements apprising Patco of possible risks of raising the ACH limit or of maintaining a high ACH limit.  *Id.* ¶ 105.

---

[24] My recitation incorporates Patco's qualification.

[25] My recitation incorporates Ocean Bank's qualification.

[26] Patco qualifies this statement, asserting that the Bank expressly recommended that Patco accomplish transfers from its account at Maine Bank & Trust to its account at Ocean Bank, necessitating the higher ACH limit. Plaintiff's Opposing SMF ¶ 191; McDowell Dep. at 92-93 (version filed at Docket No. 100-3).

[27] Ocean Bank qualifies this statement, asserting that, when Patco requested that its ACH limit be increased, Patco and the Bank did not discuss any risks. Defendant's Opposing SMF ¶ 104; [Rule] 30(b)(6) Deposition of People's United Bank (Matthew J. Stringer) and Matthew J. Stringer Individually ("Stringer Dep.") (Docket No. 96), Tab 4H to Suppl. Appendix, at 68-69.

## C. Ocean Bank's Security Measures

### 1. Jack Henry Products

In 2004, Ocean Bank began using Jack Henry & Associates ("Jack Henry") to provide its core online banking platform, known as "NetTeller." Defendant's SMF ¶ 7; Plaintiff's Opposing SMF ¶ 7. Jack Henry has provided Ocean Bank with the NetTeller Internet banking platform since then. *Id.* ¶ 63. Jack Henry is a leading provider of computer systems and services to financial institutions nationwide, including a suite of online banking security and authentication solutions. *Id.* ¶ 64.[28]

Jack Henry provides the NetTeller product to approximately 1,300 of its 1,500 bank customers. *Id.* ¶ 65. NetTeller operates in an Application Service Provider ("ASP") environment, where the application is hosted at Jack Henry sites. *Id.* ¶ 66. The application uses a conduit to customer-specific accounting data that may reside either on a host at the financial institution or at a Jack Henry (or third party) data processing center. *Id.*

Jack Henry provides security for the systems it sells, including software patches, firewalls, anti-virus, and other security measures. *Id.* ¶ 67. Jack Henry's security systems are regularly audited by federal regulatory authorities for adherence to regulatory mandates. *Id.* Jack Henry's internal auditors and third parties perform additional reviews to ensure that the security systems in place are working as designed. *Id.*

---

[28] Patco qualifies this statement, characterizing the assertion that Jack Henry is a "leading provider" of such services as conclusory and argumentative. Plaintiff's Opposing SMF ¶ 64. The phrase at issue is more in the nature of a "fact" than an "argument." Patco's objection to the statement on the ground that Tarte lacks the foundation to make it, *id.*, is overruled. Tarte served as Information Security Officer for Chittenden Bank from 1998 through 2008, a position in which he was responsible for information security program strategy. Tarte Decl. ¶ 5. In turn, Chittenden Bank worked with Jack Henry in 2006 to revamp Chittenden Bank's online authentication security. *Id.* ¶¶ 23-24.

## 2. 2005 FFIEC Guidance

In October 2005, the agencies of the Federal Financial Institutions Examination Council ("FFIEC") issued guidance titled "Authentication in an Internet Banking Environment" ("FFIEC Guidance" or "Guidance"). Plaintiff's SMF ¶ 22; Defendant's Opposing SMF ¶ 22.[29] The Guidance does not endorse any particular technology for compliance with the Guidance. Defendant's SMF ¶ 68; Plaintiff's Opposing SMF ¶ 68.[30] The Guidance states that "financial institutions should periodically . . . [a]djust, as appropriate, their information security program in light of any relevant changes in technology, the sensitivity of its customer information, and internal or external threats to information[.]" *Id.* ¶ 69.[31] The Guidance also provides that "where risk assessments indicate that the use of single-factor authentication is inadequate, financial institutions should implement multi factor authentication, layered security, or other controls reasonably calculated to mitigate those risks." *Id.* ¶ 70.

The Guidance explains that existing authentication methodologies involve three basic "factors": (i) "[s]omething the user *knows* (e.g., password, PIN)"; (ii) [s]omething the user *has* (e.g., ATM card, smart card)"; and (iii) "[s]omething the user *is* (e.g., biometric characteristic, such as a fingerprint)." FFIEC Guidance at 3 (emphasis in original).[32] It states:

> Authentication methods that depend on more than one factor are more difficult to compromise than single-factor methods. Accordingly, properly designed and implemented multifactor authentication methods are more reliable and stronger fraud deterrents. For example, the use of a logon ID/password is single-factor

---

[29] My recitation incorporates Ocean Bank's qualification.

[30] Patco qualifies this statement, observing that the Guidance states that "[t]he agencies consider single-factor authentication, as the only control mechanism, to be inadequate for high-risk transactions involving access to customer information or the movement of funds to other parties." Plaintiff's Opposing SMF ¶ 68; FFIEC Guidance (Docket No. 71), Tab 19 to Appendix, at 1.

[31] My recitation incorporates Patco's qualification.

[32] The parties neglected, in their statements of material facts, to set forth certain provisions of the FFIEC Guidance upon which they rely in their briefs. *See, e.g.,* Plaintiff's S/J Motion at 4. Because these provisions are important to understanding and/or resolution of the case, there is no material dispute concerning them, and the court in any event can take judicial notice of their existence, I have set them forth.

authentication (i.e., something the user knows); whereas, an ATM transaction requires multifactor authentication: something the user possesses (i.e., the card) combined with something the user knows (i.e., PIN). A multifactor authentication methodology may also include "out-of-band" controls for risk mitigation.

*Id.*[33] The Guidance also states:

> The agencies consider single-factor authentication, as the only control mechanism, to be inadequate for high-risk transactions involving access to customer information or the movement of funds to other parties. . . . Account fraud and identity theft are frequently the result of single-factor (e.g., ID/password) authentication exploitation. Where risk assessments indicate that the use of single-factor authentication is inadequate, financial institutions should implement multifactor authentication, layered security, or other controls reasonably calculated to mitigate those risks.

*Id.* at 1-2. Financial institutions further are advised to "[a]djust, as appropriate, their information security program in light of any relevant changes in technology, the sensitivity of [their] customer information, and internal or external threat to information" and to "implement appropriate risk mitigation strategies." *Id.* at 2.

In November 2005, Chittenden Bank stated in a Chittenden Audit Report that "[i]t is recognized in the industry that I[D]s and passwords, used alone (single factor), are not a secure method of system authentication. Passwords can be revealed relatively easily." Plaintiff's SMF ¶ 85; Defendant's Opposing SMF ¶ 85.

In 2006, following the publication of the FFIEC Guidance, Chittenden Bank, then an affiliate of Ocean Bank, conducted a comprehensive assessment to comply with the Guidance. Plaintiff's SMF ¶ 23; Defendant's Opposing SMF ¶ 23. Chittenden Bank identified Jack Henry's retail and commercial NetTeller product as involving high-risk transactions that required multifactor authentication. *Id.* Accordingly, the Bank broke out this system into a sub-project to

---

[33] "Out-of-band generally refers to additional steps or actions taken beyond the technology boundaries of a typical transaction." FFIEC Guidance at 3 n.5. "Callback (voice) verification, e-mail approval or notification, and cell-phone based challenge/response processes are some examples." *Id.*

implement stronger authentication. *Id.* Chittenden Bank put together a team of individuals to investigate how best to comply with the FFIEC Guidance. *Id.* The team worked with Jack Henry to identify the most appropriate solution to achieve compliance with the Guidance. *Id.*[34]

Following publication of the FFIEC Guidance, Jack Henry entered into a re-seller agreement with Cyota, Inc., an RSA Security Company ('RSA/Cyota") for a multifactor authentication system to integrate into its NetTeller product so that it could offer security solutions compliant with FFIEC Guidance. Defendant's SMF ¶ 71; Plaintiff's Opposing SMF ¶ 71.[35] RSA/Cyota is the industry leader for protecting online identities and digital assets. *Id.* ¶ 72. Security provided by RSA/Cyota is used by 90 percent of the Fortune 500 companies. *Id.*[36]

Jack Henry marketed its RSA/Cyota multifactor solution to its customers as "the most robust and effective solution available" as of 2006. *Id.* ¶ 73.[37] Jack Henry, through collaboration with RSA/Cyota, made two multifactor authentication products available to its customers to meet the FFIEC Guidance: the "Basic" package ("Basic Product") and the "Premium" package ("Premium Product"). *Id.* ¶ 74.

---

[34] My recitation incorporates Ocean Bank's qualification.

[35] Patco qualifies this and other statements, denying that the "Premium" authentication product used true multifactor authentication because it allowed a user's knowledge of a customer's challenge questions (something the user knows) to override the user's lack of anything the customer was or is. *See, e.g.*, Plaintiff's Opposing SMF ¶ 71. This critique is set forth in detail *infra*.

[36] Patco qualifies paragraph 72, characterizing the assertion that RSA/Cyota is "the industry leader" as conclusory and argumentative. Plaintiff's Opposing SMF ¶ 72. The phrase at issue is more in the nature of a "fact" than an "argument." Patco's objection that Debra L. Edwards, whose affidavit the Bank cites, lacks foundation to make the assertions contained in paragraph 72, *id.*, is overruled. Edwards is Jack Henry's Senior Manager of Client Support, Internet Solutions. Declaration of Debra L. Edwards in Support of Defendant People's United Bank's Motion for Summary Judgment ("Edwards Decl.") (Docket No. 69), Tab 3 to Appendix, ¶ 5. Among Jack Henry's products are two authentication products developed in conjunction with RSA/Cyota. *Id.* ¶ 13.

[37] Patco qualifies this statement, denying that this advertising claim was true because, by 2007, authentication systems were widely available incorporating true multifactor authentication, tokens, and other means of generating one-time passwords, and true out-of-band authentication. Plaintiff's Opposing SMF ¶ 73. However, the citations provided do not support the proposition that these authentication systems were "widely available" by 2007.

With both the Basic and Premium products, when a customer logged onto online banking, it entered a company NetTeller ID and password and then an ID and password specific to each user. *Id.* ¶ 75. In addition to IDs and passwords, the Basic Product offered invisible device authentication and challenge/response questions. *Id.* ¶ 76. In addition to IDs and passwords, the Premium Product offered development of a customer profile, challenge/response questions, invisible device authentication, user-selected picture, IP Geo location, transaction monitoring, scoring engine for transactions, an eFraud Network subscription, and reporting. *Id.* ¶ 77.[38] The Premium Product cost $1,500 per banking division as a one-time installation fee and an additional 52 cents per enrolled Internet banking account. *Id.* ¶ 78. A one-time installation fee of $1,000 was charged for the Basic Product. *Id.*[39]

### 3. Implementation of New Authentication Product in 2007

#### a. Features of Jack Henry Premium Product

To comply with the Guidance, Ocean Bank selected the Jack Henry Premium Product at greater expense to the bank. *Id.* ¶ 80. The new system was implemented in January 2007. Plaintiff's SMF ¶ 25; Defendant's Opposing SMF ¶ 25. The system:

1. <u>Passwords and IDs</u>. Required each authorized Patco employee to use both a company ID and password and user-specific ID and password to access online banking. Defendant's SMF ¶ 82; Plaintiff's Opposing SMF ¶ 82;

2. <u>Challenge Questions</u>. Required users, during initial log-in, to select three challenge questions and responses. *Id.* ¶ 87. The challenge questions might be prompted for

---

[38] Patco qualifies this statement, asserting that Ocean Bank's system did not incorporate a user-selected picture and that, while the NetTeller system provided activity reports, Ocean Bank began reviewing them only after the fraud involving Patco occurred. Plaintiff's Opposing SMF ¶ 77; Maxwell Dep. (version filed at Docket No. 100-7) at 45, 127-30.

[39] Patco qualifies this statement, reckoning that because the Chittenden family of banks had approximately 30,000 customers in 2006 and 2007, the additional cost of the Premium Product to that entire family of banks was only approximately $16,100. Plaintiff's Opposing SMF ¶ 78; Maxwell Dep. (version filed at Docket No. 100-7) at 107.

various reasons. *Id.* For example, if the risk score associated with a particular transaction exceeded a certain amount, the challenge questions would be triggered. *Id.* ¶ 88. If the challenge question responses entered by the user did not match the ones originally provided, the customer would receive an error message. *Id.* ¶ 89. If the customer was unable to answer the challenge questions in three attempts, the customer was blocked from online banking and required to contact the bank. *Id.* Once a customer established answers to its challenge questions, the customer was not required to change its answers unless they were reset by the Bank. Plaintiff's SMF ¶ 52; Defendant's Opposing SMF ¶ 52. A Jack Henry document states that changing passwords periodically is "an essential piece of the online security puzzle." *Id.* ¶ 53;[40]

    3.    Risk Profiling. Entailed the building of a risk profile for each customer by RSA/Cyota from a number of different factors, such as the location from which a user logged in, when/how often a user logged in, and what a user did while on the system. *Id.* ¶ 83. The Premium Product noted the IP address that the customer typically used to log into online banking and added it to the customer profile. Defendant's SMF ¶ 114; Plaintiff's Opposing SMF ¶ 114. With the Basic product, there was protection at log-in only. *Id.* ¶ 115. RSA/Cyota's adaptive monitoring provided risk scoring to, among other things, every log-in attempt and transaction based on a multitude of data, including but not limited to IP, device cookie ID, Geo location, and transaction activity. Plaintiff's SMF ¶ 32; Defendant's Opposing SMF ¶ 32.[41] The Cyota unique profiling system was designed to take into account the circumstances of a customer known to the

---

[40] Ocean Bank qualifies this statement, asserting that this language should not be imputed to challenge questions.
[41] My recitation reflects Ocean Bank's qualification.

bank, including the size, type, and frequency of payment orders normally issued by the customer to the bank. Defendant's SMF ¶ 157; Plaintiff's Opposing SMF ¶ 157.[42]

After the risk profile was complete, if a transaction showed up on that user's account that differed from its normal profile, the risk score associated with that transaction was elevated. *Id.* ¶ 84. Challenge questions were prompted any time the risk score for a transaction exceeded 750 on a scale of zero to 1,000. Plaintiff's SMF ¶ 34; Defendant's Opposing SMF ¶ 34.[43] RSA Security, Inc., the company that developed the risk-scoring application, considered transactions generating risk scores in excess of 750 to be high-risk transactions. *Id.* ¶ 35. The only result of a high-risk score was that a customer was prompted to answer his or her challenge questions. *Id.* ¶ 38;

4.   Device Cookies. Placed a "device cookie" onto customers' computers to identify particular computers used to access online banking. Defendant's SMF ¶ 85; Plaintiff's Opposing SMF ¶ 85. The device cookie was used to help establish a secure communication session with the NetTeller environment and to establish the component risk score. *Id.* ¶ 86. If the cookie changed or was new, that impacted the risk score and potentially resulted in the user being challenged. *Id.*;

---

[42] Patco's objection to paragraph 157 on the basis that it fails to set forth each fact in a separately numbered paragraph as required by Local Rule 56(b), Plaintiff's Opposing SMF ¶ 157, is overruled. While paragraph 157 could and should have been shortened, Patco has not been rendered unable to respond properly and with clarity, as it asserts. *Id.* Patco alternatively qualifies the statement, asserting that, in May 2009, Ocean Bank had configured its system to ask challenge questions on every transaction regardless of the outcome of the Cyota profiling system, depriving the system of its behind-the-scenes functionality as a trigger for challenge questions, and Ocean Bank was not manually reviewing transactions that generated high risk scores in May 2009, depriving the Cyota profiling system of any practical utility. Plaintiff's Opposing SMF ¶ 157. This critique is set forth in detail *infra.*

[43] My recitation reflects Ocean Bank's qualification.

5.     <u>Dollar Amount Rule</u>.  Permitted financial institutions to set a dollar threshold amount above which a transaction would trigger the challenge questions even if the user ID, password, and device cookie were all valid (the "Dollar Amount Rule").  *Id.* ¶¶ 90, 94;[44]

6.     <u>Subscription to eFraud Network</u>.  Provided Ocean Bank with a subscription to the eFraud Network, which compared characteristics of the transaction (such as the IP address of the user seeking access to the Bank's system) with those of known instances of fraud.  *Id.* ¶ 121; Plaintiff's SMF ¶ 36; Defendant's Opposing SMF ¶ 36.  Subscription to the eFraud Network added a higher level of security beyond the individual customer authentication process.  Defendant's SMF ¶ 122; Plaintiff's Opposing SMF ¶ 122.  Any fraudulent activity, IP address, or other indicia identified and reported by a financial institution belonging to the eFraud Network was immediately blocked if someone attempted to access a customer's NetTeller account.  *Id.* The individual would not even be prompted for challenge questions.  *Id.*; and[45]

7.     <u>Reports to Financial Institutions</u>.  Provided reports to financial institutions *via* the Internet through the Cyota dashboard.  *Id.* ¶ 123.  With the Premium Product, financial institutions were provided all standard reports and allowed to create their own custom reports. *Id.*[46]

Not all the security procedures used by Ocean Bank are visible to customers.  *Id.* ¶ 157. Security measures such as device ID, GeoIP, and cookies all happen in the background in order

---

[44] Financial institutions could set other transaction-based rules, such as rules based on transaction type (*e.g.*, ACH *versus* wire) or the location of an IP address in a foreign country, which would prompt the user to answer challenge questions if a particular type of transaction was made.  Defendant's SMF ¶ 116; Plaintiff's Opposing SMF ¶ 116; Plaintiff's SMF ¶ 39; Defendant's Opposing SMF ¶ 39.

[45] Patco qualifies this statement, asserting that it contradicts the Bank's previous description of the eFraud Network as providing fraud scoring for all RSA customers.  Plaintiff's Opposing SMF ¶ 122.  I perceive no inherent conflict. The eFraud Network could serve both functions.

[46] Patco qualifies this statement, asserting that Ocean Bank did not review any reports showing suspicious or high-risk transactions prior to the fraud at Patco, and began reviewing such reports only in late 2009.  Plaintiff's Opposing SMF ¶ 123; Maxwell Dep. (version filed at Docket No. 100-7) at 127-32.

to minimize disruption to customers' experience and the risk of criminals receiving and using the information. *Id.*

### b. Parties' Understandings, Communications on Security Measures

Patco agreed to the use of security passcodes, which consisted of a customer ID and a customer password and a user ID and password for each authorized user of the customer. *Id.* ¶ 145. Patco used challenge questions both (1) in its initial selection of those questions and its input of the answers to those questions and (2) through its use, *i.e.*, when it logged on to online banking almost weekly over the course of years. *Id.* ¶ 146. Specifically, during initial log-in, the Ocean Bank system (through the Premium Product) would prompt every user to provide answers to three challenge questions, which would be used in the future to confirm that user's identity. *Id.*[47] Thus, Patco initially was required to select its preferences of three challenge questions from a drop-down list. *Id.* ¶ 147. Thereafter, it had to input the answers to those challenge questions. *Id.* These three questions, and the answers inputted by Patco, would become the challenge questions with which Patco was presented when it logged on. *Id.* Patco also answered those challenge questions when prompted to do so over the course of many years of logging into its online banking account on a weekly basis. *Id.*[48]

Prior to May 14, 2009, Patco did not communicate any wishes separate and apart from the security procedures included in the agreements governing eBanking and the eBanking for Business User Guide. Defendant's SMF ¶ 148; Tarte Decl. ¶ 40. Patco never expressed its dissatisfaction with these security procedures to Ocean Bank personnel. Defendant's SMF

---

[47] Patco's objection to paragraph 146 on the grounds that it is argumentative, conclusory, and not provided by the record citation provided, Plaintiff's Opposing SMF ¶ 146, is sustained in part, to the extent that I have edited the statement, and otherwise overruled.

[48] Patco's objections to paragraph 147 on the grounds that it is argumentative, conclusory, and not supported by the record citation provided, and that Tarte lacks foundation for his assertion that Patco answered challenge questions over the course of many years, Plaintiff's Opposing SMF ¶ 147, are sustained in part, to the extent that I have edited the statement, and otherwise overruled.

¶ 149; Tarte Decl. ¶ 40. Likewise, prior to May 14, 2009, Patco had not sought any additional protections or expressed dissatisfaction with the eBanking security procedures offered. Defendant's SMF ¶ 150; [Rule] 30(b)(6) Deposition of Patco Construction Company, Inc. (Thomas P. McDowell) and Thomas P. McDowell Individually ("McDowell Dep.") (Docket No. 70), Tab 5 to Appendix, at 226.[49]

McDowell could not recall the specifics of discussions with anyone at Ocean Bank about the eBanking agreement. Defendant's SMF ¶ 151; Plaintiff's Opposing SMF ¶ 151.[50] Patco continued to use eBanking on at least a weekly basis, using the security procedures in place. *Id.* ¶ 152.[51] Patco also agreed that it was responsible for all of the transfers and bill payments that it authorized, including any transactions authorized by third parties that Patco permitted to use its password. *Id.* ¶ 153. Patco further agreed that use of a user's password constituted authentication of all transactions performed by the user or on the user's behalf. *Id.* ¶ 154.

### c. Ocean Bank's Configuration of Dollar Amount Rule

The Dollar Amount Rule was among configurations known as "rules" that Jack Henry allowed financial institutions to modify. *Id.* ¶ 94. For those configurations that Jack Henry

---

[49] Patco purports to deny or qualify paragraphs 148 through 150 on the ground that Patco expressly requested that the Bank send email alerts to Patco on every ACH transaction it initiated, and the Bank agreed, but then failed, to do so. Plaintiff's Opposing SMF ¶¶ 148-50; *see also* Plaintiff's SMF ¶¶ 111-13. Nonetheless, as Ocean Bank points out, Defendant's Opposing SMF ¶¶ 111-13, the request on which Patco relies, emailed by McDowell to the Bank on March 23, 2004, is taken out of context. McDowell's request predated the availability of email alerts, which were first made available to the Bank's customers on December 1, 2006, and McDowell testified that he was not aware that email alerts were available. *Id.* ¶ 111; Suppl. Tarte Decl. ¶ 14; McDowell Dep. at 225. McDowell's request evidently pertained to Patco's practice of emailing Ocean Bank to request transfers from accounts that were not set up for eBanking, with McDowell seeking confirmation that transfers requested by email had been completed. Defendant's Opposing SMF ¶¶ 111-13; Deposition of Diana Pierce ("Pierce Dep.") (Docket No. 71), Tab 12 to Appendix, at 42; Exh. 1 to Declaration of Thomas P. McDowell ("McDowell Decl.") (Docket No. 74-4); Tabs 4I-4K (Docket No. 96) to Suppl. Appendix.

[50] My recitation incorporates Patco's qualification.

[51] Patco qualifies this statement, asserting that, as the Bank itself elsewhere notes, certain security procedures were not visible to customers, and the Bank should not have expected Patco to be in a position to evaluate and understand its online authentication security procedures, which were not expressly made clear. Plaintiff's Opposing SMF ¶ 152; Supplemental Declaration of Sari Stern Greene ("Suppl. Greene Decl.") (Docket No. 99-1) ¶ 37.

allowed its customers to change, Jack Henry had determined that any configuration that the customer chose would result in the effective operation of the multifactor authentication product. *Id.* ¶ 95.[52] Jack Henry determined that a customer could set the Dollar Amount Rule at any particular dollar amount threshold, and its product would operate effectively. *Id.* ¶ 96. Jack Henry allowed modification of particular configurations in certain circumstances, such as the Dollar Amount Rule, because such settings were purely matters of business discretion rather than security (*i.e.*, the rules could be set by a bank at points reasonable for the particular bank, dependent on the bank's customer base, issues of customer convenience, usability, and so on). Defendant's SMF ¶ 97; Edwards Decl. ¶ 26.[53]

Jack Henry's default setting for the Dollar Amount Rule was $1,000. Defendant People['s] United Bank's Additional Statement of Material Facts ("Defendant's Additional SMF"), commencing on page 48 of Defendant's Opposing SMF, ¶ 17; Plaintiff's Reply Statement of Material Facts ("Plaintiff's Reply SMF") (Docket No. 110) ¶ 17. If the customer did not change the default setting, the Dollar Amount Rule would remain set at $1,000. *Id.* ¶ 18. Jack Henry believed that it would be reasonable for bank customers either to leave the Dollar Amount Rule set at the default of $1,000 or to modify it as their business needs changed or as various events, such as low-dollar frauds, occurred. *Id.* ¶ 19. The system permitted banks to set the Dollar Amount Rule at any dollar amount, from $1 up. *Id.*

The $1,000 default Dollar Amount Rule set by Jack Henry was not rolled out to Jack Henry's Premium customers, including Ocean Bank, until August 2007, and, therefore, the

---

[52] Patco qualifies this and other statements, *see, e.g.,* Plaintiff's Opposing SMF ¶ 95, asserting that the setting of the Dollar Amount Rule played an integral role in the effectiveness of Jack Henry's system. This point is set forth in detail *infra.*

[53] By contrast, Jack Henry did not allow financial institutions to modify challenge question collection settings that required users to provide answers to three challenge questions and triggered the blocking of the online banking account if challenge questions were answered incorrectly three times. Defendant's SMF ¶¶ 92-93; Plaintiff's Opposing SMF ¶¶ 92-93.

default Dollar Amount Rule was not implemented in Ocean Bank's Premium Product until then. *Id.* ¶ 20.[54] In August 2007, Ocean Bank set the Dollar Amount Rule to $100,000. Defendant's SMF ¶ 101; Plaintiff's Opposing SMF ¶ 101. The Dollar Amount Rule was set at $100,000 to ensure that customers were not inconvenienced by frequent prompts for challenge questions. *Id.* Ocean Bank also considered current information regarding ACH fraud known in the banking industry at that time in setting the Dollar Amount Rule. *Id.*[55]

On June 6, 2008, Ocean Bank intentionally lowered the Dollar Amount Rule from $100,000 to $1. *Id.* ¶ 103. Neither Jack Henry, RSA Security, nor any other outside security consultant or professional recommended that the Bank set the threshold for challenge questions at any particular dollar amount. Plaintiff's SMF ¶ 46; Maxwell Dep. (version filed at Docket No. 100-7) at 144-45.[56] After the Bank lowered the threshold to $1, Patco was prompted to answer challenge questions every time it initiated an ACH transaction, for instance its weekly ACH payroll transactions. Plaintiff's SMF ¶ 45; Pierce Dep. at 87-88.[57] In May 2009, the Dollar Amount Rule threshold was set at $1. Plaintiff's SMF ¶ 48; Defendant's Opposing SMF ¶ 48. In February 2010, the Bank raised the dollar amount threshold from $1 to $6,000. *Id.* ¶ 49.[58]

---

[54] Patco qualifies paragraphs 17 through 20, asserting that (i) Jack Henry did not make any specific dollar threshold recommendations, (ii) the Bank understood that it had the responsibility to decide the amount at which the Dollar Amount Rule should be set, and (iii) it would not have been reasonable from a security perspective for Jack Henry to implement a "one-size-fits-all" Dollar Amount Rule threshold for all of its NetTeller customers. Plaintiff's Reply SMF ¶¶ 17-20; Maxwell Dep. (version filed at Docket No. 100-7) at 144-45; Second Supplemental Declaration of Sari Stern Greene ("Second Suppl. Greene Decl.") (Docket No. 109-1) ¶ 3.

[55] Patco qualifies this statement, asserting that Maxwell, who was designated by Ocean Bank to testify on the configuration by the bank of its security procedures, testified that the $100,000 threshold was set "where we believed there was a balance between customer experiences, as well as the fraud that was occurring in the industry at that time." Plaintiff's Opposing SMF ¶ 101; Continued Deposition of Kimberly Maxwell ("Continued Maxwell Dep.") (Docket No. 100-8) at 24.

[56] Ocean Bank purports to deny this statement but fails to controvert it. Defendant's Opposing SMF ¶ 46.

[57] Ocean Bank purports to deny this statement but fails to controvert it. Defendant's Opposing SMF ¶ 45.

[58] Ocean Bank qualifies this statement, asserting that, as the threat landscape evolved and cybercriminals became more sophisticated, it reassessed and changed the Dollar Amount Rule threshold from time to time and purposely changed the challenge question amount triggers from time to time to thwart fraudsters' software that was designed to identify the online system's default dollar amount threshold. Defendant's Opposing SMF ¶ 49; Tarte Decl. ¶ 32. It *(continued on next page)*

24

Ocean Bank states that it lowered the Dollar Amount Rule threshold to $1 as a means to enhance security for its customers after the occurrence of ACH frauds at Ocean Bank that targeted low-dollar amount ACH transactions, Defendant's SMF ¶ 104; Tarte Decl. ¶ 32, with fraudsters having begun making fraudulent withdrawals at very low amounts in an attempt to "fly under the radar," Defendant's SMF ¶ 105; Continued Maxwell Dep. at 34, 41; Tarte Decl. ¶ 32; Makohon Decl. ¶ 23. Patco disputes this, noting, *inter alia*, that Maxwell testified that the decision to lower the threshold was not based on specific dollar amounts. Plaintiff's Opposing SMF ¶¶ 104-05; Maxwell Dep. (version filed at Docket No. 100-7) at 146. With respect to the two incidents of fraud on the Bank's system prior to May 2009, individuals with access to the customer's company IDs, passwords, user IDs, and user passwords were prompted for challenge questions. Plaintiff's Local Rule 56(c) Statement of Additional Material Facts ("Plaintiff's Additional SMF"), commencing on page 96 of Plaintiff's Opposing SMF, ¶ 3; Defendant's Reply SMF ¶ 3.[59] With respect to these prior instances of fraud, the Bank believed that the fraud was likely to have been perpetrated by means of keylogging malware or as a result of internal fraud. Plaintiff's SMF ¶ 96; [Rule] 30(b)(6) Deposition of People's United Bank (Jeffrey R. Tarte) and Jeffrey R. Tarte Individually ("Tarte Dep.") (Docket No. 75-9) at 32-34.[60]

Ocean Bank further states that the lowering of the Dollar Amount Rule threshold did in fact increase the security of online banking for customers because it added an additional layer of security every time a customer initiated an ACH transaction. Defendant's SMF ¶ 106; Tarte

---

states that, specifically, malware code was designed by cybercriminals to target certain perceived thresholds, and by varying its Dollar Amount Rule thresholds, Ocean Bank endeavored to interfere with criminals' malware code. *Id.*

[59] My recitation incorporates Ocean Bank's qualification.

[60] Ocean Bank purports to deny this statement, Defendant's Opposing SMF ¶ 96, but its denial is in the nature of a qualification: that Tarte testified that the Bank believed that malware and internal fraud were two possible options, although there could have been other causes, Tarte Dep. at 32-33.

Decl. ¶ 32; Makohon Decl. ¶ 23.[61] There was no fraud in the approximately one-year period following the institution of the $1 limit until the alleged fraudulent withdrawals from Patco's account. Defendant's SMF ¶ 113; Plaintiff's Opposing SMF ¶ 113.[62]

Patco disputes this point as well, stating that, while Jack Henry may have believed that customers could change rules settings, such as the Dollar Amount Rule, without affecting security, Jack Henry was wrong. *See* Plaintiff's Opposing SMF ¶¶ 95-96. Patco states that rules such as the Dollar Amount Rule played an integral role in the effectiveness of the security procedures on Jack Henry's system, pointing to a passage from RSA's Rules Management User Guide that provides:

> **Warning:** Decision rules must be edited **carefully**, slowly, with great caution. These rules are very powerful, directly affecting the customer experience of genuine users as well as playing a major role in fraud prevention.

Plaintiff's Opposing SMF ¶¶ 95-97; Exh. 55 to Continued Maxwell Dep. at PUB_0016391 (boldface in original). Patco also relies on testimony of its expert, Sari Greene, that setting challenge questions to be asked on every transaction greatly increases the risk that a fraudster equipped with a keylogger will be able to compromise the answers to a customer's challenge questions because it increases the frequency with which such information is entered through a

---

[61] Patco objects to paragraphs 104 and 105 on the basis of the asserted lack of personal knowledge of the declarants on whom the Bank relies, Tarte, Maxwell, and Makohon, none having provided any explanation as to the number or specific amounts of purported low-dollar transactions that prompted the change in the rule. Plaintiff's Opposing SMF ¶¶ 104-05. The objection is overruled. The lack of detail does not necessarily signal a lack of personal knowledge of the fact that low-dollar frauds prompted the rule change.

[62] Patco qualifies this statement, asserting that there also had been no ACH fraud during the period between Ocean Bank's implementation of its new authentication system in January 2007 and the frauds on Ocean Bank's system in May and June 2008, during which time Ocean Bank had either no dollar amount threshold or a $100,000 threshold. Plaintiff's Opposing SMF ¶ 113; Tarte Dep. at 29-30; Continued Maxwell Dep. at 18-19, 23. Patco adds that a fourth instance of fraud occurred in January 2010, at which time the Bank still had in place its $1 limit, after which it raised the limit to $6,000. Plaintiff's Opposing SMF ¶ 113; Tarte Dep. at 29-30; Continued Maxwell Dep. at 42-43.

user's keyboard.  Plaintiff's Opposing SMF ¶ 96; Declaration of Sari Stern Greene ("Greene Decl.") (Docket No. 74-1) ¶¶ 19-26, 32.[63]

Ocean Bank denies that the lowering of the Dollar Rule Amount threshold to $1 meant that users were prompted to answer challenge questions every time they initiated an ACH or wire transfer transaction on their accounts, observing that the eFraud Network would immediately block a transaction without asking challenge questions if the transaction involved fraudulent activity, an IP address, or other indicia reported to the eFraud Network.  Defendant's Opposing SMF ¶ 44; Edwards Decl. ¶ 19.

### d.  Whether Ocean Bank Had "True" Multifactor Authentication

Ocean Bank describes the Premium Product as offering multifactor authentication based on its employment of three relevant factors: "something the user knows," "something the user has," and "something the user is."  Defendant's SMF ¶¶ 160-63.  There is no dispute that Ocean Bank's security procedures employed "something the user knows": IDs and passwords and answers to challenge questions.  Defendant's SMF ¶ 160; Plaintiff's Opposing SMF ¶ 160. Ocean Bank asserts, and Patco denies, that its security procedures also employed "something the user has": device identification information specific to the client's personal computer and its use of the Bank's application, and "something the user is": taking into account user behavior. *Compare* Defendant's SMF ¶¶ 161-63; Edwards Decl. ¶ 24; Makohon Decl. ¶ 17; FFIEC Guidance at 7 *with* Plaintiff's Opposing SMF ¶¶ 161-63; Greene Decl. ¶¶ 17-18; Suppl. Greene Decl. ¶¶ 12-13.

---

[63] A "keylogger" is a form of computer malware, or malicious code, capable of infecting a user's system, secretly monitoring the user's Internet activity, recognizing when the user has browsed to the website of a financial institution, and recording the user's key strokes on that website.  Greene Decl. ¶ 20. In this way, the keylogger is able to capture a user's authentication credentials, which the keylogger then transmits to a cyber thief. *Id.*

Patco states that because, as of May 2009, the Bank had configured its security procedures such that challenge questions were triggered on every transaction regardless of the outcome of the device identification system, that system did not trigger any additional security and, accordingly, the Bank's security procedures did not employ "something the user has." Plaintiff's Opposing SMF ¶ 161; Suppl. Greene Decl. ¶¶ 12-13. Patco asserts that the third authentication factor, "something the user is," refers to physical (biometric) characteristics, not behavior patterns. Plaintiff's Opposing SMF ¶ 163; FFIEC Guidance at 7, 9-11. In any event, Patco states, because the Bank configured its procedures to trigger challenge questions on every transaction, the behavioral profiling system did not trigger any additional security. Plaintiff's Opposing SMF ¶ 163; Suppl. Greene Decl. ¶¶ 12-13.

Ocean Bank responds that the fact that the Jack Henry Premium Product may respond to various factors in a particular way, for example, by asking the user for "something the user knows," does not negate the existence of the other factors. Defendant's Additional SMF ¶ 22; Supplemental Declaration of Debra L. Edwards in Support of Defendant People's United Bank's Opposition to Patco Construction Company, Inc.'s Motion for Summary Judgment ("Suppl. Edwards Decl.") (Docket No. 96), Tab 3 to Suppl. Appendix. It states that the FFIEC Guidance explains that a multifactor system must include at least two of the three basic factors, but says nothing about how banks must respond when one of these factors detects an anomaly (*e.g.*, the system recognizes an unusual device ID). *Id.*

In addition to being multifactor, Jack Henry's Premium Product also contains "layered security" and has "other controls," both of which (in Ocean Bank's view) also satisfy the FFIEC Guidance. Defendant's Additional SMF ¶ 23; Suppl. Edwards Decl. ¶ 6; Supplemental Declaration of Peter A. Makohon in Support of Defendant People's United Bank's Opposition to

Patco Construction Company, Inc.'s Motion for Summary Judgment ("Suppl. Makohon Decl.") (Docket No. 96), Tab 2 to Suppl. Appendix, ¶ 17.[64]

Ocean Bank's security procedures are multilayered because they employ challenge questions as well as user IDs/passwords. Defendant's Additional SMF ¶ 24; Plaintiff's Reply SMF ¶ 24. The "other controls" that the Bank employed (*i.e.*, controls in addition to ID/passwords and challenge questions) that, in its view, satisfied the FFIEC Guidance included SSL encryption, invisible device authentication (device cookies), IP Geo location, transaction monitoring, scoring engine for transactions, customer profile, an eFraud Network subscription, reporting, commercial third-party anti-phishing services, posting of fraud alerts on the eBanking website, and email alerting. Defendant's Additional SMF ¶ 25; Suppl. Makohon Decl. ¶ 17.[65]

### 4. Security Measures Implemented in Addition to the Premium Product

### a. Email Alerts

Ocean Bank first offered email alerts to its eBanking customers beginning on December 1, 2006. Defendant's Additional SMF ¶ 21; Plaintiff's Reply SMF ¶ 21. At that time, the Bank began actively promoting the alerts to customers. *Id.* Email alerts were available on the NetTeller website. Defendant's SMF ¶ 126; Plaintiff's Opposing SMF ¶ 126.[66] The cover letter enclosing a copy of the Original eBanking Agreement stated that if Patco had any questions, it should check the user guide online or screen-by-screen icons. *Id.* ¶ 127.[67] The eBanking for

---

[64] Patco purports to deny this statement, Plaintiff's Reply SMF ¶ 23, but the cited portions of the Greene declarations on which it relies do not controvert that the Premium Product was layered or had other controls, although Greene does challenge the effectiveness of the Premium Product as configured by the Bank, Greene Decl. ¶¶ 17-18, 32; Suppl. Greene Decl. ¶¶ 7-13.

[65] Patco's denial is in the nature of a qualification: It denies that the other controls employed by the Bank satisfied the FFIEC Guidance, were commercially reasonable, or constituted multifactor authentication. Plaintiff's Reply SMF ¶ 25; Greene Decl. ¶¶ 17-18, 32; Suppl. Greene Decl. ¶¶ 7-13.

[66] Patco qualifies these statements, asserting that it never saw anything from the Bank indicating that email alerts were available. Plaintiff's Opposing SMF ¶ 126; McDowell Dep. at 176-78; Plaintiff's Reply SMF ¶ 21.

[67] My recitation incorporates Patco's qualification.

Business User Guide, available on Ocean Bank's eBanking website, also provides instructions on how to set up email alerts. *Id.* ¶ 128.[68] A user need only click on a tab visible on the eBanking web page in order to set up the alerts. *Id.* ¶ 129.[69]

Diana Pierce, the Patco employee with primary responsibility for eBanking, admitted navigating to the Preferences tab on at least one occasion, although she did not recall what then happened. *Id.* ¶ 130.[70] McDowell admitted that he never went online and looked at the user guide. *Id.* ¶ 131. Patco did not set up email alerts through the eBanking system. Defendant's SMF ¶ 133; Tarte Decl. ¶ 35.[71]

### b. Anti-Phishing Controls

In 2007, Ocean Bank increased the controls it had on anti-phishing above and beyond the Jack Henry security procedures, which also used anti-phishing starting in or about 2007, and beyond those used by similarly situated banks. Defendant's SMF ¶ 135; Plaintiff's Opposing SMF ¶ 135.[72] The specific product that Ocean Bank used to counter phishing attacks was called "counterphish." *Id.* In 2009, before the allegedly fraudulent withdrawals, Ocean Bank subscribed to another anti-phishing service. *Id.* ¶ 136. At the time of the alleged theft, Ocean

---

[68] Patco qualifies this statement, asserting that it did not see the eBanking for Business User Guide on the Bank's website. Plaintiff's Opposing SMF ¶ 128; McDowell Dep. at 176-78.

[69] Patco purports to deny this statement, but its denial is in the nature of a qualification: It asserts that setting up alerts on the eBanking system required a user to first click on the "Preferences" tab, which was visible from the eBanking web page, and then click a second tab labeled "Alerts," visible only from the Preferences page. Plaintiff's Opposing SMF ¶ 129; eBanking for Business User Guide (Docket No. 68), Tab 1E to Appendix, at PUB_0018085. The user then would have to follow a specific set of procedures to activate individual alerts. *Id.*

[70] My recitation incorporates Patco's qualification (mislabeled as a denial).

[71] Patco purports to deny this, asserting that it specifically requested that the Bank provide such alerts, and the Bank agreed but failed to do so. Plaintiff's Opposing SMF ¶ 133. However, as noted above, the Bank demonstrates that the request in question, made by McDowell on March 23, 2004, was not for alerts tied to eBanking.

[72] So-called "man in the middle" or "phishing" attacks generally function by redirecting the user to a spoof website that is designed to mimic a bank's site, which prompts customers to input their confidential log-in information. Greene Decl. ¶ 26.

Bank had at least two independent anti-phishing services available and one from Jack Henry. *Id.*[73]

### c. Secure Socket Layer

In addition to the Premium Product, Ocean Bank used secure socket layer ("SSL") encryption on its main banking page before customer log-in to online banking. *Id.* ¶ 137. SSL comprises crypotographic protocols that provide security for communications over networks such as the Internet, and appear in a website's URL as "https//" instead of "http//." *Id.* ¶ 138. In particular, Ocean Bank used a Secure Site Pro digital certificate from VeriSign that forces a browser to use the stronger 128-bit encryption as the minimum strength to encrypt data transmitted over the Internet. *Id.* This added security above and beyond the Secure Site solution and was a more expensive product. *Id.*[74]

### d. Phishing and Fraud Alerts

Since 2008, Ocean Bank has posted phishing and fraud alert notices to its customers on its main log-in screen, as well as on the main website, www.ocean.com. *Id.* ¶ 139. Such notices would "pop up" on the screen immediately upon the customer's log-in to the eBanking website. *Id.* ¶ 140. On June 30, 2008, Ocean Bank posted a notice on its website stating: "Please be advised that Ocean Bank has seen evidence of ACH fraud in your area. Our security features remain strong and in place. However, we need your help to combat fraud. Taking the following measures will help to ensure your security. Secure all eBanking IDs and Passwords. Monitor all account daily activity and notify us immediately if you notice anything which appears unusual or

---

[73] Patco purports to qualify paragraphs 135 and 136, as well as other statements by Ocean Bank, on the ground that the security measures discussed are not "security procedures" as defined in Article 4A of the Uniform Commercial Code ("UCC"). *See, e.g.,* Plaintiff's Opposing SMF ¶¶ 135-36. This is not a factual qualification but, rather, a legal argument.

[74] Patco qualifies this statement, asserting, in relevant part, that SSL encryption is commonly used, relatively inexpensive, and not intended to protect against keylogging malware. Plaintiff's Opposing SMF ¶ 138; Suppl. Greene Decl. ¶ 17.

out of the ordinary patterns of your business. Call 1-800-206-3790 to report your concerns." *Id.* ¶ 141.[75]

All of the above security procedures were in effect in May 2009, at the time of the alleged fraudulent withdrawals. *Id.* ¶ 143.[76]

### 5. Security Measures Not Implemented

#### a. Out-of-Band Option

In 2006 and 2007, when Ocean Bank initially implemented its authentication system in response to the FFIEC Guidance, the Bank was offered by Jack Henry, but declined, a version of the NetTeller system that included an out-of-band authentication option. Plaintiff's SMF ¶ 118; Defendant's Opposing SMF ¶ 118.[77]

#### b. Monitoring of Risk-Scoring Reports

In May 2009, Bank personnel did not monitor the risk-scoring reports received as part of the Premium Product package, nor did the Bank conduct any other regular review of transactions

---

[75] Patco qualifies paragraphs 139 through 141, asserting that website postings, particularly pop-up notices, are an insufficient means of informing customers of important security procedure updates because many browsers and anti-malware programs are configured to block pop-up messages. Plaintiff's Opposing SMF ¶¶ 139-41; Suppl. Greene Decl. ¶ 32. It also states that Ocean Bank has no evidence that anyone from Patco saw the described notices. Plaintiff's Opposing SMF ¶ 141.

[76] Patco qualifies this statement, Plaintiff's Opposing SMF ¶ 143, asserting, in relevant part, that, in May 2009, (i) the Bank was not actively reviewing any reports produced by the NetTeller system, Maxwell Dep. (version filed at Docket No. 100-7) at 131-32, and (ii) the transaction-monitoring and risk-scoring engines were not used by the Bank in any meaningful way because they were used to prompt challenge questions, and the Bank had lowered the dollar amount threshold to prompt challenge questions to $1, Continued Maxwell Dep. at 41; Pierce Dep. at 87-88.

[77] Ocean Bank qualifies this statement, asserting that it did not opt for Jack Henry's out-of-band option because it allowed the end-user to choose, when prompted with challenge questions, whether to answer the questions or have the system call the user with a new passcode for the user to input into the computer. Defendant's Opposing SMF ¶ 118; Edwards Decl. ¶ 14. Ocean Bank states that a fraudster who had already obtained answers to the challenge questions through malware could simply choose to answer the challenge questions. *Id.* Ocean Bank asserts that it had determined, as well, that Jack Henry's configuration allowed customers to input and change their own phone numbers. Defendant's Opposing SMF ¶ 118; Tarte Decl. ¶ 27. Accordingly, a fraudster who obtained a customer's ID and password could change the customer's phone number so that the system would call the fraudster rather than the true customer. *Id.* For these reasons, Ocean Bank explains, it determined that Jack Henry's out-of-band feature provided little to no benefit in an overall security framework. *Id.*; *see also* Defendant's SMF ¶ 81; Tarte Decl. ¶ 27. Patco asserts that, according to the RSA Customer Service Guide, financial institutions could choose whether to use out-of-band or challenge-response only, or a combination of the two, in which case the financial institution could specify which technology would be used first. Plaintiff's Opposing SMF ¶ 81; Customer Service User Guide (Docket No. 74-1), Exh. 10 to Greene Decl., at PUB_0015796.

that generated high risk scores. Plaintiff's SMF ¶ 37; Defendant's Opposing SMF ¶ 37.[78] In May 2009, the Bank had the capability to conduct manual reviews of high-risk transactions. *Id.* ¶ 86. Ocean Bank did not conduct such reviews in May 2009. *Id.* ¶ 87. The Bank began conducting manual reviews of high-risk transactions in late 2009. *Id.* ¶ 88. In May 2009, the Bank had the capability to conduct manual review of high-risk transactions through its transaction-profiling and risk-scoring system, but did not do so. *Id.* ¶ 109. The Bank had the ability to call a customer if it detected fraudulent activity. *Id.* ¶ 110.

In the case of uncharacteristic transactions, the Bank now calls the customer to inquire if the customer did indeed initiate the transaction. Plaintiff's SMF ¶ 89; Maxwell Dep. (version filed at Docket No. 100-7) at 129.[79] The Bank added manual reviews as a result of increased fraud in the ACH network. Plaintiff's SMF ¶ 90; Defendant's Opposing SMF ¶ 90. The Bank became aware of this increased fraud in the ACH network throughout 2009. *Id.* ¶ 91.[80] By May 2009, Ocean Bank was aware of two, possibly three, prior incidents of ACH fraud on its eBanking system that had occurred in May and June 2008. *Id.* ¶¶ 93-94.

---

[78] Ocean Bank qualifies this and other statements made by Patco pertaining to manual review, asserting that (i) the Jack Henry Premium Product system that it employed did not require manual review, (ii) in May 2009, the Premium Product system generated reports that included hundreds of events each day, including a great many events other than ACH transactions, such as log-ins or other activities that did not involve the transfer of money, and numerous "false positives," and (iii) over time, it became more feasible to manually review risk-scoring reports. Defendant's Opposing SMF ¶ 37; Suppl. Tarte Decl. ¶ 13. Ocean Bank adds that Patco itself logged into its eBanking account six times during the week of the alleged fraudulent withdrawals but failed to notice and report the suspicious activity. Defendant's Opposing SMF ¶ 37; Tarte Decl. ¶ 46.

[79] Ocean Bank purports to deny this statement, but its denial is in the nature of a qualification: that Maxwell testified that, when a risk score is above a certain amount, the Bank first compares the transaction against the customer's transaction history to determine if it is typical for that customer to be originating that amount that day and then examines the IP address from which the transactions are made to determine if it is an atypical IP address for the customer, only calling the customer if it determines that the transaction is not typical. Defendant's Opposing SMF ¶ 89; Maxwell Dep. (version filed at Docket No. 100-7) at 129-30.

[80] Ocean Bank qualifies this statement, asserting that it became aware in 2008 that fraudsters had begun making fraudulent withdrawals in very low amounts, after which it implemented "pop-up" notices to its customers alerting them of the need to monitor their accounts on a daily basis and lowered the amount of its Dollar Amount Rule to $1. Defendant's Opposing SMF ¶ 91; Continued Maxwell Dep. at 34, 41; Tarte Decl. ¶¶ 32, 37.

### c. Tokens

A token-based solution was not available from Jack Henry when Ocean Bank implemented the Premium Product in 2007. Defendant's SMF ¶ 165; Plaintiff's Opposing SMF ¶ 165.[81] Jack Henry began testing tokens with just a few of its customers in January 2009. *Id.* ¶ 166. In May 2009, less than 2 percent of Jack Henry NetTeller customers were using tokens. *Id.* ¶ 167. Today, only 25 percent of Jack Henry's customers offer tokens to some or all of their customers. *Id.* ¶ 168.[82]

In May 2009, People's United Bank used tokens for its ACH and wire origination customers. Plaintiff's SMF ¶ 106; Defendant's Opposing SMF ¶ 106.[83] In May 2009, Wachovia used tokens for its commercial accounts. *Id.* ¶ 107.[84] Ocean Bank recently began offering tokens to its customers that originate ACH transfers. *Id.* ¶ 117.

### d. User-Selected Picture

Ocean Bank's security procedures did not include the user-selected picture function that was available through Jack Henry's Premium option. Plaintiff's Additional SMF ¶ 2; Defendant's Reply SMF ¶ 2.[85]

---

[81] "Tokens are physical devices (*something the person has*) and may be part of a multifactor authentication scheme." FFIEC Guidance at 8 (emphasis in original). The FFIEC Guidance provides examples of three types of tokens: a USB token device, a smart card, and a password-generating token. *Id.* Patco qualifies paragraph 165, asserting that tokens were readily available to financial institutions at that time through other sources. Plaintiff's Opposing SMF ¶ 165; Suppl. Greene Decl. ¶ 21.

[82] Patco qualifies this statement, asserting that it does not account for customers that have requested token technology and are waiting for it to be implemented. Plaintiff's Opposing SMF ¶ 168; Suppl. Greene Decl. ¶ 22.

[83] Ocean Bank qualifies this statement, asserting that People's United Bank, unlike Ocean Bank, used an in-house online banking system and was not dependent on third-party banking platform providers. Defendant's Opposing SMF ¶ 106; Suppl. Tarte Decl. ¶ 12.

[84] The Bank's objection on the ground that this fact is irrelevant and immaterial, given that the Bank has no way of verifying whether every Wachovia customer used tokens, that Wachovia, a national bank, is not similarly situated to Ocean Bank, and that tokens can be compromised and deliver a false sense of security, Plaintiff's Opposing SMF ¶ 107, is overruled. These concerns go to the weight rather than the admissibility of the statement.

[85] Ocean Bank qualifies this statement, asserting that it used other anti-phishing controls, including three anti-phishing services, and since 2008 has posted various notices regarding account phishing and ACH fraud on the main log-in page to its online banking site for its eBanking customers as well as on the main website. Defendant's Reply SMF ¶ 2; Tarte Decl. ¶¶ 36-37.

## D. The May 2009 Allegedly Fraudulent Transactions

In the year 2009, 3,761,327 ACH transactions were sent from the Northern New England Divisions of People's United Bank, including Ocean Bank. Defendant's Additional SMF ¶ 1; Plaintiff's Reply SMF ¶ 1. Between February 13, 2009, and May 6, 2009, Patco successfully logged into its account approximately 107 times. *Id.* ¶ 2. These 107 log-ins represent every time that Patco logged into its eBanking account for any purpose over this time period. *Id.* ¶ 3. The Jack Henry Premium Product risk-scoring engine worked in the background during each of these 107 account activity log-ins. *Id.* ¶ 4.[86] During these 107 log-ins, Patco initiated 12 ACH transactions and was prompted with its challenge questions 12 times. *Id.* ¶ 5. Of these 12 ACH transactions, all but one was for more than $1,000. *Id.* ¶ 6. Specifically, seven of Patco's ACH transactions were for more than $16,000. *Id.* Four were for more than $24,000, and one was for more than $200,000. *Id.* One of Patco's 12 ACH transactions was a $204,724 ACH transfer from Patco's Maine Bank & Trust account to its Ocean Bank checking account. *Id.* ¶ 7. This transfer was initiated on May 3, 2009. *Id.*

On May 6, 2009, one day prior to the first allegedly unauthorized withdrawal, Patco employee Pierce used eBanking to make an ACH transaction in the amount of $16,026.58. *Id.* ¶ 8. Patco's account was set up so that money could be both transferred into or out of Patco's Ocean Bank account. *Id.* ¶ 9. This means that Patco had the capability to, among other things, transfer money from its Ocean Bank account to its account at Maine Bank & Trust. *Id.*[87]

---

[86] Patco qualifies this statement, denying that the risk-scoring engine triggered any heightened authentication after the Bank lowered the Dollar Amount Rule threshold to $1. Plaintiff's Reply SMF ¶ 4; Suppl. Greene Decl. ¶ 13.

[87] Patco qualifies this statement, asserting that the account arrangement was set up at the recommendation of the Bank for the purpose of transferring deposited funds from the Maine Bank & Trust account into the Ocean Bank account. Plaintiff's Reply SMF ¶ 9; McDowell Dep. at 92-93 (version filed at Docket No. 100-3).

Beginning on May 7, 2009, a series of withdrawals were made on Patco's account over the course of several days. Defendant's SMF ¶ 183; Plaintiff's Opposing SMF ¶ 183. On May 7, 2009, unknown third parties initiated a $56,594 ACH withdrawal from Patco's account. *Id.* ¶ 184. The Bank authenticated this electronic transfer with Patco's company ID and password and Diana Pierce's proper credentials, including her ID, password, and answers to challenge questions. Plaintiff's SMF ¶ 56; Defendant's Opposing SMF ¶ 56. Whoever initiated this transaction did not submit an incorrect password or answers to challenge questions even once. *Id.*[88]

This payment was directed to the accounts of numerous individuals, none of whom had previously been sent money by Patco. *Id.* ¶ 57. The perpetrators logged in from a device unrecognized by Ocean Bank's system, and from an IP address that Patco had never before used. *Id.* ¶ 58. The risk-scoring engine generated a risk score of 790 for the May 7, 2009, transaction. *Id.* ¶ 60. The risk-scoring engine reported the following contributors to the risk score for that transaction: (i) "Very high risk non-authenticated device"; (ii) "High risk transaction amount"; (iii) "IP anomaly"; and (4) "Risk score distributor per cookie age." *Id.* ¶ 61. An RSA manual describing risk score contributors states that any transaction triggering the contributor "Very high risk non-authenticated device" is "a very high-risk transaction." *Id.* ¶ 62. Patco's legitimate transactions generally produced risk scores in the range of 10 to 214, and the documents produced show no prior risk score exceeding 214. *Id.* ¶ 63.[89] Bank personnel did not manually

---

[88] My recitation incorporates Ocean Bank's qualification.

[89] Ocean Bank qualifies this statement, asserting that it is based on a report showing Patco's log-ins from April 14, 2009, until the alleged fraudulent withdrawals started, because no reports were available for the time period from January 2007 through April 14, 2009. Defendant's Opposing SMF ¶ 63; Suppl. Tarte Decl. ¶ 11.

review the May 7, 2009, transaction. *Id.* ¶ 64. The Bank batched and processed the transaction as usual, and it was paid the next day. *Id.* ¶ 65.[90]

On Friday, May 8, 2009, unknown third parties again successfully initiated an ACH payment order from Patco's account, this time in the total amount of $115,620.26. *Id.* ¶ 66. As with the prior day's transactions, the perpetrators wired money to multiple individual accounts to which Patco had never before sent funds. *Id.* ¶ 67. The perpetrators again used a device that was not, except with regard to the prior day's transaction, recognized by Ocean Bank's system. *Id.* ¶ 68. The payment order originated from the same IP address as the day before. *Id.* ¶ 69. The transaction was larger than any ACH transfer Patco had ever made to third parties. *Id.* ¶ 70.[91] Despite these unusual characteristics, the Bank again batched and processed the transaction as usual, which was paid by the Bank on Monday, May 11, 2009. *Id.* ¶ 71.[92]

On May 11, 12, and 13, unknown third parties initiated further withdrawals from Patco's account in the amounts of $99,068, $91,959, and $113,647, respectively. *Id.* ¶ 72. These transactions involved the sending of money to individuals to whom Patco had never before sent funds, used a device that was not recognized by Ocean Bank's system, and used an IP address that was not recognized as a valid IP address of Patco. Plaintiff's SMF ¶ 73; McDowell Decl.

---

[90] Ocean Bank qualifies this statement, asserting that it did so because the transaction was properly authenticated with Patco's company ID and password and Pierce's credentials, consistent with the Original eBanking Agreement and the Modified eBanking Agreement. Defendant's Opposing SMF ¶ 65; Tarte Decl. ¶ 45; Original eBanking Agreement § XIV; Modified eBanking Agreement § XVI.

[91] Ocean Bank qualifies this statement, asserting that Patco frequently made ACH transactions from its Maine Bank & Trust account to its Ocean Bank checking account that exceeded the amounts of the alleged fraudulent withdrawals, and initiated a $204,724 ACH transfer from its Maine Bank & Trust account on March 3, 2009. Defendant's Opposing SMF ¶ 70; Tarte Decl. ¶ 49; Suppl. Tarte Decl. ¶ 9.

[92] With respect to this transaction, as well, Ocean Bank offers the qualifier that it did so because the transaction was properly authenticated with Patco's company ID and password and Pierce's credentials, consistent with the Original eBanking Agreement and the Modified eBanking Agreement. Defendant's Opposing SMF ¶ 71; Tarte Decl. ¶ 45; Original eBanking Agreement § XIV; Modified eBanking Agreement § XVI. The Bank further qualifies Patco's assertions regarding this transaction by stating that Patco logged into eBanking six times during the week of the allegedly fraudulent withdrawals but failed to notice or to notify the Bank of this allegedly fraudulent transaction at the time. Defendant's Opposing SMF ¶ 67; Tarte Decl. ¶ 46.

¶¶ 9-10; Exh. 16 to Maxwell Dep. (version filed at Docket No. 100-7) at PUB_0013752-55.[93] As a result of these unusual characteristics, these transactions continued to generate higher than normal risk scores. Plaintiff's SMF ¶ 74; Defendant's Opposing SMF ¶ 74.[94] The log-in on May 11, 2009, generated a risk score of 720, while the May 13, 2009, withdrawal generated a risk score of 785. *Id.* ¶ 75. The Bank did not manually review any of these transactions to determine their legitimacy. Plaintiff's SMF ¶ 76; Maxwell Dep. (version filed at Docket No. 100-7) at 131-32.[95]

Portions of the transfers, beginning with the first transfer initiated on May 7, 2009, were returned to the Bank because certain of the account numbers to which the money was slated to be transferred were invalid. Defendant's SMF ¶ 77; Plaintiff's Opposing SMF ¶ 77. As a result, the Bank sent return notices to the home of Mark Patterson, one of Patco's principals, *via* U.S. mail. *Id.* ¶ 78.[96] Patco received the first such notice on the evening of May 13, a full six days after the allegedly fraudulent withdrawals began. *Id.* ¶ 79.[97] The next morning, on May 14, 2009, Patco called the Bank to inform it that Patco had not authorized the transactions. *Id.* ¶ 80. Also on the morning of May 14, another alleged fraudulent transaction was initiated from

---

[93] Ocean Bank purports to deny paragraph 73, Defendant's Opposing SMF ¶ 73, but its assertions do not contradict it.

[94] Ocean Bank qualifies this statement, asserting that it is based on the limited sample of risk scores available for the period from April 14, 2009, through the time of the alleged fraudulent withdrawals, with RSA reports for the period from January 2007 through April 14, 2009, no longer being available. Defendant's Opposing SMF ¶ 74; Suppl. Tarte Decl. ¶ 11.

[95] The Bank purports to deny this statement, but its denial is in the nature of a qualification: that these ACH transactions were batched only after the Jack Henry Premium Product properly authenticated the transactions with Patco's company ID and password and Pierce's user ID and password and answers to challenge questions. Defendant's Opposing SMF ¶ 76; Tarte Decl. ¶ 45.

[96] Ocean Bank purports to qualify this statement, asserting that Patco chose to have notices sent by mail to Mark Patterson's home. Defendant's Opposing SMF ¶ 78. However, the citations given support only the proposition that Patco chose to have *bank statements* sent to Mark Patterson's home. McDowell Dep. at 77; [Rule] 30(b)(6) Deposition of Patco Construction Company, Inc. (Mark I. Patterson) ("Patterson Dep.") (Docket No. 70), Tab 6 to Appendix, at 49-50.

[97] Ocean Bank admits that Patterson testified to this effect but denies that this was Patco's first notice, asserting that during the week of the fraudulent withdrawals, Patco logged into its eBanking account six times and that, upon log-in, a customer's account balances are conspicuously displayed on the eBanking main page and would have been visible when Patco logged into its account. Defendant's Opposing SMF ¶ 79; Tarte Decl. ¶ 46.

Patco's account in the amount of $111,963. *Id.* ¶ 81. The Bank initially processed this payment order on May 15, 2009. *Id.* ¶ 82.[98] The Bank was able to block a portion of this transaction and recovered a portion of the transferred funds shortly thereafter. *Id.* ¶ 83. Of the total amount withdrawn from Patco's account between May 7 and 15, 2009, Ocean Bank blocked $243,406.83. *Id.* ¶ 84.[99]

Ocean Bank accepted the allegedly fraudulent May 2009 payment orders in compliance with its security procedures. Defendant's SMF ¶ 194; Tarte Decl. ¶ 48.[100] There was no evidence of any security breach on Ocean Bank's systems. Defendant's SMF ¶ 195; Plaintiff's Opposing SMF ¶ 195. Ocean Bank authenticated the May 2009 electronic transfers with Patco's company ID and password and Pierce's proper credentials, including her ID, password, and answers to challenge questions. *Id.* ¶ 196. Whoever perpetrated the alleged fraud knew Patco's company ID and password and Pierce's proper credentials because the person did not submit an incorrect password or incorrect answers to challenge questions even once. *Id.* ¶ 197.

The nature of the Jack Henry application architecture is such that the only place that all authentication credentials can be compromised is on the end-user's computer. *Id.* ¶ 200. Jack Henry's architecture houses the authentication information as encrypted data only and stores parts of it in multiple separate locations (including storing some of the information only on the system of RSA, a different company). *Id.* ¶ 201. This design is such that it would be virtually

---

[98] Ocean Bank qualifies this statement, asserting that the ACH transactions were only batched after the Jack Henry Premium Product authenticated them with Patco's company ID and password and Pierce's user ID, password, and correct answers to challenge questions. Defendant's Opposing SMF ¶ 82; Tarte Decl. ¶ 45.
[99] My recitation incorporates Ocean Bank's qualification.
[100] Patco purports to deny this statement, but its denial is in the nature of a qualification: that the fraudulent withdrawals were not authenticated by the invisible device ID and the Cyota profiling system because these systems both operated as triggers for challenge questions, and by May 2009 Ocean Bank had configured its system to ask challenge questions on every transaction regardless of the system's recognition of the device used or the risk score associated with the event. Plaintiff's Opposing SMF ¶ 194; Defendant's SMF ¶¶ 84-88; Continued Maxwell Dep. at 33-34, 41.

impossible for someone to garner all of the authentication information without obtaining it from the end-user. *Id.* It has been Jack Henry's experience that virtually all of the fraud incidents involving banks that use Jack Henry products relate back to a compromise of the end-user's machine. *Id.* ¶ 202. Breaching Ocean Bank's systems to obtain Pierce's credentials would have been nearly impossible, as the password was stored encrypted on bank systems, and the challenge question answers were stored at a separate company, Jack Henry/RSA. *Id.* ¶ 203. Patco was the only customer of Ocean Bank that experienced any alleged online banking fraud in May 2009. *Id.* ¶ 205.

Patco did not monitor its eBanking accounts on a daily basis. *Id.* ¶ 206. One of the documented "major duties and responsibilities" of Patco's Accounting Supervisor Diana Pierce, who was primarily responsible for Patco's eBanking, was to "maintain[] summary of weekly cash and cash requirements, allocation of funds between accounts, [and] monitor[] online banking[.]" *Id.* ¶ 207. After a March 2009 reduction in force, Pierce monitored Patco's account sporadically, "maybe a couple times a month[.]" *Id.* ¶ 208.[101] During the week of the fraudulent withdrawals, Patco logged into its eBanking account six times but failed to notice and report the suspicious activity. *Id.* ¶ 209.[102] When a customer logs into eBanking, its account balances are conspicuously displayed on the eBanking main page. *Id.* ¶ 210.[103]

### E. Patco's Handling of Its Computers in Wake of Transactions

According to Ocean Bank, on May 14, 2009, immediately after the allegedly fraudulent withdrawals occurred, the Bank instructed Patco to disconnect the computers it used for

---

[101] My recitation includes, in relevant part, Patco's qualification.

[102] Patco qualifies this statement, asserting that it primarily performed Positive Pay uploads during those six occasions and that logging into eBanking in itself would not provide any indication that fraudulent ACH transactions had taken place. Plaintiff's Opposing SMF ¶ 209; McDowell Dep. at 247-48.

[103] Patco qualifies this statement, asserting that account balance information in itself would not provide any indication that fraudulent transactions had taken place. Plaintiff's Opposing SMF ¶ 210; McDowell Dep. at 247-48.

electronic banking from its network, stop using these computers for work purposes, leave the computers turned on, and bring in a third-party forensic professional or law enforcement to create a forensic image of the computers to determine whether a security breach had occurred. Defendant's SMF ¶ 214; Tarte Decl. ¶ 47.  Patco disputes this, stating that a Bank employee recommended only that it check its system for a security breach using a third-party forsensic party, which it attempted to do.  Plaintiff's Opposing SMF ¶ 214; McDowell Dep. at 257-58, 262 (version filed at Docket No. 100-3).

Patco did not isolate its computers or forensically preserve the hard drives.  Defendant's SMF ¶ 215; Declaration of Edward M. Stroz in Support of Defendant People's United Bank's Motion for Summary Judgment ("Stroz Decl.") (Docket No. 69), Tab 4 to Appendix, ¶ 11.[104] Patco irretrievably altered the computer evidence on the hard drives by (i) failing to take the Pierce and Bramblett computers offline immediately, (ii) allowing Pierce and Bramblett to continue to use their computer during the week following the alleged fraud, and (iii) having an outside IT consultant, Gorham Micro, run anti-malware scans on the Pierce hard drive. Defendant's SMF ¶ 218; Stroz Decl. ¶ 11.[105]

A remnant of Zeus/Zbot malware was found on the Pierce and Bramblett hard drives. Defendant's SMF ¶ 220; Plaintiff's Opposing SMF ¶ 220.[106]  However, the Zeus/Zbot malware,

---

[104] Patco purports to deny this statement, Plaintiff's Opposing SMF ¶ 215, but the McDowell deposition excerpts on which it relies do not controvert that Patco failed to forensically preserve computer hard drives, McDowell Dep. at 263, 277-80 (version filed at Docket No. 100-3). McDowell does testify that Patco isolated Pierce's computer, but indicates that this did not happen until Monday, May 18, 2009. *Id.* at 277-78.

[105] Patco's objection to this statement on the ground that it is conclusory and argumentative, Plaintiff's Opposing SMF ¶ 218, is overruled.  Patco alternatively purports to deny this statement, *id.*, but the McDowell deposition excerpts and Greene declaration excerpt on which it relies do not controvert it, McDowell Dep. at 262, 279-83 (version filed at Docket No. 100-3); Greene Decl. ¶ 31.

[106] According to Stroz, Zeus software typically "resides on the user's computer and inserts itself into a user's interaction with an online banking website in such a way that the user may be led to believe that he or she is interacting with the legitimate banking website, but, instead, is viewing information supplied by Zeus.  Therefore, Zeus can be programmed to display questions similar to the bank's legitimate security questions.  The responses to *(continued on next page)*

which contained the encryption key for the Zeus/Zbot configuration file, was quarantined and deleted by the anti-malware scan. *Id.* ¶ 222. Without the encryption key, it is impossible to decrypt the configuration file. *Id.* The configuration file would have identified which banks, if any, the Zeus/Zbot malware would have implicated, if in fact it was of a type that would have intercepted authentication credentials. *Id.* ¶ 223.[107] Without the configuration file, there is no way to tell whether the particular Zeus/Zbot malware version indicated by the remnant on Patco's computer was programmed to intercept online banking credentials. *Id.* ¶ 224.[108] Ocean Bank asserts, and Patco denies, that because the configuration file cannot be decrypted and analyzed to determine whether the Zeus/Zbot was configured with the design to steal Pierce's ACH credentials, it is impossible to say with any certainty that Zeus or another form of malware or something else altogether (*e.g.*, Patco sharing its credentials with a third party) was responsible for the alleged fraudulent withdrawals. *Compare* Defendant's SMF ¶ 225; Stroz Decl. ¶ 22 *with* Plaintiff's Opposing SMF ¶ 225; Greene Decl. ¶ 30.

### F.  Commercial Reasonableness of Ocean Bank's Security Measures

When the Bank chose its security features, it had to consider not only the threat posed by keyloggers but also threats from various sources including other types of malware such as man-in-the-middle attacks, insider fraud (*e.g.*, employee theft), cyber attacks targeting its online banking application infrastructure, and security breaches of the customer's premises (*e.g.*, theft of tokens, location cameras, intruders). Defendant's Additional SMF ¶ 13; Plaintiff's Reply

---

these questions, as well as other data entered into the page displayed by Zeus, including a user's credentials, can then be sent to a third party and may be stored and used by that third party." Stroz Decl. ¶ 17.

[107] Patco qualifies this statement, asserting that notwithstanding that the configuration file was quarantined and deleted, there is sufficient evidence, including that remnants of a "Zeus Trojan" were found on Patco's machine and that the sequence of events is highly indicative of a Zeus attack, to conclude that it is more likely than not, and indeed highly probable, that the Zeus Trojan was responsible for the fraudulent withdrawals in this case. Plaintiff's Opposing SMF ¶ 223; Greene Decl. ¶ 30.

[108] Patco qualifies this statement, asserting that Zeus generally and most often is used exactly for this purpose. Plaintiff's Opposing SMF ¶ 224; Stroz Decl. ¶ 17.

SMF ¶ 13.[109] Nearly all versions of keylogging malware are able to record data in a log and report it back to the fraudster, who can review it at a later time. *Id.* ¶ 14. The fraudster does not need to be actively monitoring the customer's activity at the time the customer enters the relevant credentials. *Id.* There are thousands of keylogger "drop sites" on the Internet that collect and store credentials for fraudsters to mine and use at a later time. *Id.* This means that, as long as the customer has input his credentials (such as answers to challenge questions) even once into a computer that is compromised by keylogging malware, the fraudster can retrieve those credentials that day, or weeks or even months later. *Id.*[110]

Challenge questions are an excellent form of security against attacks using spoof websites. Defendant's Additional SMF ¶ 15; Suppl. Makohon Decl. ¶ 15. Even in the rare case that a fraudster using a spoof website knows the universe of challenge questions from which the user may select, he or she has no way of knowing which challenge questions the customer has chosen to answer. *Id.* For this reason, fraudsters using spoof websites often prompt users for answers to challenge questions by using generic language such as asking for the answer to "Challenge Question 2," rather than asking the actual challenge questions themselves. *Id.* In contrast, the Bank's security system asks the user the precise challenge question, such as "What is your spouse's middle name?" Defendant's SMF ¶ 16; Suppl. Makohon Decl. ¶ 15. Thus, a customer accustomed to answering challenge questions on the Bank's website is much more

---

[109] Patco qualifies this statement, asserting that, while it is true that the Bank had to consider other threats, as of 2009 the ability of malicious Trojans to compromise the computers of end-users through keyloggers had become well known, and keyloggers were widely regarded as one of the predominant – if not the predominant – threats facing the online banking community. Plaintiff's Reply SMF ¶ 13; Suppl. Greene Decl. ¶¶ 2, 5, 9, 11.

[110] Patco qualifies this statement, asserting that with a properly configured challenge question system, a fraudster using a keylogger would have to wait until the customer initiated an atypical transaction, and thus triggered the challenge questions, in order to steal the answers to the questions, which should be a very rare occurrence. Plaintiff's Reply SMF ¶ 14; Second Suppl. Greene Decl. ¶ 6.

likely to notice something amiss on a spoof website if he or she is prompted for the answers to challenge questions by generic language. *Id.*[111]

Ocean Bank asserts, based in part on its expert Peter Makohon's opinion, that its security procedures in May 2009 were more than commercially reasonable and provided multifactor authentication and that both the Jack Henry Basic and Premium products were designed to, and did, exceed the recommendations set forth in the FFIEC Guidance, as both products employed multifactor authentication. Defendant's SMF ¶¶ 158-59; Makohon Decl. ¶¶ 10, 17; Edwards Decl. ¶ 22; Tarte Decl. ¶ 42. Based on the opinion of its expert, Sari Greene, Patco denies these assertions. Plaintiff's Opposing SMF ¶¶ 158-59; Greene Decl. ¶¶ 17-26, 32; Suppl. Greene Decl. ¶¶ 2-10, 12-13, 15-16, 33-34.[112]

The parties dispute whether, as Ocean Bank asserts, its security procedures would have been commercially reasonable and complied with FFIEC Guidance as of May 2009, even if the only security feature the Bank had was company IDs and passwords, individual user IDs and passwords, and challenge questions and answers, because such a system constitute multilayered security. *Compare* Defendant's Additional SMF ¶ 26; Suppl. Makohon Decl. ¶ 18 *with* Plaintiff's Reply SMF ¶ 26; Greene Decl. ¶¶ 19-26, 32; Suppl. Greene Decl. ¶¶ 2-10, 12, 15-16, 33-34.[113]

Banks that were using tokens at the time were still experiencing ACH fraud primarily due to security weaknesses on the customers' personal computer and supporting IT infrastructure,

---

[111] Patco purports to deny paragraphs 15 and 16, but its denial is in the nature of a qualification: that challenge questions that are asked too frequently are not an excellent form of security against attacks using spoof websites. Plaintiff's Reply SMF ¶¶ 15-16; Greene Decl. ¶ 26.

[112] Patco's objection on the ground that the Bank sets forth conclusory opinions on a matter of law, Plaintiff's Opposing SMF ¶¶ 158-59, is overruled with the proviso that the court is indeed the final arbiter on these issues.

[113] Patco's objection on the ground that the Bank sets forth conclusory opinions on a matter of law, Plaintiff's Reply SMF ¶ 26, is overruled with the proviso that the court is indeed the final arbiter on these issues.

44

and fraudsters were able to compromise a token within seconds of a user entering the token into the bank's web page. Defendant's SMF ¶ 170; Makohon Decl. ¶ 20.[114]

Ocean Bank did not use tokens in May 2009 because it viewed the many security features offered through Jack Henry's Premium Product as more than sufficient to comply with FFIEC Guidance. Defendant's SMF ¶ 171; Plaintiff's Opposing SMF ¶ 171.[115] Tokens were just one more available alternative security option. *Id.* ¶ 172.[116] Moreover, it would have taken Ocean Bank six months or more to roll out tokens to its customer base. *Id.* ¶ 173.

The parties dispute whether, as Ocean Bank asserts, IP blocking and out-of-band authentication would have had little or no impact here, as both have been bypassed by cybercriminals since 2008 and receiving passwords or tokens submitted over out-of-band technologies is not effective, if the passwords are entered into the banking portal through a compromised personal computer. *Compare* Defendant's SMF ¶ 174; Makohon Decl. ¶ 20 *with* Plaintiff's Opposing SMF ¶ 174; Suppl. Greene Decl. ¶¶ 24-26.

The parties also dispute whether, as Ocean Bank asserts, its security procedures in May 2009 were well above the security procedures employed by similarly situated banks at the time. Compare Defendant's SMF ¶ 175; Makohon Decl. ¶ 18 *with* Plaintiff's Opposing SMF ¶ 175; Suppl. Greene Decl. ¶ 33-34.[117] Currently, 50 percent of Jack Henry's financial institutions are

---

[114] Patco purports to deny this statement, Plaintiff's Opposing SMF ¶ 170; however, the cited portions of the declarations of Greene on which it relies qualify, rather than controvert, the statement, with Greene asserting that, while it is true that tokens can be and have been compromised, they still offer increased security over challenge questions alone, Suppl. Greene Decl. ¶ 19.

[115] Patco qualifies this statement, stating that this belief was erroneous. Plaintiff's Opposing SMF ¶ 171; Suppl. Greene Decl. ¶¶ 7-13, 19-21.

[116] Patco's objection to this statement on the basis that it is argumentative and conclusory, Plaintiff's Opposing SMF ¶ 172, is overruled. Patco alternatively qualifies the statement, asserting that, in the words of Jack Henry itself, tokens are "a very secure option that virtually eliminates the risk of an unauthorized user accessing [a] customer's accounts." *Id.*; Exh. 23 to Maxwell Dep. (version filed at Docket No. 100-7) at PUB_0018181.

[117] Patco's objection to this statement on the ground that it sets forth a conclusory opinion that is nothing more than Ocean Bank's expert's opinion and is lacking in foundation, Plaintiff's Opposing SMF ¶ 175, is overruled. In general, an expert's opinion is the proper subject of a statement of material facts. In addition, in the cited portion of *(continued on next page)*

using the Premium Product. Defendant's SMF ¶ 176; Plaintiff's Opposing SMF ¶ 176. Nine

percent of Jack Henry's financial institutions use the Premium Product with the out-of-band

option. *Id.* ¶ 177. Forty-one percent of Jack Henry's financial institutions use the Basic Product.

*Id.* ¶ 178.[118]

The parties dispute whether, as Ocean Bank asserts, its security procedures exceeded

those recommended in the FFIEC Guidance. *Compare* Defendant's SMF ¶ 179; Makohon Decl.

¶ 17 *with* Plaintiff's Opposing SMF ¶ 179; Suppl. Greene Decl. ¶¶ 2-10, 12-13, 15-16, 33-34.[119]

Ocean Bank employed SSL encryption, a security method not even employed by $700 billion

bank Wachovia, in May 2009. Defendant's SMF ¶ 180; Plaintiff's Opposing SMF ¶ 180.[120]

Ocean Bank used Jack Henry's Premium Product, which employed adaptive authentication

similar to that used by much larger national bank Wachovia. *Id.* ¶ 181.[121] Patco's own expert

admitted in an email to Patco that Ocean Bank's procedures were commercially reasonable.

Defendant's SMF ¶ 182; Tab 18 (Docket No. 71) to Appendix.[122]

---

the Makohon declaration, Makohon sets forth reasons for his opinion, for example, that, in May 2009, hundreds of other small to regional-sized banks used the Basic Product and many used products less sophisticated than either the Premium or Basic product. Makohon Decl. ¶ 18.

[118] Patco qualifies paragraphs 176 through 178, asserting that they do not account for what other authentication procedures, such as tokens, out-of-band procedures, and manual reviews, might be in place at other banks using the Jack Henry products, or those banks' configuration of the Jack Henry products. Plaintiff's Opposing SMF ¶¶ 176-78; Greene Decl. ¶ 35.

[119] Patco's objection on the ground that the Bank sets forth conclusory opinions on a matter of law, Plaintiff's Opposing SMF ¶ 179, is overruled with the proviso that the court is indeed the final arbiter on this issue.

[120] Patco qualifies this statement, asserting, in relevant part, that SSL encryption is commonly used, relatively inexpensive, and not intended to protect against keylogging malware. Plaintiff's Opposing SMF ¶ 180; Suppl. Greene Decl. ¶ 17.

[121] Patco qualifies this statement, asserting that the two most important features of the Premium Product system, the device ID system and risk-scoring engine, were deprived of any practical utility after the Bank configured its system to ask challenge questions on every transaction, and that there were critical differences between the authentication procedures employed by the Bank and those employed by Wachovia; for example, Wachovia used tokens. Plaintiff's Opposing SMF ¶ 181; Defendant's SMF ¶¶ 84-88; Continued Maxwell Dep. at 33-34, 41; Deposition of Peter A. Makohon (Docket No. 75-10) at 137-38.

[122] Patco purports to deny this statement, Plaintiff's Opposing SMF ¶ 182, but the cited portions of the Greene declaration on which it relies qualify, rather than controvert, the underlying statement, Suppl. Greene Decl. ¶¶ 29-30 (explaining, *inter alia*, that Greene's comment that it appeared that the Bank had instituted generally accepted *(continued on next page)*

## III. Discussion

Patco brings six claims against Ocean Bank seeking to recover sums withdrawn from its account as a result of the series of allegedly fraudulent transactions in May 2009 as well as interest assessed by the Bank on that portion of a Patco line of credit tapped by the Bank to help cover the allegedly fraudulent withdrawals. *See generally* Second Amended Complaint ("Complaint") (Docket No. 39). Specifically, Patco brings claims pursuant to UCC § 4A-201 *et seq.* (Count I), negligence (Count II), breach of contract (Count III), breach of fiduciary duty (Count IV), unjust enrichment (Count V), and conversion (Count VI). *See id.* ¶¶ 49-82. The parties cross-move for summary judgment on Count I, and Ocean Bank moves for summary judgment on the remaining claims on grounds that Article 4A provides the exclusive remedy for unauthorized electronic funds transfers and, alternatively, none of those counts survives summary judgment on its merits. *See* Defendant's S/J Motion at 1-4; Plaintiff's S/J Motion at 1. For the reasons that follow, I recommend that Ocean Bank's motion for summary judgment be granted and that of Patco denied.[123]

### A. Count I (UCC Article 4A)

### 1. Background

The allocation of loss involving commercial electronic funds transfers is governed, *inter alia*, by Article 4A of the UCC, first approved by the National Conference of Commissioners on Uniform State Laws and the American Law Institute in 1989. *See, e.g.*, Robert W. Ludwig, Jr., Salvatore Scanio, & Joseph S. Szary, *Malware and Fraudulent Electronic Funds Transfers: Who*

---

banking practices for high risk transactions was preliminary and based on limited information, without benefit of review of how the Bank's security procedures were actually configured and implemented).

[123] The parties disagree whether Maine or Connecticut law applies. *Compare* Defendant's SMF ¶ 61 (Connecticut law) *with* Plaintiff's Opposing SMF ¶ 61 (Maine law). I need not resolve the dispute because, under either state's laws, the outcome is the same.

*Bears the Loss?*, 16 Fidelity L.J. 101, 106 (Oct. 2010). "Before [Article 4A] was drafted there was no comprehensive body of law – statutory or judicial – that defined the juridical nature of a funds transfer or the rights and obligations flowing from payment orders." Conn. Gen. Stat. Ann. § 42a-4A-102 cmt.; 11 M.R.S.A. § 4-1102 cmt. Article 4A's drafters explained:

> In the drafting of Article 4A, a deliberate decision was made to write on a clean slate and to treat a funds transfer as a unique method of payment to be governed by unique rules that address the particular issues raised by this method of payment. A deliberate decision was also made to use precise and detailed rules to assign responsibility, define behavioral norms, allocate risks and establish limits on liability, rather than to rely on broadly stated, flexible principles. In the drafting of these rules, a critical consideration was that the various parties to funds transfers need to be able to predict risk with certainty, to insure against risk, to adjust operational and security procedures, and to price funds transfer services appropriately. This consideration is particularly important given the very large amounts of money that are involved in funds transfers.

*Id.*

Of critical importance to the instant case is Article 4A-202, which provides, in relevant part:

> If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if (i) the security procedure is a commercially reasonable method of providing security against unauthorized payment orders, and (ii) the bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer.

Conn. Gen. Stat. Ann. § 42a-4A-202(b); *see also* 11 M.R.S.A. § 4-1202(2). For purposes of Article 4A:

> "Security procedure" means a procedure established by agreement of a customer and a receiving bank for the purpose of (i) verifying that a payment order or communication amending or cancelling a payment order is that of the customer, or (ii) detecting error in the transmission or the content of the payment order or communication. A security procedure may require the use of algorithms or other codes, identifying words or numbers, encryption, callback procedures, or similar

security devices.   Comparison of a signature on a payment order or communication with an authorized specimen signature of the customer is not by itself a security procedure.

Conn Gen. Stat. Ann. § 42a-4A-201; *see also* 11 M.R.S.A. § 4-1201.

Pursuant to these provisions, Patco, rather than the Bank, bore the risk of loss flowing from the allegedly unauthorized May 2009 transactions if (i) Patco and the Bank agreed to a security procedure, (ii) the security procedure was commercially reasonable, and (iii) the Bank accepted the payment orders in question in good faith and in compliance with the security procedure and any relevant written agreement or instruction of Patco.[124]

**2. Whether Parties Agreed to Security Procedure and Bank Complied Therewith**

The central issue in this case is whether the Bank's security procedures were commercially reasonable. *See, e.g.,* Plaintiff's S/J Motion at 10 ("Liability against the Bank is proper under Article 4A because the Bank did not maintain commercially reasonable security procedures to protect Patco's accounts from theft in May of 2009, when the unauthorized withdrawals occurred."). Patco does not argue, either in support of its own motion for summary

---

[124] As Patco points out, *see* Plaintiff's S/J Motion at 13, a customer may yet avoid liability, even if these three tests are met, by showing either that (i) the bank agreed to take all or part of the loss resulting from an unauthorized payment order, or (ii) the information used to effect the fraudulent payment order was not obtained, either directly or indirectly, from the customer or someone under the customer's control, *see* Conn. Gen. St. Ann. § 42a-4A-203(a); 11 M.R.S.A. § 4-1203(1). Patco does not claim that either of these exceptions applies in this case. Rather, it cites this provision for the proposition that this is the only point in the statutory analysis at which an examination of the *customer's* security procedures may be appropriate. *See* Plaintiff's S/J Motion at 13-14. As the Bank points out, *see* Defendant's S/J Motion at 20-22, a security procedure is *deemed* commercially reasonable if "(i) the security procedure was chosen by the customer after the bank offered, and the customer refused, a security procedure that was commercially reasonable for that customer, and (ii) the customer expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name and accepted by the bank in compliance with the security procedure chosen by the customer[,]" Conn. Gen. St. Ann. § 42a-4A-202(c); *see also* 11 M.R.S.A. § 4-1202(3). Ocean Bank does argue, in the alternative, that its security procedures should be deemed commercially reasonable because it offered Patco the availability of emailing alerting, and Patco did not avail itself of that offer. *See* Defendant's S/J Motion at 20-22. Nonetheless, as Patco points out, *see* Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's S/J Opposition") (Docket No. 99) at 18-19, there is no dispute that Patco was unaware of this offer, which was posted online, and hence Patco cannot be said to have "refused" it, *see* Defendant's SMF ¶ 126; Plaintiff's Opposing SMF ¶ 126. Further, as Patco notes, *see* Plaintiff's S/J Opposition at 19-20, there is no evidence that it expressly agreed in writing to be bound by a security procedure that *it* had chosen following Ocean Bank's "offer" of email alerting.

judgment or in opposition to that of the Bank, that the Bank failed to act in good faith and in compliance with its security procedures when it processed the allegedly fraudulent transfers. Indeed, the undisputed evidence is that the Bank processed those transfers only after its system authenticated that the proper IDs, passwords, and answers to challenge questions were provided. *See, e.g.,* Defendant's SMF ¶¶ 196-97; Plaintiff's Opposing SMF ¶¶ 196-97.

While, in its motion for summary judgment, Patco argued in the alternative that it did not agree to a security procedure, or that those few security procedures to which it did agree, standing alone, were not commercially reasonable, *see* Plaintiff's S/J Motion at 31-34, it did not specifically respond, either in its reply memorandum or in its opposition to the Bank's motion for summary judgment, *see generally* Plaintiff's S/J Opposition; Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Plaintiff's S/J Reply") (Docket No. 109), to the Bank's argument that Patco *did* agree, expressly and/or implicitly, to the full panoply of security measures implemented by the Bank, *see* Defendant's S/J Motion at 14; Defendant People's United Bank's Opposition to Plaintiff Patco Construction Company, Inc.'s Motion for Summary Judgment ("Defendant's S/J Opposition") (Docket No. 88) at 7-10.[125] Patco's silence in the face of this argument fairly can be construed as conceding the point. *See, e.g., Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 678 (1st Cir. 1995) ("If a party fails to assert a legal reason why summary judgment should not be granted, that ground is waived and cannot be considered or raised on appeal.") (citations and internal quotation marks omitted).

In any event, even assuming *arguendo* that Patco did not impliedly concede the point, there is no genuine dispute that it agreed to the core security procedures visible to users that

---

[125] Patco did incorporate its motion for summary judgment by reference into both its reply memorandum and its opposition to the Bank's motion for summary judgment. *See* Plaintiff's S/J Reply at 1; Plaintiff's S/J Opposition at 1. Nonetheless, it did not address the Bank's specific arguments.

comprised the key components of the integrated security package used by the Bank. Patco expressly agreed to the use of security passcodes, which consisted of a customer ID and customer password and a user ID and user password for each authorized user of the customer, *see* Defendant's SMF ¶ 145; Plaintiff's Opposing SMF ¶ 145, and it agreed by course of performance to the use of challenge questions, having cooperated in setting up answers to such questions and having answered them in the course of conducting eBanking, *see id.* ¶¶ 146-47; *Leshine Carton Co. v. Matik N. Am.*, No. CV0540076365, 2006 WL 1359651, at *1 (Conn. Super. Ct. Mar. 9, 2006) ("[T]he UCC parol evidence rule permits contract terms to be explained or supplemented (a) by course of dealing or usage of trade as provided by § 42a-1-205 or by course of performance as provided by § 42a-2-208; and (b) by evidence of consistent additional terms.") (citation and internal quotation marks omitted); 11 M.R.S.A. §§ 1-1201(3), 1-1303(1) (same); *Regatos v. North Fork Bank*, 257 F. Supp.2d 632, 646 (S.D.N.Y. 2003) (for purposes of Article 4A, commercial customer and bank agreed on security procedure when, regardless of whether there was an explicit agreement, their unvaried course of conduct over a period of four years evinced a clear understanding on security procedure).

While other aspects of the Premium Product security system, such as device authentication, IP Geo location, transaction monitoring, and the risk-profiling engine, were invisible to Patco, they were integrated with, and largely operated in the service of, the visible portions of the system. Thus, Patco fairly can be said to have agreed to the use of the Premium Product security system *in toto*.

In addition, by virtue of the posting online of the Modified eBanking Agreement, Patco effectively agreed to monitor its commercial accounts daily. While Patco protests that it did not actually ever see the Modified eBanking Agreement and thus was never properly notified of its

51

existence or bound by it, *see* Plaintiff's S/J Opposition at 21-22, the Bank reserved the right, in the Original eBanking Agreement, to modify the terms and conditions of that agreement at any time effective upon publication, see Defendant's SMF ¶ 24; Plaintiff's Opposing SMF ¶ 24. There is no dispute that Patco reviewed and agreed to the terms of the Original eBanking Agreement. *See id.* ¶¶ 14-18. The online publication of the Modified eBanking Agreement hence was binding upon Patco. *See, e.g., Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F. Supp.2d 696, 708 (D. Md. 2008) (unilateral modification of Internet-based service contract held effective when prior agreements permitted modification at any time and stated that modifications would be effective after they were posted for 30 days).[126]

The agreed-to obligation of Patco, a commercial banking customer, to monitor its accounts daily in turn fits the definition of a "security procedure": "a procedure established by agreement of a customer and a receiving bank for the purpose of . . . detecting error in the transmission or the content of the payment order or communication." Conn Gen. Stat. Ann. § 42a-4A-201; 11 M.R.S.A. § 4-1201.[127]

### 3. Whether the Procedure Was Commercially Reasonable

Article 4A provides, in relevant part:

Commercial reasonableness of a security procedure is a question of law to be determined by considering the wishes of the customer expressed to the bank, the circumstances of the customer known to the bank, including the size, type, and

---

[126] Patco cites *Douglas v. United States Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1066 (9th Cir. 2007), for the proposition that generic online publication constitutes insufficient notice to create a binding modification of an agreement. *See* Plaintiff's S/J Opposition at 21. *Douglas* is distinguishable. In *Douglas*, the court held that an individual who had entered into a contract with America Online ("AOL") for long-distance telephone service was not bound by a revised contract that AOL's successor, Talk America, had posted on its website. *See Douglas*, 495 F.3d at 1066-67. However, there is no suggestion that the individual had entered into an agreement with AOL providing for modification of that agreement upon online posting by AOL. *See id.*

[127] To the extent that Patco or its experts argue that this obligation pertained only to ACH debit transactions, not ACH credit transactions such as the fraudulent withdrawals at issue, *see* Plaintiff's S/J Opposition at 22, I disagree. Although the monitoring obligation was set forth in the context of ACH debits, it is an unambiguous obligation to monitor all commercial accounts daily. *See* Defendant's SMF ¶ 38; Plaintiff's Opposing SMF ¶ 38.

frequency of payment orders normally issued by the customer to the bank, alternative security procedures offered to the customer, and security procedures in general use by customers and receiving banks similarly situated.

Conn. Gen. Stat. Ann. § 42a-4A-202(c); 11 M.R.S.A. § 4-1202(3).

In official commentary, the drafters of Article 4A have further illuminated the concept of

"commercial reasonableness" as follows:

> The burden of making available commercially reasonable security procedures is imposed on receiving banks because they generally determine what security procedures can be used and are in the best position to evaluate the efficacy of procedures offered to customers to combat fraud. The burden on the customer is to supervise its employees to assure compliance with the security procedure and to safeguard confidential security information and access to transmitting facilities so that the security procedure cannot be breached.

***

> The concept of what is commercially reasonable in a given case is flexible. Verification entails labor and equipment costs that can vary greatly depending upon the degree of security that is sought. A customer that transmits very large numbers of payment orders in very large amounts may desire and may reasonably expect to be provided with state-of-the-art procedures that provide maximum security. But the expense involved may make use of a state-of-the-art procedure infeasible for a customer that normally transmits payments orders infrequently or in relatively low amounts. Another variable is the type of receiving bank. It is reasonable to require large money center banks to make available state-of-the-art security procedures. On the other hand, the same requirement may not be reasonable for a small country bank. A receiving bank might have several security procedures that are designed to meet the varying needs of different customers. The type of payment order is another variable. For example, in a wholesale wire transfer, each payment order is normally transmitted electronically and individually. A testing procedure will be individually applied to each payment order. In funds transfers to be made by means of an automated clearing house many payment orders are incorporated into an electronic device such as a magnetic tape that is physically delivered. Testing of the individual payment orders is not feasible. Thus, a different kind of security procedure must be adopted to take into account the different mode of transmission.

> The issue of whether a particular security procedure is commercially reasonable is a question of law. Whether the receiving bank complied with the procedure is a question of fact. It is appropriate to make the finding concerning commercial reasonability a matter of law because security procedures are likely to be standardized in the banking industry and a question of law standard leads to more

predictability concerning the level of security that a bank must offer to its customers. The purpose of subsection (b) is to encourage banks to institute reasonable safeguards against fraud but not to make them insurers against fraud. A security procedure is not commercially unreasonable simply because another procedure might have been better or because the judge deciding the question would have opted for a more stringent procedure. The standard is not whether the security procedure is the best available. Rather it is whether the procedure is reasonable for the particular customer and the particular bank, which is a lower standard. On the other hand, a security procedure that fails to meet prevailing standards of good banking practice applicable to the particular bank should not be held to be commercially reasonable.

Conn. Gen. St. Ann. § 42a-4A-203 cmts. 3-4; 11 M.R.S.A. § 4-1203 cmts. 3-4.

If, pursuant to these provisions, a bank is judged to bear the risk of loss, it must refund to its customer, with interest, any amounts retained to fund the fraudulent payment orders. *See* Conn. Gen. St. Ann. § 42a-4A-204; 11 M.R.S.A. § 4-1204(1).

### a. Patco's Arguments

Patco seeks summary judgment in its favor as to Count I, and opposes the Bank's bid for summary judgment on that count, on the bases that (i) the Bank made a crucial error when it set the Dollar Amount Rule threshold at $1, effectively creating a "single-factor" authentication system that was ineffective against the known threat of compromise of an end-user's computer by keylogging malicious software, and (ii) the Bank failed to implement additional measures, such as tokens or a true out-of-band option, that would have increased the effectiveness of its security procedures. *See* Plaintiff's S/J Motion at 16-31; Plaintiff's S/J Opposition at 2-18.

### i. The Lowering of the Dollar Amount Rule Threshold to $1

Patco points out that the Bank's core security procedures in May 2009 consisted of the use of IDs, passwords, and challenge questions. *See* Plaintiff's S/J Opposition at 2.[128] Patco's

---

[128] The arguments set forth in Patco's opposition to the Bank's motion for summary judgment largely echo and refine those set forth in its own motion for summary judgment. Accordingly, I have cited primarily to its opposing brief.

device identification system, cookies, transaction monitoring, risk-scoring systems, and IP Geo location tracking all served merely as alternative bases for the triggering of challenge questions. *See id.* at 2 n.1.

In June 2008, according to Patco expert Sari Greene, the Bank made a crucial error in configuring its system when it set the Dollar Amount Rule threshold at $1. *See id.* at 3. Instead of enhancing security, as the Bank wrongly believed, this change undermined the effectiveness of the challenge questions as a security procedure. *See id.* This was so, according to Patco and Greene, because the frequent asking of such questions increased the risk that a fraudster using "keylogger" malicious software could intercept answers to such questions. *See id.* at 3-4. If a fraudster attempting to gain access to a customer's account had obtained only a user's ID and password, other components of the Jack Henry Premium Product designed to recognize aberrant activity, such as the IP Geo tracking and risk-scoring systems, would trigger the challenge questions, which the fraudster then would be unable to answer. *See id.* at 4-5.

Patco does not dispute, as the Bank's expert Peter Makohon points out, that a computer infected with keylogging malware will capture the answers to challenge questions if they are used even once. *See id.* at 5-6. But Patco posits that the timing matters: if legitimate users trigger challenge questions only rarely, a fraudster's ability to compromise the user's account could be delayed for months, years, or even indefinitely, during which time, for example, the malware might be detected and eliminated by a customer's antivirus software, or the fraudster might give up and move to another target or be brought to justice. *See id.* at 6-7 & n.5.[129]

---

[129] This represents a shift from Patco's earlier position, expressed in its motion for summary judgment, that if a security system were properly configured to ask challenge questions only infrequently, "[f]raud . . . could only be achieved if the keylogger happened to be present on the customer's computer and the fraudster happened to be monitoring the customer's activity on the rare occasion the customer himself might initiate an atypical transaction, thus prompting the challenge questions." Plaintiff's S/J Motion at 19.

Beyond this, Patco challenges the Bank's logic in lowering the Dollar Amount Rule threshold to $1 on account of asserted low-dollar-amount ACH fraud, asserting that, regardless of the Dollar Amount Rule threshold, the Bank's system was configured to pose challenge questions based on other indicia of fraud, such as an unrecognized IP address, and thus, challenge questions would have been triggered in the event of fraudulent activity regardless of the Dollar Amount Rule threshold. *See id.* at 7. Indeed, Patco notes, the individuals perpetrating the alleged 2008 frauds were asked, and successfully answered, challenge questions. *See id.* Thus, it reasons, the lowering of the Dollar Amount Rule threshold added no additional protection even in cases of asserted low-dollar amount fraud. *See id.* at 7-8.

Patco argues that, to the extent that the Bank and Jack Henry believed that the setting of the Dollar Amount Rule threshold had no bearing on the effectiveness of the security system, they were wrong. *See id.* at 10-11. RSA Security had recognized this fact when it warned financial institutions to edit decision rules carefully, slowly, and with great caution because such rules play a major role in fraud prevention. *See id.* Moreover, Patco notes, the Bank's position is contradicted by its own argument that it lowered the Dollar Amount Rule threshold to foil fraudsters engaged in low-dollar amount thefts. *See id.* at 11 n.9.

Patco states that, in May 2009, it was virtually universally recognized, as it is today, that a system offering a level of protection no greater than user IDs and passwords alone was not commercially reasonable for high-risk transactions. *See id.* at 5.[130] Patco argues that the Bank's system, as configured, was not effectively a "multifactor" authentication system in May 2009

---

[130] Patco explains that, although its expert Sari Greene did state in an email to it on May 26, 2009, the same day she had been formally retained, that the Bank's security seemed to conform to generally accepted banking practices, she was not aware at that time that the Bank had configured its system to ask challenge questions on every transaction and had not been given specific information about the underlying technical characteristics of the Bank's authentication security procedures. *See* Plaintiff's S/J Opposition at 5 n.3.

because a fraudster needed only two things to access a commercial account through the Bank's eBanking website: (i) the customer's user ID/password combinations and (ii) the answers to the customer's challenge questions. *See id.* at 13. Patco asserts that this information comprised a single factor: something the user knew. See id. Patco argues that the Bank's invisible device ID (the asserted second factor) and profiling engine (the asserted third factor) acted only as triggers for the challenge questions (part of the first factor) rather than, for example, resulting in denial of access to the system. *See id.*

More to the point, Patco reasons, the Bank deprived the invisible device ID and the profiling engine of any practical effect whatsoever by configuring the Dollar Amount Rule threshold at $1. *See id.* at 14. Patco asserts that, even if the Bank's system had possessed some semblance of multifactor authentication when first implemented by Jack Henry, the Bank had effectively turned off both allegedly multifactor components of the system prior to May 2009. *See id.* at 15.[131]

As a result of the Bank's configuration of its security system, Patco reasons, that system in May 2009 was ineffective against a by-then-well-known threat, the compromise of end-users' computer systems by keylogging malware. *See* Plaintiff's S/J Opposition at 11-12. The Bank's security procedures, in Patco's view, accordingly were not commercially reasonable. *See id.* at 12.

---

[131] Patco also argues, in its motion for summary judgment, that the Bank's security procedures failed to take into account the known circumstances of Patco because, although the allegedly unauthorized withdrawals were completely different from those typically made by Patco, the Bank paid no attention to the discrepancies, having configured its system in such a way that its own risk profiling was ineffective to prevent fraud and having failed to adopt another security procedure that would reveal the discrepancies, such as manual review. *See* Plaintiff's S/J Motion at 23-27. Patco argues, "Inaction in the face of potential fraud is not the mark of a commercially reasonable security procedure." *Id.* at 26. Patco also contends that the Bank permitted its ACH withdrawal limit to be set at an imprudently high level without warning it of the security risks in so doing. *See id.* at 26-27. Even assuming *arguendo* that the Bank had a duty to warn Patco of such risks and that, had Patco been warned, it would have requested an ACH limit that would have lessened its loss, ACH limits do not comprise a "security procedure" for purposes of Article 4A and, thus, have no bearing on the instant analysis.

### ii. Security Measures Not Implemented by Ocean Bank

Patco further argues that the Bank neglected to implement "security procedures in general use by customers and receiving banks similarly situated[,]" Conn. Gen. St. Ann. § 42a-4A-202(c); 11 M.R.S.A. § 4-1202(3), a factor cutting against a finding of commercial reasonableness, when it failed to adopt additional security measures such as tokens and "true" out-of-band authentication, *see* Plaintiff's S/J Motion at 27-31; Plaintiff's S/J Opposition at 15-18. Patco argues that:

1.    By May 2009, Internet banking security had largely moved to hardware-based tokens and other means of generating "one-time" passwords. *See* Plaintiff's S/J Motion at 28. As of then, both People's United Bank and Wachovia, which employed Makohon, were using tokens for commercial accounts, as were many community banks in New England. *See id.* at 29. Although tokens can be compromised, bypassing them requires greater sophistication than obtaining challenge questions. *See* Plaintiff's S/J Opposition at 16. The fraudster must use the information within seconds of acquiring it, before the system generates a new password to replace the old. *See id.* The answers to challenge questions, by contrast, may be used at the fraudster's leisure, particularly when, as was the case at Ocean Bank, the answers are static. *See id.* at 16 & n.16. Even if a token had been used and compromised in this case, the magnitude of the resulting fraud would have been greatly reduced because the captured password could not have been used after the initial transaction. *See id.* at 16.

2.    Of banks that did not use tokens in May 2009, many community banks in New England used some form of out-of-band verification or conducted manual reviews of uncharacteristic or suspicious transactions. *See* Plaintiff's S/J Motion at 29. Although the Bank's expert, Makohon, states that receiving passwords or tokens over out-of-band

technologies is not effective if the passwords are entered into the banking portal using a compromised personal computer, true out-of-band authentication entails entering information through the out-of-band channel itself. *See* Plaintiff's S/J Opposition at 17. Even if Jack Henry did not offer a true out-of-band option in May 2009, others did. *See id.* Moreover, even Jack Henry's product offered greater security because it entailed the generation of a one-time password. *See id.*

3.     Ocean Bank failed to conduct manual reviews of suspicious transactions in May 2009, although it could have done so. *See id.* at 18. Ocean Bank began reviewing reports at the end of 2009. *See id.* at 29.

### b. Ocean Bank's Arguments

Ocean Bank seeks summary judgment as to Count I on the ground that its security measures in place as of May 2009 met the standard of commercial reasonableness, given that:

1.     Patco expressed no wishes to the Bank regarding security procedures apart from those contained in the parties' agreements. *See* Defendant's S/J Motion at 15-16.[132]

2.     The Bank's security procedures took into account the circumstances of the customer known to the Bank by building a risk profile based on the customer's eBanking habits, with the system comparing each transaction against that auto-generated profile, and the Bank set Patco's ACH withdrawal limit based on its specific needs. *See id.* at 16.

3.     The Bank made email alerts available to Patco, but Patco chose not to use them.

---

[132] To the extent that Patco asserts, in a footnote in its motion for summary judgment, that it requested email notification upon the transfer of monies from its Ocean Bank accounts, *see* Plaintiff's S/J Motion at 31 n.45, the Bank succeeds in demonstrating that there is no genuine issue of material fact that this request, made in 2004, was not a request for email alerts with respect to eBanking, which were not offered by the Bank until 2006, *see* Defendant's S/J Opposition at 11.

*See id.*[133]

4.      The Bank's security procedures exceeded those in general use by customers and similarly situated banks in May 2009, as well as those suggested by the FFIEC Guidance, the Bank having (i) chosen to implement the Jack Henry Premium multifactor authentication system, which incorporated not only multiple "factors" but also layered security, and (ii) employed numerous other controls to reduce the risk of account fraud and identity theft, including SSL encryption, the use of commercial third-party anti-phishing services, the use of transaction-based email alerting, and the use of cyber intelligence from RSA's eFraud Network. *See id.* at 16-18. Further, the Bank contends, it periodically changed the transaction threshold at which challenge questions were asked to adapt to the changing threat landscape, for example, lowering the Dollar Amount Rule threshold in response to instances of ACH fraud. *See id.* at 18.

The Bank argues that, in the face of this strong evidence, Patco resorts to offering suggestions for how the Bank's security measures could have been improved, for example, how it should have configured its Dollar Amount Rule threshold and what other measures it should have implemented. *See* Defendant People's United Bank's Reply Memorandum in Support of Its Motion for Summary Judgment ("Defendant's S/J Reply") (Docket No. 116) at 1-2. The Bank contends that these assertions miss the critical question, which is not whether the Bank had the best system available, or whether a different system would have been better or would have prevented the fraud, but, rather, whether the procedures the Bank *did* use were commercially reasonable. *See id.* at 2-3.

---

[133] Patco adduces evidence that it received no individual notification of the availability of email alerts and was unaware of the existence of that option. *See* Plaintiff's Opposing SMF ¶ 120. Nonetheless, the Bank posted notice of the availability of such alerts online, and a user only had to click on a tab visible on the eBanking webpage to begin the process of setting up such alerts. *See* Defendant's SMF ¶¶ 128-29. By posting the availability of email alerting in several formats online, the Bank sufficiently notified Patco of its availability.

The Bank argues that, in any event, Patco's theory that the Bank configured the Dollar Amount Rule threshold in such a manner as to compromise the Jack Henry system and cause the fraud at issue is fundamentally flawed. *See id.* at 3-5.

First, the Bank argues, the premise that keylogging caused the fraud in question is based on pure supposition, Patco having irreparably altered the evidence on its hard drives by running scans on its computers and continuing to use them prior to making proper forensic copies. *See id.* at 3. Thus, the Bank reasons, no one can know for certain when or whether keylogging malware infected Pierce's computer and enabled the alleged fraud. *See id.* at 4.

Second, the Bank contends, even accepting that keylogging was the culprit, Patco retreated from the premise set forth in its motion for summary judgment that a keylogger must be online at the same time that a user is inputting data in order to capture that data. *See id.* at 4. Patco instead offers what the Bank terms "remote hypothetical scenarios" in which keyloggers would be delayed and possibly frustrated in stealing or using challenge questions if such questions were asked infrequently. *See id.* at 4-5.

Third, the Bank argues that even if the Dollar Amount Rule threshold had been set at a higher amount, for example, the Jack Henry default setting of $1,000 or even as high as $16,000, this would not have materially changed the frequency with which Patco was prompted to answer its challenge questions. *See id.* at 5. Patco generally made ACH transactions well over $1,000 and often in excess of $16,000. *See id.*

Fourth, the Bank asserts that Patco's contention that its Jack Henry Premium Product as configured was not a "true" multifactor authentication system is wrong. *See id.* at 5-6 n.5. The Bank points out that there is no dispute that the system incorporated such aspects as an invisible device ID and a risk-scoring module. *See id.* It argues that Patco, in essence, attempts to

manufacture an additional "requirement" for multifactor authentication, unsupported in the FFIEC Guidance or in the caselaw, by arguing that the system must *respond* in a certain way to each of the factors, for example, by blocking a transaction if one of the factors fails. *See id.* Moreover, it notes, Patco's assertion that the system's only response in all situations was to trigger challenge questions is factually wrong: if the system detected activity matching suspicious activity reported to the eFraud Network, the transaction was immediately blocked. *See id.*

In any event, the Bank contends, even if its system properly could be characterized as "single factor" as of May 2009, the FFIEC Guidance did not require multifactor authentication but, rather, stated that "where risk assessments indicate that the use of single-factor authentication is inadequate, financial institutions should implement multifactor authentication, layered security, or other controls reasonably calculated to mitigate those risks." *Id.* (quoting FFIEC Guidance at 1-2). The Bank notes that its security procedures were multilayered in that they employed challenge questions as well as IDs/passwords, and that it employed other controls such as SSL encryption, an eFraud Network subscription, commercial third-party anti-phishing services, posting of fraud alerts on its website, and email alerting. *See id.*

Finally, the Bank argues, its non-implementation, as of May 2009, of security procedures such as tokens, manual review, and out-of-band authentication does not render the security procedures that it did use commercially unreasonable. *See* Defendant's S/J Opposition at 3. It points out that less than 2 percent of the 1,500 banks that Jack Henry serviced in any capacity used tokens in May 2009. *See id.* It notes that it concluded that Jack Henry's out-of-band authentication option would have offered little to no benefit in overall security. *See id.* at 19. It observes that Jack Henry's system did not require manual review and, in any event, Patco itself

logged into its account six times during the week of the allegedly fraudulent withdrawals without detecting the alleged fraud. *See id.* at 20.

### c. Analysis

This is a hard-fought and well-presented case bearing on a discrete but nuanced issue. There is a relatively small body of caselaw construing Article 4A. The parties point to no case considering whether the configuration of a discretionary rule can render a bank's security system commercially unreasonable, and my research discloses none.

Patco makes a facially appealing argument that, in setting the Dollar Amount Rule threshold at $1, the Bank ill-advisedly neutralized critical aspects of the seemingly high-quality security system it chose to implement in the wake of the issuance of the FFIEC Guidance. Yet, for the reasons that follow, I conclude that the Bank has the better argument and has demonstrated that the security procedures that it had in place as of May 2009 were commercially reasonable.

The Jack Henry Premium Product was the result of a careful effort at compliance with the 2005 FFIEC Guidance. The Bank's affiliate, Chittenden Bank, recognized that the Jack Henry NetTeller product involved high-risk transactions that required multifactor authentication and worked with Jack Henry, which in turn worked with RSA/Cyota, to create such a security system. *See* Plaintiff's SMF ¶ 23; Defendant's Opposing SMF ¶ 23; Defendant's SMF ¶ 71; Plaintiff's Opposing SMF ¶ 71. The Premium Product employed by the Bank, marketed at the time as "the most robust and effective solution available," Defendant's SMF ¶ 73; Plaintiff's Opposing SMF ¶ 73, is a multifactor authentication system, relying on at least two factors: something the user knows (ID and password) and something the user has (device identification specific to the user's personal computer and its use of the bank's application). On its face, the

Premium Product, when measured against the FFIEC Guidance yardstick that both parties have treated as a critical factor in this case, is commercially reasonable, incorporating not only at least two factors but also multiple layers (challenge questions in addition to passwords/IDs). Indeed, Patco's expert, Sari Greene, so concluded upon her preliminary review of the Bank's security system. *See id.* ¶ 182.

Further, the Premium Product provided additional security measures, including a subscription to the eFraud Network, *see, e.g., id.* ¶¶ 121-22, and the Bank chose to implement measures above and beyond those provided through the Premium Product, such as making email alerts available and requiring that customers choosing to accept ACH debits monitor their commercial accounts daily, *see, e.g., id.* ¶¶ 38, 126-29. While, unfortunately, these protections did not prevent the alleged fraud at issue, they are not insignificant. For example, if the alleged fraud in this case had been attempted by a cybercriminal whose fraudulent activity, IP address, or other data matched any data that had been reported to the eFraud Network, the transaction would have been immediately blocked without challenge questions even having been triggered. *See, e.g., id.* ¶ 122. Had Patco monitored its commercial accounts daily, its scrutiny may well have minimized the extent of the loss. The Bank's adoption of these additional security procedures as of May 2009 weighs in favor of a finding that its security procedures as a whole were commercially reasonable.

I am unpersuaded that, in setting the Dollar Amount Rule threshold at $1, the Bank neutralized an otherwise commercially reasonable security procedure system. First, I find it highly significant that Jack Henry *permitted* its bank customers to adjust the Dollar Amount Rule threshold to any level, including as low as $1, having determined that any configuration chosen

by the customer bank would result in the effective operation of its multifactor authentication product. *See id.* ¶¶ 94-96; Defendant's Additional SMF ¶ 19; Plaintiff's Reply SMF ¶ 19.

Second, while Patco (i) adduces evidence that the setting of the Dollar Amount Rule threshold *did* in fact impact security, with RSA warning bank customers to edit decision rules carefully, slowly, and with great caution in part because such rules did play a "major role" in fraud prevention, *see, e.g.*, Plaintiff's Opposing SMF ¶¶ 95-97, and (ii) points out that Ocean Bank itself claims to have adjusted the Dollar Rule Amount threshold to $1 in response to low-dollar amount frauds, *see, e.g.*, Defendant's SMF ¶¶ 104-05, the premise that the adjustment in question materially altered the properties of the Premium Product security system is flawed. As the Bank argues, even if the Dollar Amount Rule had been set at the Jack Henry default of $1,000, or, for that matter, $16,000, Patco still would have been prompted on most of the occasions on which it made ACH transfers to answer challenge questions, providing virtually the same level of opportunity for interception of its answers to challenge questions as when the threshold was set at $1. There is no dispute that, once keylogging malware captures a user's authentication credentials, including the challenge question answers, they are accessible to the cybercriminal.

Beyond this, even crediting Patco's expert's assertions that the infrequent triggering of challenge questions would have effectively prevented or minimized instances of keylogging cybercrime, as the Premium Product system, if configured correctly, was designed to do, *see, e.g.*, Plaintiff's Opposing SMF ¶¶ 95-97, Patco does not say at what level the Bank should have set its Dollar Amount Rule threshold, for what length of time, and whether comparable banks were aware in May 2009 that setting Dollar Amount Rule thresholds at low amounts increased

the opportunity for keylogging malware fraud and were altering the manner in which they set the Dollar Amount Rule threshold accordingly.[134]

It is apparent, in the light of hindsight, that the Bank's security procedures in May 2009 were not optimal. The Bank would have more effectively harnessed the power of its risk-profiling system if it had conducted manual reviews in response to red flag information instead of merely causing the system to trigger challenge questions. Indeed, it commenced manual reviews in the wake of the transactions at issue here. The use of other systems, such as tokens and out-of-band authentication, also would have improved the security of the Bank's system and might have minimized the loss that occurred in May 2009, assuming, as Patco's expert opines, that despite the destruction of evidence on Patco's computers, the loss fairly can be traced to Zeus/Zbot keylogger malware that intercepted Pierce's authentication credentials.

Yet, as of May 2009, only 2 percent of Jack Henry's bank customers had adopted tokens, *see* Defendant's SMF ¶ 167; Plaintiff's Opposing SMF ¶ 167, Ocean Bank had concluded (reasonably, in my view) that Jack Henry's offered version of out-of-band authentication did not offer significantly greater security, *see* Defendant's Opposing SMF ¶ 118, and Jack Henry did not require manual review, *see id.* ¶ 37. Patco says that Ocean Bank could have, and should have, as of May 2009, gone beyond the confines of its Jack Henry product to obtain and implement tokens and better versions of out-of-band authentication, and should have by then implemented manual review. Yet, in so arguing, Patco in effect demands that Ocean Bank have

---

[134] Patco cites Bank, RSA, and Jack Henry documents in support of the proposition that the Bank understood or should have grasped the security implications of Dollar Amount Rule threshold settings. *See, e.g.,* Plaintiff's S/J Motion at 20-21 & n.27; Plaintiff's S/J Opposition at 10-11 & n.8. Yet, inasmuch as appears, these documents did not explicitly address the keylogging malware threat or the manner in which a lower threshold setting might enable such fraud. *See id.* Patco further asserts that Greene, who advises numerous community banks throughout New England on their security procedures, knows of no other banks that have configured their system in the manner that Ocean Bank did. *See* Plaintiff's S/J Opposition at 23. This fact was not set forth in a statement of material facts as required by Local Rule 56, warranting its disregard. In any event, even taking it into consideration, Greene does not indicate that keylogging malware concerns prompted these banks to avoid that configuration.

adopted the best security procedures then available. As the Bank observes, *see* Defendant's S/J Reply at 2-3, that is not the law, *see* Conn. Gen. Stat. Ann. § 42a-4A-203 cmt. 4; 11 M.R.S.A. § 4-1203 cmt. 4; *see also, e.g., Braga Filho v. Interaudi Bank*, No. 03 Civ. 4795(SAS), 2008 WL 1752693, at \*4 (S.D.N.Y. Apr. 16, 2008), *aff'd*, 354 Fed. Appx. 381 (2d Cir. 2009) (finding bank's security procedures, consisting of a signed order and confirmatory phone call, together with security measure that did not itself qualify as a "security procedure," a signature comparison, commercially reasonable under Article 4A despite "the absence of other procedural safeguards such as telephone logs, recorded conversations, and passwords").[135]

Summary judgment accordingly should be granted to Ocean Bank, and denied to Patco, on Count I.

### B. Counts II-VI

The Bank finally seeks summary judgment as to the remaining counts of Patco's complaint on grounds that (i) each is effectively preempted by Article 4A and, (ii) alternatively, there is no genuine dispute of material fact preventing summary judgment in the Bank's favor on the merits of each. *See* Defendant's S/J Motion at 24-28. Patco disputes that any of its claims are preempted but acknowledges that their fate is tied to that of Count I. *See* Plaintiff's S/J Opposition at 25.

The comment to section 4A-102 explains:

---

[135] Patco relies, in part, on a quotation from a 1991 law review article by J. Kevin French, an advisor to the Article 4A Drafting Committee, in which French stated: "Requiring security procedures to 'keep up with the times' will foster one of the main goals of the model statute, minimization of losses due to fraudulent payment orders. . . . Courts should be reluctant to find a security procedure commercially reasonable merely because other receiving banks are using similar security procedures. Permitting receiving banks to find 'safety in numbers' would not encourage receiving banks to pursue improvements in security procedure technology and could result in commercial reasonableness being synonymous with the lowest common denominator of security procedures in general use." Plaintiff's S/J Motion at 27-28 (quoting J. Kevin French, *Article 4A's Treatment of Fraudulent Payment Orders – The Customer's Perspective*, 42 Ala. L. Rev. 773, 794-95 (1991)). Ocean Bank's security procedures cannot fairly be described as the "lowest common denominator of security procedures in general use" among comparable banks in May 2009.

> Funds transfers involve competing interests – those of the banks that provide funds transfer services and the commercial and financial organizations that use the services, as well as the public interest. These competing interests were represented in the drafting process and they were thoroughly considered. The rules that emerged represent a careful and delicate balancing of those interests and are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties in any situation covered by particular provisions of the Article. Consequently, resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities inconsistent with those stated in this Article.

Conn. Gen. Stat. Ann. § 42a-4A-102 cmt.; 11 M.R.S.A. § 4-1102 cmt.

Consistent with this admonition, courts have held common law causes of action preempted when (i) the circumstances giving rise to the common law claims are specifically covered by the provisions of Article 4A or (ii) the common law claims would create rights, duties, or liabilities inconsistent with the provisions of that article. *See, e.g., Travelers Cas. & Surety Co. of Am. v. Bank of Am., N.A.*, No. 09 C 06473, 2010 WL 1325494, at *2 (N.D. Ill. Mar. 30, 2010); *Zengen, Inc. v. Comerica Bank*, 158 P.3d 800, 808 (Cal. 2007). *See also, e.g., Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89-90 (2d Cir. 2010) ("For Article 4A purposes, the critical inquiry is whether its provisions protect against the type of underlying injury or misconduct alleged in a claim.").

The Bank correctly analyzes Counts II (negligence), III (breach of contract), and IV (breach of fiduciary duty) as displaced by Article 4A. The gravamen of all three counts is precisely the same as that of Count I: that the Bank failed to employ proper security procedures, as a result of which Patco suffered the loss in question. *Compare* Complaint ¶¶ 49-59 *with id.* ¶¶ 60-73. The Bank accordingly is entitled to summary judgment as to Counts II, III, and IV.

Counts V (unjust enrichment) and VI (conversion) implicate a different transaction: the Bank's alleged improper drawing on Patco's line of credit to cover the alleged fraudulent withdrawals, as a result of which additional interest was assessed on that line of credit. *See id.*

¶¶ 74-82. Hence, these two counts seemingly are not displaced by Article 4A. *See, e.g., Ma,* 597 F.3d at 89 ("Claims that, for example, are not about the mechanics of how a funds transfer was conducted may fall outside of this regime [Article 4A]."); *Schlegel v. Bank of America, N.A.,* 628 S.E.2d 362, 368 (Va. 2006) (while common law claims involving alleged unauthorized payment orders were preempted by Article 4A, common law claims arising from a second transaction, the freezing by the bank of the funds that were the subject of the allegedly unauthorized payment orders, was not preempted). Nonetheless, as Patco itself acknowledges, the viability of these two counts hinges on the success of Count I. *See* Plaintiff's S/J Opposition at 25. If the Bank employed commercially reasonable security procedures, it cannot have been unjustly enriched, or have wrongly converted Patco's funds, when it drew on Patco's line of credit pursuant to the Sweep Agreement to cover the allegedly unauthorized withdrawals. Because I have recommended that the court grant summary judgment in the Bank's favor and against Patco on Count I, I recommend that it also grant summary judgment in the Bank's favor on Counts V and VI.

## IV. Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the Bank's motion for summary judgment as to all counts of Patco's complaint and **DENY** Patco's cross-motion for summary judgment as to Count I. This recommended disposition, if adopted, will **MOOT** Patco's and the Bank's motions to exclude expert testimony (Docket Nos. 77 & 64) and the Bank's motion to strike Patco's jury demand (Docket No. 66).

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14)*

*days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 27th day of May, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | | |
|---|---|---|
| PATCO CONSTRUCTION COMPANY, INC., | ) ) ) | |
| PLAINTIFF | ) ) | |
| v. | ) ) | CIVIL NO. 09-503-P-H |
| PEOPLES UNITED BANK DBA OCEAN BANK, | ) ) ) | |
| DEFENDANT | ) | |

**ORDER AFFIRMING RECOMMENDED DECISION
OF THE MAGISTRATE JUDGE**

On May 27, 2011, the United States Magistrate Judge filed with the court, with copies to counsel, his Recommended Decision on Cross-Motions for Summary Judgment. The plaintiff filed an objection to the Recommended Decision on June 13, 2011. Oral argument was held on August 3, 2011.

On the issue whether Patco agreed to the Bank's security procedures, I do not rely on the Magistrate Judge's conclusion that Patco conceded the point by not addressing the issue in its Reply. The parties filed simultaneous cross-motions for summary judgment and Patco did address the issue in its initial filing. That was enough to preserve it. I do agree with the Magistrate Judge, however, that the record supports the conclusion that Patco did agree.

I have reviewed and considered the Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Recommended Decision; and I concur with the

recommendations of the United States Magistrate Judge for the reasons set forth in the Recommended Decision, and determine that no further proceeding is necessary.

It is therefore **ORDERED** that the Recommended Decision of the Magistrate Judge is hereby **ADOPTED**. The Bank's motion for summary judgment as to all counts of Patco's complaint is **GRANTED**. Patco's cross-motion for summary judgment on Count I is **DENIED**. Patco's and the Bank's motions to exclude expert testimony and the Bank's motion to strike Patco's jury demand are **MOOT**.

**SO ORDERED.**

**DATED THIS 4TH DAY OF AUGUST, 2011**

/S/D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

2

C

Maine Revised Statutes Annotated Currentness
  Title 11. Uniform Commercial Code (Refs & Annos)
    Article 4-A. Funds Transfers (Refs & Annos)
      Part 2. Issue and Acceptance of Payment Order
        **§ 4-1202. Authorized and verified payment orders**

**(1)** A payment order received by the receiving bank is the authorized order of the person identified as sender if that person authorized the order or is otherwise bound by it under the law of agency.

**(2)** If a bank and its customer have agreed that the authenticity of payment orders issued to the bank in the name of the customer as sender will be verified pursuant to a security procedure, a payment order received by the receiving bank is effective as the order of the customer, whether or not authorized, if:

    **(a)** The security procedure is a commercially reasonable method of providing security against unauthorized payment orders; and

    **(b)** The bank proves that it accepted the payment order in good faith and in compliance with the security procedure and any written agreement or instruction of the customer restricting acceptance of payment orders issued in the name of the customer. The bank is not required to follow an instruction that violates a written agreement with the customer or notice of which is not received at a time and in a manner affording the bank a reasonable opportunity to act on it before the payment order is accepted.

**(3)** Commercial reasonableness of a security procedure is a question of law to be determined by considering the wishes of the customer expressed to the bank, the circumstances of the customer known to the bank, including the size, type and frequency of payment orders normally issued by the customer to the bank, alternative security procedures offered to the customer and security procedures in general use by customers and receiving banks similarly situated. A security procedure is deemed to be commercially reasonable if:

    **(a)** The security procedure was chosen by the customer after the bank offered and the customer refused, a security procedure that was commercially reasonable for that customer; and

    **(b)** The customer expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name and accepted by the bank in compliance with the security procedure chosen by the customer.

**(4)** The term "sender" in this Article includes the customer in whose name a payment order is issued if the order

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

is the authorized order of the customer under subsection (1), or it is effective as the order of the customer under subsection (2).

**(5)** This section applies to amendments and cancellations of payment orders to the same extent it applies to payment orders.

**(6)** Except as provided in this section and in section 4-1203, subsection (1), paragraph (a), rights and obligations arising under this section or section 4-1203 may not be varied by agreement.

CREDIT(S)

Current with legislation through the 2011 First Regular Session of the 125th Legislature

(c) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

C

Maine Revised Statutes Annotated Currentness
  Title 11. Uniform Commercial Code (Refs & Annos)
    Article 4-A. Funds Transfers (Refs & Annos)
      Part 2. Issue and Acceptance of Payment Order
        **§ 4-1203. Unenforceability of certain verified payment orders**

**(1)** If an accepted payment order is not under section 4-1202, subsection (1) an authorized order of a customer identified as sender but is effective as an order of the customer pursuant to section 4-1202, subsection (2), the following rules apply.

**(a)** By express written agreement, the receiving bank may limit the extent to which it is entitled to enforce or retain payment of the payment order.

**(b)** The receiving bank is not entitled to enforce or retain payment of the payment order if the customer proves that the order was not caused, directly or indirectly, by a person:

**(i)** Entrusted at any time with duties to act for the customer with respect to payment orders or the security procedure or who obtained access to transmitting facilities of the customer; or

**(ii)** Who obtained from a source controlled by the customer and without authority of the receiving bank information facilitating breach of the security procedure, regardless of how the information was obtained or whether the customer was at fault. Information includes any access device, computer software or the like.

**(2)** This section applies to amendments of payment orders to the same extent it applies to payment orders.

CREDIT(S)

UNIFORM COMMERCIAL CODE COMMENT

1. Some person will always be identified as the sender of a payment order. Acceptance of the order by the receiving bank is based on a belief by the bank that the order was authorized by the person identified as the sender. If the receiving bank is the beneficiary's bank acceptance means that the receiving bank is obliged to pay the beneficiary. If the receiving bank is not the beneficiary's bank, acceptance means that the receiving bank has executed the sender's order and is obliged to pay the bank that accepted the order issued in execution of the sender's order. In either case the receiving bank may suffer a loss unless it is entitled to enforce payment of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

payment order that it accepted. If the person identified as the sender of the order refuses to pay on the ground that the order was not authorized by that person, what are the rights of the receiving bank? In the absence of a statute or agreement that specifically addresses the issue, the question usually will be resolved by the law of agency. In some cases, the law of agency works well. For example, suppose the receiving bank executes a payment order given by means of a letter apparently written by a corporation that is a customer of the bank and apparently signed by an officer of the corporation. If the receiving bank acts solely on the basis of the letter, the corporation is not bound as the sender of the payment order unless the signature was that of the officer and the officer was authorized to act for the corporation in the issuance of payment orders, or some other agency doctrine such as apparent authority or estoppel causes the corporation to be bound. Estoppel can be illustrated by the following example. Suppose P is aware that A, who is unauthorized to act for P, has fraudulently misrepresented to T that A is authorized to act for P. T believes A and is about to rely on the misrepresentation. If P does not notify T of the true facts although P could easily do so, P may be estopped from denying A's lack of authority. A similar result could follow if the failure to notify T is the result of negligence rather than a deliberate decision. Restatement, Second, Agency § 8B. Other equitable principles such as subrogation or restitution might also allow a receiving bank to recover with respect to an unauthorized payment order that it accepted. In Gatoil (U.S.A.), Inc. v. Forest Hill State Bank, 1 U.C.C. Rep.Serv.2d 171 (D.Md.1986), a joint venturer not authorized to order payments from the account of the joint venture, ordered a funds transfer from the account. The transfer paid a bona fide debt of the joint venture. Although the transfer was unauthorized the court refused to require re-credit of the account because the joint venture suffered no loss. The result can be rationalized on the basis of subrogation of the receiving bank to the right of the beneficiary of the funds transfer to receive the payment from the joint venture.

But in most cases these legal principles give the receiving bank very little protection in the case of an authorized payment order. Cases like those just discussed are not typical of the way that most payment orders are transmitted and accepted, and such cases are likely to become even less common. Given the large amount of the typical payment order, a prudent receiving bank will be unwilling to accept a payment order unless it has assurance that the order is what it purports to be. This assurance is normally provided by security procedures described in Section 4A-201.

In a very large percentage of cases covered by Article 4A, transmission of the payment order is made electronically. The receiving bank may be required to act on the basis of a message that appears on a computer screen. Common law concepts of authority of agent to bind principal are not helpful. There is no way of determining the identity or the authority of the person who caused the message to be sent. The receiving bank is not relying on the authority of any particular person to act for the purported sender. The case is not comparable to payment of a check by the drawee bank on the basis of a signature that is forged. Rather, the receiving bank relies on a security procedure pursuant to which the authenticity of the message can be "tested" by various devices which are designed to provide certainty that the message is that of the sender identified in the payment order. In the wire transfer business the concept of "authorized" is different from that found in agency law. In that business a payment order is treated as the order of the person in whose name it is issued if it is properly tested pursuant to a security procedure and the order passes the test.

Section 4A-202 reflects the reality of the wire transfer business. A person in whose name a payment order is issued is considered to be the sender of the order if the order is "authorized" as stated in subsection (a) or if the order is "verified" pursuant to a security procedure in compliance with subsection (b). If subsection (b) does not apply, the question of whether the customer is responsible for the order is determined by the law of agency. The issue is one of actual or apparent authority of the person who caused the order to be issued in the name of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

customer. In some cases the law of agency might allow the customer to be bound by an unauthorized order if conduct of the customer can be used to find an estoppel against the customer to deny that the order was unauthorized. If the customer is bound by the order under any of these agency doctrines, subsection (a) treats the order as authorized and thus the customer is deemed to be the sender of the order. In most cases, however, subsection (b) will apply. In that event there is no need to make an agency law analysis to determine authority. Under Section 4A-202, the issue of liability of the purported sender of the payment order will be determined by agency law only if the receiving bank did not comply with subsection (b).

2. The scope of Section 4A-202 can be illustrated by the following cases. *Case #1*. A payment order purporting to be that of Customer is received by Receiving Bank but the order was fraudulently transmitted by a person who had no authority to act for Customer. *Case #2*. An authentic payment order was sent by Customer, but before the order was received by Receiving Bank the order was fraudulently altered by an unauthorized person to change the beneficiary. *Case #3*. An authentic payment order was received by Receiving Bank, but before the order was executed by Receiving Bank a person who had no authority to act for Customer fraudulently sent a communication purporting to amend the order by changing the beneficiary. In each case Receiving Bank acted on the fraudulent communication by accepting the payment order. These cases are all essentially similar and they are treated identically by Section 4A-202. In each case Receiving Bank acted on a communication that it thought was authorized by Customer when in fact the communication was fraudulent. No distinction is made between Case #1 in which Customer took no part at all in the transaction and Case #2 and Case #3 in which an authentic order was fraudulently altered or amended by an unauthorized person. If subsection (b) does not apply, each case is governed by subsection (a). If there are no additional facts on which an estoppel might be found, Customer is not responsible in Case #1 for the fraudulently issued payment order, in Case #2 for the fraudulent alteration or in Case #3 for the fraudulent amendment. Thus, in each case Customer is not liable to pay the order and Receiving Bank takes the loss. The only remedy of Receiving Bank is to seek recovery from the person who received payment as beneficiary of the fraudulent order. If there was verification in compliance with subsection (b), Customer will take the loss unless Section 4A-203 applies.

3. Subsection (b) of Section 4A-202 is based on the assumption that losses due to fraudulent payment orders can best be avoided by the use of commercially reasonable security procedures, and that the use of such procedures should be encouraged. The subsection is designed to protect both the customer and the receiving bank. A receiving bank needs to be able to rely on objective criteria to determine whether it can safely act on a payment order. Employees of the bank can be trained to "test" a payment order according to the various steps specified in the security procedure. The bank is responsible for the acts of these employees. Subsection (b)(ii) requires the bank to prove that it accepted the payment order in good faith and "in compliance with the security procedure." If the fraud was not detected because the bank's employee did not perform the acts required by the security procedure, the bank has not complied. Subsection (b)(ii) also requires the bank to prove that it complied with any agreement or instruction that restricts acceptance of payment orders issued in the name of the customer. A customer may want to protect itself by imposing limitations on acceptance of payment orders by the bank. For example, the customer may prohibit the bank from accepting a payment order that is not payable from an authorized account, that exceeds the credit balance in specified accounts of the customer, or that exceeds some other amount. Another limitation may relate to the beneficiary. The customer may provide the bank with a list of authorized beneficiaries and prohibit acceptance of any payment order to a beneficiary not appearing on the list. Such limitations may be incorporated into the security procedure itself or they may be covered by a separate agreement or instruction. In either case, the bank must comply with the limitations if the conditions stated in subsection (b) are met. Normally limitations on acceptance would be incorporated into an agreement between the customer and

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the receiving bank, but in some cases the instruction might be unilaterally given by the customer. If standing instructions or an agreement state limitations on the ability of the receiving bank to act, provision must be made for later modification of the limitations. Normally this would be done by an agreement that specifies particular procedures to be followed. Thus, subsection (b) states that the receiving bank is not required to follow an instruction that violates a written agreement. The receiving bank is not bound by an instruction unless it has adequate notice of it. Subsections (25), (26) and (27) of Section 1-201 apply.

Subsection (b)(i) assures that the interests of the customer will be protected by providing an incentive to a bank to make available to the customer a security procedure that is commercially reasonable. If a commercially reasonable security procedure is not made available to the customer, subsection (b) does not apply. The result is that subsection (a) applies and the bank acts at its peril in accepting a payment order that may be unauthorized. Prudent banking practice may require that security procedures be utilized in virtually all cases except for those in which personal contact between the customer and the bank eliminates the possibility of an unauthorized order. The burden of making available commercially reasonable security procedures is imposed on receiving banks because they generally determine what security procedures can be used and are in the best position to evaluate the efficacy of procedures offered to customers to combat fraud. The burden on the customer is to supervise its employees to assure compliance with the security procedure and to safeguard confidential security information and access to transmitting facilities so that the security procedure cannot be breached.

4. The principal issue that is likely to arise in litigation involving subsection (b) is whether the security procedure in effect when a fraudulent payment order was accepted was commercially reasonable. The concept of what is commercially reasonable in a given case is flexible. Verification entails labor and equipment costs that can vary greatly depending upon the degree of security that is sought. A customer that transmits very large numbers of payment orders in very large amounts may desire and may reasonably expect to be provided with state-of-the-art procedures that provide maximum security. But the expense involved may make use of a state-of-the-art procedure infeasible for a customer that normally transmits payment orders infrequently or in relatively low amounts. Another variable is the type of receiving bank. It is reasonable to require large money center banks to make available state-of-the-art security procedures. On the other hand, the same requirement may not be reasonable for a small country bank. A receiving bank might have several security procedures that are designed to meet the varying needs of different customers. The type of payment order is another variable. For example, in a wholesale wire transfer, each payment order is normally transmitted electronically and individually. A testing procedure will be individually applied to each payment order. In funds transfers to be made by means of an automated clearing house many payment orders are incorporated into an electronic device such as a magnetic tape that is physically delivered. Testing of the individual payment orders is not feasible. Thus, a different kind of security procedure must be adopted to take into account the different mode of transmission.

The issue of whether a particular security procedure is commercially reasonable is a question of law. Whether the receiving bank complied with the procedure is a question of fact. It is appropriate to make the finding concerning commercial reasonability a matter of law because security procedures are likely to be standardized in the banking industry and a question of law standard leads to more predictability concerning the level of security that a bank must offer to its customers. The purpose of subsection (b) is to encourage banks to institute reasonable safeguards against fraud but not to make them insurers against fraud. A security procedure is not commercially unreasonable simply because another procedure might have been better or because the judge deciding the question would have opted for a more stringent procedure. The standard is not whether the security procedure is the best available. Rather it is whether the procedure is reasonable for the particular customer and the particular bank, which is a lower standard. On the other hand, a security procedure that fails to meet prevailing standards

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of good banking practice applicable to the particular bank should not be held to be commercially reasonable. Subsection (c) states factors to be considered by the judge in making the determination of commercial reasonableness. Sometimes an informed customer refuses a security procedure that is commercially reasonable and suitable for that customer and insists on using a higher-risk procedure because it is more convenient or cheaper. In that case, under the last sentence of subsection (c), the customer has voluntarily assumed the risk of failure of the procedure and cannot shift the loss to the bank. But this result follows only if the customer expressly agrees in writing to assume that risk. It is implicit in the last sentence of subsection (c) that a bank that accedes to the wishes of its customer in this regard is not acting in bad faith by so doing so long as the customer is made aware of the risk. In all cases, however, a receiving bank cannot get the benefit of subsection (b) unless it has made available to the customer a security procedure that is commercially reasonable and suitable for use by that customer. In most cases, the mutual interest of bank and customer to protect against fraud should lead to agreement to a security procedure which is commercially reasonable.

5. The effect of Section 4A-202(b) is to place the risk of loss on the customer if an unauthorized payment order is accepted by the receiving bank after verification by the bank in compliance with a commercially reasonable security procedure. An exception to this result is provided by Section 4A-203(a)(2). The customer may avoid the loss resulting from such a payment order if the customer can prove that the fraud was not committed by a person described in that subsection. Breach of a commercially reasonable security procedure requires that the person committing the fraud have knowledge of how the procedure works and knowledge of codes, identifying devices, and the like. That person may also need access to transmitting facilities through an access device or other software in order to breach the security procedure. This confidential information must be obtained either from a source controlled by the customer or from a source controlled by the receiving bank. If the customer can prove that the person committing the fraud did not obtain the confidential information from an agent or former agent of the customer or from a source controlled by the customer, the loss is shifted to the bank. "Prove" is defined in Section 4A-105(a)(7). Because of bank regulation requirements, in this kind of case there will always be a criminal investigation as well as an internal investigation of the bank to determine the probable explanation for the breach of security. Because a funds transfer fraud usually will involve a very large amount of money, both the criminal investigation and the internal investigation are likely to be thorough. In some cases there may be an investigation by bank examiners as well. Frequently, these investigations will develop evidence of who is at fault and the cause of the loss. The customer will have access to evidence developed in these investigations and that evidence can be used by the customer in meeting its burden of proof.

6. The effect of Section 4A-202(b) may also be changed by an agreement meeting the requirements of Section 4A-203(a)(1). Some customers may be unwilling to take all or part of the risk of loss with respect to unauthorized payment orders even if all of the requirements of Section 4A-202(b) are met. By virtue of Section 4A-203(a)(1), a receiving bank may assume all of the risk of loss with respect to unauthorized payment orders or the customer and bank may agree that losses from unauthorized payment orders are to be divided as provided in the agreement.

7. In a large majority of cases the sender of a payment order is a bank. In many cases in which there is a bank sender, both the sender and the receiving bank will be members of a funds transfer system over which the payment order is transmitted. Since Section 4A-202(f) does not prohibit a funds transfer system rule from varying rights and obligations under Section 4A-202, a rule of the funds transfer system can determine how loss due to an unauthorized payment order from a participating bank to another participating bank is to be allocated. A funds transfer system rule, however, cannot change the rights of a customer that is not a participating bank. § 4A-501(b). Section 4A-202(f) also prevents variation by agreement except to the extent stated.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

HISTORICAL AND STATUTORY NOTES

1995 Main Volume

Purpose

**1991 Act.** Laws 1991, c. 812, § 3, provided:

"This Act is the Maine enactment of the Uniform Commercial Code, Article 4A as adopted by the National Conference of Commissioners on Uniform State Laws. The text of that uniform act has been changed to conform to Maine statutory conventions. Unless otherwise noted in a Maine comment, the changes are technical in nature and it is the intent of the Legislature that this Act be interpreted as substantively the same as the uniform act."

Uniform Law:

This section is similar to § 4A-203 of the Uniform Commercial Code, see Uniform Laws Annotated.

LAW REVIEW AND JOURNAL COMMENTARIES

Comparing article 4A with existing case law on funds transfers: A series of case studies. Tony M. Davis, 42 Ala.L.Rev. 823 (1991).

LIBRARY REFERENCES

1995 Main Volume

> Depositors' accounts, see Banks and Banking ⚷ 151.
> Disposition and repayment of deposits, see Banks and Banking ⚷ 128 to 131, 133.
> Depositors' accounts, see C.J.S. Banks and Banking § 271.
> Payment of orders on deposits, see C.J.S. Banks and Banking §§ 330, 331.

11 M. R. S. A. § 4-1203, ME ST T. 11 § 4-1203

Current with legislation through the 2011 First Regular Session of the 125th Legislature

(c) 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT