No. 11-2031

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

---

PATCO CONSTRUCTION CO., INC.

Plaintiff-Appellant,

v.

PEOPLE'S UNITED BANK,

Defendant-Appellee.

---

On Appeal from Judgment in the
United States District Court for the District of Maine
Civil Action No. 2:09-CV-00503-DBH

---

**BRIEF FOR DEFENDANT-APPELLEE**

---

Brenda R. Sharton (1st Cir. #59154)
Don M. Kennedy (1st Cir. #36874)
Katherine A. Borden (1st Cir. #1148873)
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Tel.: 617-570-1000
Fax: 617-523-1231
*Attorneys for Defendant-Appellee*
*People's United Bank*

February 15, 2012

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellee People's United Bank d/b/a Ocean Bank states that it is a wholly-owned subsidiary of People's United Financial, Inc., a bank holding company that is publicly held, and that no other publicly-held company owns 10% or more of People's United Bank's common stock.

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF ISSUES ...................................................................................1

STATEMENT OF THE CASE...............................................................................1

STATEMENT OF FACTS ....................................................................................4

    A.    The Parties. ....................................................................................4

    B.    The Parties' eBanking Agreements. ...................................................5

        1.    Original eBanking Agreement. ................................................6

        2.    Modified eBanking Agreement. ...............................................7

        3.    Sweep Agreement. ..............................................................8

        4.    ACH Agreement. ................................................................9

    C.    Ocean Bank's Security Procedures. ....................................................9

        1.    Jack Henry Products. ............................................................9

        2.    Implementation of New Authentication Product in 2007.........12

            a.    Features of Jack Henry Premium Product………………..12

            b.    Parties' Course of Dealing Communications on Security Measures………………………………………………15

            c.    Ocean Bank's Configuration of Dollar Amount Rule…...15

        3.    Security Measures Implemented in Addition to the Premium Product. ................................................................17

            a.    Email Alerts…………………………………………...17

            b.    Anti-Phishing Controls………………………………..18

            c.    Secure Socket Layer…………………………………...18

            d.    Phishing and Fraud Alerts……………………………..19

D. Patco's Use of Its eBanking Account Immediately Prior to the Allegedly Fraudulent Transactions. ....................................................20

E. The May 2009 Allegedly Fraudulent Transactions............................20

F. Patco's Failure to Monitor Its Accounts. ...........................................22

G. Patco's Handling of Its Computers After the Transactions. ...............23

H. Keylogging Malware; Other Security Threats. ..................................24

SUMMARY OF ARGUMENT ........................................................................25

STANDARD OF REVIEW .............................................................................28

ARGUMENT ...................................................................................................29

I. PATCO AND OCEAN BANK AGREED THAT PAYMENT ORDERS WOULD BE VERIFIED BY A SECURITY PROCEDURE. .......................29

II. OCEAN BANK'S SECURITY SYSTEM WAS COMMERCIALLY REASONABLE. ....................................................................................37

A. Standards For Determining Commercial Reasonableness. ................37

B. Ocean Bank Purchased and Employed a Security Procedure That Equaled or Exceeded Those In Use By Similarly Situated Banks......40

C. The Dollar Amount Rule Threshold Of $1 Did Not Render The Bank's System Commercially Unreasonable. ....................................47

D. The Bank's Selection Of The Dollar Amount Rule Was Considered And Deliberate. .................................................................................51

E. The Issue Is Whether Ocean Bank's Security System Was Commercially Reasonable, Not Whether It Was The Best System Available. ...........................................................................................52

III. OCEAN BANK ACTED IN COMPLIANCE WITH ITS SECURITY PROCEDURE.......................................................................................56

IV. PATCO'S COMMON LAW CLAIMS ARE PREEMPTED. ......................58

CONCLUSION ...............................................................................................60

# **TABLE OF AUTHORITIES**

**CASES**                                                                                                **PAGES**

*Borden v. Sec'y of Health & Human Servs.*,
836 F.2d 4 (1st Cir. 1987)......................................................................................57

*Braga Filho v. Interaudi Bank*,
No. 03 Civ. 4795 (SAS), 2008 WL 1752693 (S.D.N.Y. Apr. 16, 2008) ...........28

*Centre-Point Merch. Bank Ltd. v. Am. Express Bank Ltd.*,
No. 95 Civ. 5000 LMM, 2000 WL 1772874 (S.D.N.Y. Nov. 30, 2000) ..............
.................................................................................................................28, 47

*Fireman's Ins. Co. of Newark, N.J. v. Todesca Equip. Co., Inc.*,
310 F.3d 32 (1st Cir. 2002)....................................................................................56

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
575 F. Supp. 2d 696 (D. Md. 2008)..................................................................32, 35

*Leshine Carton Co., Inc. v. Matik, N. Am.*,
No. CV054007636S, 2006 WL 1359651 (Conn. Super. Ct. Mar. 9, 2006)...........32

*Lust v. Sealy, Inc.*,
383 F.3d 580 (7th Cir. 2004) ................................................................................56

*Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
597 F.3d 84 (2d Cir. 2010) ...................................................................................59

*Patco Const. Co., Inc. v. People's United Bank*,
No. 2:09-cv-503-DBH, 2011 WL 2174507 (D. Me. May 27, 2011) ......... *passim*

*Patco Const. Co., Inc. v. People's United Bank*,
No. 09-503-P-H, 2011 WL 3420588 (D. Me. Aug. 4, 2011) ........................2, 28

*Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*,
840 F.2d 985 (1st Cir. 1988)..................................................................................56

*Regatos v. N. Fork Bank,*
257 F. Supp. 2d. 632 (S.D.N.Y. 2003) ....................................................32,38, 52

*Regions Bank v. The Provident Bank, Inc.,*
345 F.3d 1267 (11th Cir. 2003) ............................................................................58

**CASES** **PAGES**

*Regions Bank v. Wieder & Mastroianni, P.C.*,
423 F. Supp. 2d 265 (S.D.N.Y. 2006) ........................................................58

*Transamerica Logistic, Inc. v. JPMorgan Chase Bank,*
No. 07 C 01678, 2008 Lexis 112708 (U.S. Dist. Ct. July 21, 2008)......32, 35, 46

*Travelers Cas. & Sur. Co. of Am. v. Bank of Am., N.A.*,
No. 09 C 06473, 2010 WL 1325494 (N.D. Ill. Mar. 30, 2010).........................59

*Vineberg v. Bissonnette*,
548 F.3d 50 (1st Cir. 2008)................................................................28

*Zengen, Inc. v. Comerica Bank*,
158 P.3d 800 (Cal. 2007) ................................................................59

**STATUTES**

U.C.C. § 4A-102. ...........................................................................27, 58

U.C.C. § 4A-201 ..................................................................................35

U.C.C. § 4A-202(b)...................................................................... *passim*

U.C.C. § 4A-202(c).........................................................................28,37, 38

U.C.C. § 4A-203 .............................................................................4, 37, 52

Article 4A of the Uniform Commercial Code ................................................ *passim*

**OTHER AUTHORITIES**

Authentication in an Internet Banking Environment....................................... *passim*

## STATEMENT OF ISSUES

(1)  Whether the District Court properly granted summary judgment in favor of Defendant People's United Bank, d/b/a Ocean Bank ("Ocean Bank"), and denied the Cross Motion for Summary Judgment of Plaintiff Patco Construction Company, Inc. ("Patco"), on Count I of Patco's Second Amended Complaint brought pursuant to Article 4A of the Uniform Commercial Code, where Patco and Ocean Bank agreed that payment orders would be verified pursuant to a security procedure and Ocean Bank employed a commercially reasonable security procedure?

(2)  Whether the District Court properly granted summary judgment in favor of Ocean Bank on Counts II–VI of the Second Amended Complaint that alleged common law claims where Article 4A of the Uniform Commercial Code provides the exclusive remedy for all of Patco's claims?

## STATEMENT OF THE CASE

By this action, Patco sought to recover from Ocean Bank for allegedly unauthorized transfers from Patco's bank account that Patco claims were accomplished by third-party cybercriminals through breaches of Patco's—and not Ocean Bank's—computer system.  The applicable law is Article 4A of the Uniform Commercial Code ("U.C.C."), which provides the "exclusive means" of determining the allocation of losses from fraudulent electronic funds transfers on

1

commercial bank accounts.  Section 202(b) provides that the customer bears the loss under the circumstances alleged by Patco if: (1) the bank and the customer have agreed that the authenticity of payment orders will be verified pursuant to a security procedure; (2) the security procedure is "a commercially reasonable method of providing security against unauthorized payment orders;" and (3) the bank accepted the orders in good faith and compliance with the security procedure.

The Magistrate Judge issued a Recommended Decision on the parties' cross motions for summary judgment, recommending that the Court grant Ocean Bank's Motion for Summary Judgment on all counts of Patco's Second Amended Complaint and deny Patco's Motion for Summary Judgment as to Count I.  *Patco Const. Co., Inc. v. People's United Bank*, No. 2:09-cv-503-DBH, 2011 WL 2174507 (D. Me. May 27, 2011) ("*Patco I*").  Following a hearing on Patco's Objection to the Recommended Decision, the District Court made a *de novo* determination of all matters adjudicated by the Recommended Decision, and adopted the Recommended Decision in all material respects.  *Patco Const. Co., Inc. v. People's United Bank*, No. 2:09-503-P-H, 2011 WL 3420588 (D. Me. Aug. 4, 2011) ("*Patco II*").

The District Court correctly found that Ocean Bank and Patco had agreed that payment orders would be authenticated by a security procedure because they entered into written agreements that expressly provide for authentication by

2

security procedures, and because Patco had continuously used Ocean Bank's electronic banking services for several years prior to the alleged fraud without ever objecting to Ocean Bank's security procedures or requesting additional ones.

The District Court correctly found as well that Ocean Bank's security procedure was commercially reasonable based on substantial, compelling evidence. Ocean Bank had purchased and employed a state-of-the-art system—the "premium" authentication product offered by a leading provider of computer systems and services, including online banking and authentication solutions, to financial institutions nationwide. Ocean Bank introduced expert testimony that its security procedure was not only commercially reasonable, but that it exceeded the standard for banks of its size at the relevant time.

Patco quarrels with the District Court's finding that Ocean Bank's security procedure was commercially reasonable in two respects: (1) that Ocean Bank undermined its system by prompting customers for answers to challenge questions (such as "what is your mother's maiden name") too often by setting the "Dollar Amount Rule" at which challenge questions were posed at $1; and (2) that Ocean Bank's security procedure should have had additional features such as "tokens," "out-of-band" verification, or manual review. The District Court correctly rejected both arguments. Adopting the Magistrate Judge's Recommended Decision, the District Court found that Ocean Bank's setting of the Dollar Amount Rule was

3

permissible under the security procedure and that it did not render unreasonable what was otherwise a commercially reasonable system, and that Patco's claim that Ocean Bank should have adopted additional procedures was a demand that Ocean Bank adopt the best system available, when the law required only that the Bank's system be commercially reasonable. "The standard is not whether the security procedure is the best available. Rather it is whether a procedure is reasonable for the particular customer and the particular bank, which is a lower standard." U.C.C. § 4A-203 cmt. 4 (codified at 11 M.R.S.A § 4-1203).

Finally, the District Court granted Ocean Bank summary judgment on Patco's common law claims—Counts II–VI—as well, finding that Article 4A provided the exclusive remedy for unauthorized funds transfers.

## STATEMENT OF FACTS

In a 70-page, carefully considered Recommended Decision, Magistrate Judge John H. Rich, III stated the material undisputed facts in detail, noting any qualifications and disputes. To avoid duplication and confusion, Ocean Bank will rely substantially on those detailed findings in this Statement of Facts, and otherwise make reference to the Joint Appendix.

### A. The Parties.

Patco is a real estate developer and contractor that has been in business since 1985. *Patco I*, 2011 WL 2174507, at *3. At their peak in 2005, Patco's revenues

were between $17 million and $18 million.  *Id.*; *see also* J. App. at 687 (Thomas McDowell Dep., dated May 6, 2010).  Patco began banking with Ocean Bank in 1985.  *Patco I*, 2011 WL 2174507, at *3.

At the time, Ocean Bank was an independent southern Maine-based community bank.  *Patco I*, 2011 WL 2174507, at *3.  Ocean Bank was a division of People's United Bank, a regional bank based in Bridgeport, Connecticut, in May 2009, when the allegedly unauthorized withdrawals occurred.  *Id.*; *see also* J. App. at 152–153 (Pl.'s Statement of Undisputed Material Facts, dated Aug. 27, 2010); *see also id.* at 437 (Statement in Supp. of Def. People's United Bank's Mot. for Summ. J., dated Aug 27, 2010).

### B. The Parties' eBanking Agreements.

Ocean Bank made online banking, referred to at Ocean Bank as "eBanking," available to its commercial customers, and enabled its eBanking commercial customers to make electronic funds transfers through Ocean Bank via the Automated Clearing House ("ACH") network, a system used by banks to transfer funds electronically.  *Patco I*, 2011 WL 2174507, at *3.

Patco began using eBanking in September 2003, and at that time, it entered into three agreements with Ocean Bank concerning eBanking:  the eBanking for Business Agreement ("Original eBanking Agreement"), the Automated Clearing House Agreement ("ACH Agreement"), and the Investment and Line of Credit

Sweep Account Managed Balance Agency Agreement ("Sweep Agreement").  *Id.* at *3–4.

### 1.    Original eBanking Agreement.

Patco distributed a copy of the Original eBanking Agreement internally in September 2003, and required Patco employees Thomas McDowell (Patco's Chief Financial Officer), Vickie Kelly, Diana Pierce, Angie Pelham, Mike Patterson, Greg Patterson, and Mark Patterson, Patco's co-owner and Treasurer, to read and initial it.  *Id.* *4.  McDowell acknowledged that Patco accepted the terms and conditions of the Original eBanking Agreement when it logged into eBanking.  *Id*.; *see also* J. App. at 696 (Thomas McDowell Dep., dated May 6, 2010).

In the Original eBanking Agreement, Patco agreed that the authenticity of payment orders would be verified pursuant to a security procedure.  Specifically, the Agreement provided that "use of the *Ocean National Bank's eBanking for Business* password [would] constitute[] authentication of all transactions performed by you or on your behalf."  *Patco I*, 2011 WL 2174507, at *4; *see also* J. App. at 509–15 (eBanking for Business Agreement, signed September 2003).

The Original eBanking Agreement provided in two sections that it could be modified by Ocean Bank.  First, Section IV.A stated: "We reserve the right to modify these terms and conditions at any time effective upon publication."  J. App. at 503.  Second, Section XV stated that "[t]he Bank may make changes to this

Agreement at any time" and that "[c]hanges to this Agreement will be effective immediately after we make them, except those changes we are required by applicable law to notify you about in advance." *Id.* at 507.

### 2. Modified eBanking Agreement.

As authorized by the Original eBanking Agreement, Ocean Bank modified that agreement and published the Modified eBanking Agreement on the Bank's website. *Patco I*, 2011 WL 2174507, at *5; J. App. at 1166 (Def. People[']s United Bank's Reply to Pl.'s Statement of Additional Undisputed Material Facts, dated Nov. 3, 2010); *see generally id.* at 518–25 (Ocean Bank eBanking and Bill Payment Agreement, dated August 2008). The Modified eBanking Agreement could be accessed any time a customer logged into eBanking. *Patco I*, 2011 WL 2174507, at *5; J. App. at 441. As with the Original eBanking Agreement, the Modified eBanking Agreement stated that continued use constituted agreement with its terms. J. App. at 518–19 ("[I]f you use Ocean Bank eBanking . . . each party agrees to the terms and conditions stated in the Agreement.").

Like the Original Agreement, the Modified eBanking Agreement provided that the authenticity of payment orders would be verified by a security procedure: it provided for "Security Passcodes," which were comprised of a customer ID and password and a user ID and password for each authorized user of the customer. *Id.*

at 522.  As it did in the Original eBanking Agreement, Patco agreed that "[u]se of [the] Ocean Bank eBanking password is [its] signature authorization."  *Id.* at 522.

The Modified eBanking Agreement also provided for two additional security features.  First, it explicitly stated that customers could choose to receive email alerts of all of their eBanking transactions.  *Id.* at 523 ("At your option and upon your request, Ocean Bank eBanking will deliver automated alert messages . . . that notify you of banking transactions and circumstances pertaining to your accounts.").  Second, it provided that, should an eBanking customer choose to receive ACH debit transactions on its commercial account, that customer "assume[d] all liability and responsibility to monitor those commercial accounts on a daily basis."  *Id.*  The customer was also responsible for reporting any objections on the same day as the suspect transaction.  *Id.*  Patco received ACH debits on its account such as 401(k) contributions and state tax payments, and was therefore responsible for monitoring its account on a daily basis.  *Patco I*, 2011 WL 2174507, at *5.  Such monitoring requirements are typical in most financial services' end-user agreements involving money-transfer capabilities.  *Id.*; *see also* J. App. at 442.

### 3.    Sweep Agreement.

Under the Sweep Agreement, Patco agreed that Ocean Bank would sweep funds from Patco's account to a separate investment account and would draw upon

Patco's line of credit if its checking account had insufficient funds.  *Patco I*, 2011 WL 2174507, at *6.

### 4. ACH Agreement.

The ACH Agreement also governed Patco's electronic funds transfers through Ocean Bank via the ACH network.  *Id.*  The ACH Agreement provided a limit on the amount of funds that a customer could transfer in a single day, absent special authorization.  *See* J. App. at 530 (Automated Clearing House Agreement – Schedule A – Operating and Security Procedures, dated Sept. 5, 2003).  Patco's ACH limit was initially set at $100,000; however, prior to May 2009, at Patco's request, its ACH limit had been raised twice, first to $500,000, then to $750,000, to meet its stated need to make ACH transactions of increasing amounts.  *Id.* at 165; *see also Patco I*, 2011 WL 2174507, at *6.

### C. Ocean Bank's Security Procedures.

### 1. Jack Henry Products.

Since 2004, Ocean Bank has used Jack Henry & Associates ("Jack Henry") to provide its core online banking platform, known as "NetTeller."  *Patco I*, 2011 WL 2174507, at *7; J. App. at 636 (Debra Edwards Decl. (on behalf of Jack Henry), dated August 26, 2010).  Jack Henry is a leading provider of computer systems and services, including a suite of online banking security and authentication solutions, to financial institutions nationwide.  *Id.*

Jack Henry provides its NetTeller product to approximately 1,300 of its 1,500 bank customers. *Patco I*, 2011 WL 2174507, at *7; J. App. at 635. Jack Henry provides security for the systems it sells, including software patches, firewalls, anti-virus, and other security measures. J. App. at 636. Jack Henry's security systems are regularly audited by federal regulatory authorities for adherence to regulatory mandates, and by Jack Henry's internal auditors and third parties to ensure that its security systems are working as designed. *Id.* at 259 (Pl.'s Opposing Statement of Material Facts and Statement of Additional Material Facts, dated Oct. 8, 2010).

In October 2005, the Federal Financial Institutions Examination Council ("FFIEC"), which is comprised of five federal bank regulatory agencies, issued guidance for financial institutions to use in evaluating and implementing authentication systems. *Id.* at 844–57 ("Authentication in an Internet Banking Environment" ("Guidance")). The Guidance generally provided that existing authentication methodologies involved three basic "factors": (1) "[s]omething the user *knows* (e.g. password, PIN)"; (2) "[s]omething the user *has* (e.g. ATM card, smart card)"; and (3) "[s]omething the user *is* (e.g. biometric characteristics, such as a fingerprint." *Id.* at 846.

The Guidance did not endorse any particular technology for compliance, but suggested that "financial institutions should periodically . . . [a]djust as

appropriate, their information security program in light of any relevant changes in technology, the sensitivity of its customer information, and internal or external threats to information. *Id.* at 845. It advised that "[a]uthentication methods that depend on more than one factor are more difficult to compromise than single factor methods," and that "properly designed and implemented multifactor authentication methods are more reliable and stronger fraud deterrents." *Id.* at 846. It did not mandate multifactor authentication, however, instructing only that "[w]here risk assessments indicate that the use of single-factor authentication is inadequate, financial institutions should implement multifactor authentication, layered security, or other controls reasonably calculated to mitigate those risks." *Id.* at 847.

Following publication of the FFIEC Guidance, Jack Henry entered into a re-seller agreement with Cyota, Inc., an RSA Security Company ("RSA/Cyota"), for a multifactor authentication system to integrate into its NetTeller product so that it could offer security solutions compliant with the Guidance. *Id.* at 446. RSA/Cyota is the industry leader for protecting online identities and digital assets. *Id.* Security provided by RSA/Cyota is used by 90 percent of the Fortune 500 companies. *Id.*

Jack Henry marketed its RSA/Cyota multifactor solution to its customers as "the most robust and effective solution available" as of 2006. *Patco I*, 2011 WL 2174507, at *8. Through collaboration with RSA/Cyota, Jack Henry made two

11

multifactor authentication products available to its customers to meet the FFIEC

Guidance: the "Basic Product" and the "Premium Product." *Patco I*, 2011 WL

2174507, at \*8.

### 2. Implementation of New Authentication Product in 2007.

### a. Features of Jack Henry Premium Product.

To comply with the Guidance, Ocean Bank selected the Jack Henry

Premium Product at greater expense to the bank. *Patco I*, 2011 WL 2174507, at

\*9; *see also* J. App. 447, 642. Implemented in January 2007, the Premium Product

included the following features:

1. Passwords and IDs. Required each authorized Patco employee to use

both a company ID and password and user-specific ID and password to access

online banking. J. App. at 266.

2. Challenge Questions. Required users, during initial log-in, to select

three challenge questions and responses. *Id*. at 267. Later, the challenge questions

might be prompted for various reasons, for example, if the risk score associated

with a particular transaction exceeded a certain amount. *Id*. If the customer could

not answer the challenge questions in three attempts, the customer would be

blocked from online banking and required to contact the bank. *Id*.

3. Risk Profiling. Built a risk profile for each customer from a number

of different factors, such as the location from which a user logged in, the IP

address that the customer typically used, when/how often a user logged in, and what a user did while on the system. *Id.* at 266. The RSA/Cyota unique profiling system was designed to take into account the circumstances of a customer known to the bank, including the size, type, and frequency of payment orders normally issued by the customer. *Id.* at 296–97.

After the risk profile was complete, if a transaction appeared different from the normal profile, the risk score associated with that transaction would be elevated. *Id.* at 266; *see also Patco I*, 2011 WL 2174507, at *10. Challenge questions were prompted any time the risk score for a transaction exceeded 750 on a scale of zero to 1,000, which RSA/Cyota considered to be high-risk transactions. *Patco I*, 2011 WL 2174507, at *10. The only result of a high-risk score was that a customer was prompted to answer his or her challenge questions. *Id.*

4. Device Cookies. Placed a "device cookie" onto customers' computers to identify particular computers used to access online banking. *Id.*; *see also* J. App. at 266–67. If a non-identified computer were used to access the system, it would affect the risk score and potentially result in the user being challenged. *Patco I*, 2011 WL 2174507, at *10; *see also* J. App. at 267.

5. Dollar Amount Rule. Permitted financial institutions to set a dollar threshold amount above which a transaction would trigger the challenge questions

even if the user ID, password, and device cookie were all valid ("Dollar Amount Rule").  *Patco I*, 2011 WL 2174507, at *10; *see also* J. App. at 267–68.

6.  <u>Subscription to eFraud Network</u>.  Provided Ocean Bank with a subscription to eFraud Network, which compared characteristics of the transaction (such as the IP address of the user seeking access to the Bank's system) with those of known instances of fraud.  *Patco I*, 2011 WL 2174507, at *10; *see also* J. App. at 157.  Subscription to the eFraud Network added a higher level of security beyond the individual customer authentication process.  J. App. at 280–81; *see also id.* at 639.  Any attempt to access customer's NetTeller account that implicated any fraudulent activity, IP address, or other indicia identified and reported by a financial institution belonging to the eFraud Network would be immediately blocked.  *Id.*  In those cases, challenge questions would never be issued at all.  *Id.* at 639.

7.  <u>Reports to Financial Institutions</u>.  Provided reports to financial institutions *via* the Internet through the Cyota dashboard.  *Id.* at 639.  With the Premium Product, financial institutions were provided all standard reports and were allowed to create their own custom reports.  *Id.*

Not all the security procedures used by Ocean Bank were visible to customers.  *Patco I*, 2011 WL 2174507, at *10; *see also* J. App. at 620 (Expert Witness Rep. of Peter A. Makohon, dated June 8, 2010).  Security measures such

as device ID, Geo IP, and cookies operated in the background in order to minimize disruption to customers' experience and the risk of criminals receiving and using the information. *Patco I*, 2011 WL 2174507, at *10; J. App. at 620

### b. Parties' Course of Dealing Communications on Security Measures.

In addition to the parties' Agreements, Patco agreed by a course of dealing to security passcodes, which consisted of a customer ID and password and a user ID and password for each authorized user of the customer. *Patco I*, 2011 WL 2174507, at *24. Patco also agreed to and used challenge questions both (1) in its initial selection of those questions and its input of the answers to those questions, and (2) through its use when it logged on to online banking on at least a weekly basis over the course of years. *Id*. at *11.

Prior to May 14, 2009, Patco never expressed dissatisfaction with Ocean Bank's security procedures to Ocean Bank personnel, nor had it sought any additional protections. *Id.*

### c. Ocean Bank's Configuration of Dollar Amount Rule.

The Dollar Amount Rule was among configurations that Jack Henry allowed financial institutions to modify, having determined that its Premium Product would operate effectively at any particular dollar amount threshold. *Id.*; J. App. at 641.

Jack Henry's default setting for the Dollar Amount Rule was $1,000, where it would remain if the customer did not change the setting. *Patco I*, 2011 WL

15

2174507, at *12. Jack Henry believed that it would be reasonable for bank customers either to leave the Dollar Amount Rule at the default setting of $1,000 or to modify it as their business needs changed or as various events, such as low-dollar frauds, occurred. *Id*.; *see also* J. App. at 641. The system permitted banks to set the Dollar Amount Rule at any dollar amount, from $1 up. *Patco I*, 2011 WL 2174507, at *12.

Jack Henry first rolled out the default Dollar Amount Rule of $1,000 to its Premium customers in August 2007. *Id*. At that time, Ocean Bank set the Dollar Amount Rule to $100,000 to ensure that customers were not inconvenienced by frequent prompts for challenge questions. J. App. at 489 (Jeffrey R. Tarte, dated Aug. 26, 2010). Ocean Bank also considered information regarding ACH fraud then known in the banking industry in setting the Dollar Amount Rule. *Id*.

On June 6, 2008, Ocean Bank intentionally lowered the Dollar Amount Rule from $100,000 to $1. *Id*. at 490. After the Bank lowered the threshold to $1, Patco was prompted to answer challenge questions every time it initiated an ACH transaction. *Patco I*, 2011 WL 2174507, at *12. In May 2009, when the alleged fraudulent transactions occurred, the Dollar Amount Rule was set at $1. *Id.*

Ocean Bank lowered the Dollar Amount Rule to $1 to enhance security for its customers after the occurrence of ACH frauds at Ocean Bank that targeted low-dollar amount ACH transactions, with fraudsters attempting to "fly under the

radar." *Id.*; *see* J. App. at 490; *see also id*. at 606 (Peter A. Makohon Decl., dated Aug. 25, 2010). Lowering the Dollar Amount Rule increased the security of online banking for customers because it added an additional layer of security every time a customer initiated an ACH transaction. *See* J. App. at 490, 606. There was no fraud in the approximately one-year period following the institution of the $1 limit until the alleged fraudulent withdrawals from Patco's account. *Patco I*, 2011 WL 2174507, at *13; *see also* J. App. at 490.

### 3. Security Measures Implemented in Addition to the Premium Product.

Ocean Bank also implemented other security measures that were not a part of the Premium Product.

### a. Email Alerts.

Ocean Bank first offered email alerts (by which a customer would receive a contemporaneous email message indicating an electronic funds transfer) to its eBanking customers on December 1, 2006. *Patco I*, 2011 WL 2174507, at *15; *see also* J. App. at 491. The Bank's NetTeller website continuously notified commercial customers of the availability of email alerts, and Ocean Bank's eBanking for Business User Guide, available on Ocean Bank's eBanking website, provided instructions on how to set up email alerts. [1] *Patco I*, 2011 WL 2174507,

---

[1] Previously, on February 3, 2004, Ocean Bank had sent a copy of the Original eBanking Agreement to Patco with a cover letter that stated: "Please

at *15; *see also* J. App. at 491.  A user needed only click on a tab visible on the

eBanking web page in order to set up the alerts.  *Patco I*, 2011 WL 2174507, at

*15; *see also* J. App. at 491.

Diana Pierce, the Patco employee with primary responsibility for eBanking,

navigated to the email tab at least once.  *Patco I*, 2011 WL 2174507, at *15.  Patco

chose not to set up email alerts through the eBanking system.  *Id.*

### b.     Anti-Phishing Controls.

Although the Jack Henry Premium Product had anti-phishing[2] features,

Ocean Bank increased the controls it had on anti-phishing beyond the Jack Henry

security procedures, and beyond those used by similarly situated banks, by

employing an additional product called "counterphish."  *Id.* at *15; *see also* J. App.

at 492.  In 2009, before the allegedly fraudulent withdrawals, Ocean Bank

subscribed to a third anti-phishing service.  J. App. at 492.

### c.     Secure Socket Layer.

Ocean Bank used secure socket layer ("SSL") encryption on its main

banking page before customer log-in to online banking.  *Id.* at 491.  SSL is

---

familiarize yourself with the *eBanking for Business Agreement. . . .*  If you
have any questions, check the user guide online or the screen-by-screen icons."
J. App. at 501.

[2]     As the Magistrate Judge explained, "'phishing' attacks generally function by
redirecting the user to a spoof website that is designed to mimic a bank's site,

comprised of cryptographic protocols that provide security for communications

over networks such as the Internet, and appear in a website's URL as "https//"

instead of "http//." *Id.* In particular, Ocean Bank used a Secure Site Pro digital

certificate from VeriSign that forces a browser to use the stronger 128-bit

encryption as the minimum strength to encrypt data transmitted over the Internet.

*Id.* This added security beyond the Secure Site solution and was a more expensive

product. *Id.* Although many national banks did not include Secure Site Pro at the

time of the alleged fraudulent transactions, Ocean Bank, a smaller regional bank,

utilized it as part of its security procedures. J. App. at 603–604.

### d.      Phishing and Fraud Alerts.

Since 2008, Ocean Bank has posted phishing and fraud alert notices to its

customers on its main log-in screen, as well as on the main website,

www.ocean.com. *Id.* at 492. These notices would "pop up" on the screen

immediately upon the customer's log-in to the eBanking website. *Id.* For

example, on June 30, 2008, Ocean Bank posted this notice on its website:

> Please be advised that Ocean Bank has seen evidence of ACH fraud in
> your area. Our security features remain strong and in place.
> However, we need your help to combat fraud. Taking the following
> measures will help to ensure your security. Secure all eBanking IDs
> and Passwords. *Monitor all account daily activity and notify us
> immediately if you notice anything which appears unusual or out of*

---

which prompts customers to input their confidential log-in information." *Patco
I*, 2011 WL 2174507, at *15 n.72.

*the ordinary patterns of your business.*  Call 1-800-206-3790 to report your concerns.

*Id.* (emphasis added)

All of these security procedures were in effect at Ocean Bank in May 2009, at the time of the alleged fraudulent withdrawals.  *Patco I*, 2011 WL 2174507, at *16.

### D. Patco's Use of Its eBanking Account Immediately Prior to the Allegedly Fraudulent Transactions.

In the three months prior to the alleged fraudulent transactions, between February 13, 2009, and May 6, 2009, Patco logged into its eBanking account 107 times.  *Id.* at *17.  During these 107 log-ins, Patco initiated 12 ACH transactions and was prompted with its challenge questions 12 times.  *Id.*  Of these 12 ACH transactions, all but one was for more than $1,000.  *Id.*  Seven of Patco's ACH transactions were for more than $16,000, four were for more than $24,000, and one, which was initiated on March 3, 2009, was for $204,724.  *Id.*  On May 6, 2009, one day prior to the first allegedly unauthorized withdrawal, Patco employee Diana Pierce used eBanking for an ACH transaction of $16,026.58.  *Id.*

### E. The May 2009 Allegedly Fraudulent Transactions.

Patco alleges that in May 2009 third-party cybercriminals infiltrated the computer of Diana Pierce—the Patco employee primarily responsible for online banking—and obtained Ms. Pierce's user ID, password, and answers to challenge questions and used that information to make a series of fraudulent withdrawals on

20

Patco's account over six business days.  *See* J. App. at 19–21 (Second Amended

Compl., filed Apr. 23, 2011); *Patco I*, 2011 WL 2174507, at *17–18.  Specifically,

$56,594.00 was transferred on May 7, $115,620.26 on May 8, $99,068.00 on

May 11, $91,959.00 on May 12, $113,647.00 on May 13, and $111,963.00 on

May 14.  Ocean Bank subsequently blocked $243,406.83 of the transfers, leaving

Patco's claimed loss at $345,444.43.  *Patco I*, 2011 WL 2174507, at *17–18.

Ocean Bank accepted the allegedly fraudulent May 2009 payment orders in

compliance with its security procedures.  *Id.* at *19.  There was no evidence of any

security breach on Ocean Bank's systems.  *Id.*  Ocean Bank authenticated the May

2009 electronic transfers with Patco's company ID and password and Pierce's

proper credentials, including her ID, password, and answers to challenge questions.

*Id*.  Whoever perpetrated the alleged fraud knew Patco's company ID and

password and Pierce's proper credentials because the person did not submit an

incorrect password or incorrect answers to the challenge questions even once.  *Id*.

Ocean Bank's risk-scoring engine generated higher than normal risk scores

for these transactions, since the payments were directed to the accounts of

individuals to whom Patco had not previously sent money, and the perpetrators

logged in from a device unrecognized by Ocean Bank's system, and from an IP

address that Patco had never before used.  *Id*. at *18.  The Premium Product did

not require manual review and Bank personnel did not manually review the

21

transactions. *Id.*; *see also* J. App. at 1114. The Bank batched and processed the transactions as usual, and they were paid on the next business days. *Patco I*, 2011 WL 2174507, at *17–18. Had Patco opted to receive contemporaneous email alerts of its eBanking transactions, it would have been notified of the allegedly fraudulent transactions before they were paid on the next business days and been able to prevent them.

Portions of the transfers, beginning with the first transfer initiated on May 7, 2009, were returned to the Bank because certain of the account numbers to which the money was slated to be transferred were invalid. *Id.* at *18. As a result, the Bank sent return notices to the home of Mark Patterson, one of Patco's principals, *via* U.S. mail.[3] *Id.* Patco received the first such notice on the evening of May 13, 2009, and on the following morning Patco called the Bank to inform it that Patco had not authorized the transactions. *Id.*

### F. Patco's Failure to Monitor Its Accounts.

Contrary to its agreement (and the Bank's express direction to do so), Patco did not monitor its eBanking accounts on a daily basis. *Id.* at *19. One of the documented "major duties and responsibilities" of Patco's Accounting Supervisor Diana Pierce was to "monitor[] online banking." *Id.*; *see also* J. App. at 314. After

---

[3] This method had been previously requested by Patco in response to an unrelated prior employee theft. J. App. at 688.

a March 2009 reduction in force at Patco, Pierce monitored Patco's account sporadically, "maybe a couple times a month." *Patco I*, 2011 WL 2174507, at *19. When a customer logs into eBanking, its account balances are conspicuously displayed on the eBanking main page. *Id.* During the week of the fraudulent withdrawals, Patco logged into its eBanking account six times but failed to notice and report the suspicious activity. *Id*. Had Patco monitored its accounts on a daily basis, it would have noticed the allegedly fraudulent transactions and been able to prevent them.

**G.      Patco's Handling of Its Computers After the Transactions.**

Patco did not isolate its computers or forensically preserve the hard drives following the fraudulent transaction. *Id.* at *20. In fact, Patco irretrievably altered the computer evidence on the hard drives by: (i) failing to take the Pierce computer and the suspected computer of a second Patco employee offline immediately; (ii) allowing Pierce and the second Patco employee to continue to use their computers during the week following the alleged fraud; and (iii) having an outside IT consultant run anti-malware scans on the Pierce hard drive. *Id.* Because these Patco computers were not isolated and forensically preserved, and because potentially relevant computer evidence was altered, it is impossible to determine whether and, if so, how Patco's computers were infiltrated. *Id.*

**H.** **Keylogging Malware; Other Security Threats.**

Nearly all versions of keylogging malware are able to record data in a log and report it back to the fraudster, who can review it at a later time.[4] *Id.* The fraudster need not be actively monitoring the customer's activity when the customer enters the relevant credentials. *Id.* There are thousands of keylogger "drop sites" on the Internet that collect and store credentials for fraudsters to mine and use at a later time. *Id.* This means that, as long as the customer has input his credentials (such as answers to challenge questions) even once into a computer that is compromised by keylogging malware, the fraudster can retrieve those credentials that day, or weeks or even months later. *Id.*

When the Bank chose its security features, it had to consider not only the threat posed by keyloggers, but also threats from various sources including other types of malware such as phishing attacks, insider fraud (*e.g.*, employee theft), cyber attacks targeting its online banking application infrastructure, and security breaches of the customer's premises (*e.g.*, theft of tokens, location cameras, intruders). *Id.*

---

[4] Malware stands for "malicious software" and encompasses a wide range of programs and codes "designed to capture and forward private information," including viruses, worms, spyware, Trojans, and keyloggers. J. App. at 847.

**SUMMARY OF ARGUMENT**

Patco seeks to make Ocean Bank responsible for allegedly fraudulent withdrawals that Patco claims were made by third-party cybercriminals in May 2009 from Patco's online commercial checking account, by using computer malware to break into the computer of the Patco employee primarily responsible for Patco's electronic banking and steal Patco's ID and password and the individual employee's user ID, password, and answers to "challenge questions[.]"

Article 4A of the Uniform Commercial Code was adopted to govern funds transfers through banks, and it specifically governs the allocation of losses from fraudulent electronic transfer orders made on commercial accounts. Section 202(b) explicitly places the risk of loss *on the customer* where, as here, the customer and the bank have agreed that the authentication payment orders will be verified by a security procedure, the bank employed a security procedure that was commercially reasonable, and the bank accepted the payment orders in good faith and in compliance with that security procedure.

The District Court correctly concluded that Ocean Bank is entitled to summary judgment because the undisputed material facts show that all of the conditions of Section 202(b) are met. First, the parties agreed that the authenticity of payment orders would be verified by a security procedure. Patco entered into written agreements with Ocean Bank that provided as much. Patco also agreed that the

authenticity of payment orders would be verified by a security procedure through its course of conduct, that is, by using Ocean Bank's eBanking system over a number of years, including the system's customer IDs and passwords, its individual user IDs and passwords, and its individual challenge questions and answers.

Second, Ocean Bank's security procedure was indisputably commercially reasonable. It utilized the "Premium Product" of a leading industry supplier, and it added significant other security procedures as well. Ocean Bank's security procedure satisfied the FFIEC Guidance for security procedures, and was, according to expert testimony, "well[ ]above the standards employed by similarly situated banks at that time." J. App. at 603; *see also id.* at 599 (calling Ocean Bank's security procedures "more than commercially reasonable").

Against this array of evidence, Patco makes two arguments: (1) that Ocean Bank undermined its otherwise commercially reasonable security procedures by setting the "Dollar Amount Rule" at which challenge questions would be asked at $1, thereby causing challenge questions to be answered too often and making them too susceptible to capture by keylogging malware, *see* Aplt. Br. at 19–40; and (2) that Ocean Bank should have adopted additional security features such as tokens, "out-of-band" verification or manual review. *See id.* at 46–47. Patco's quarrels with Ocean Bank's procedure are both factually wrong and legally insufficient. Ocean Bank's security system permitted the Dollar Amount Rule to be set at $1; moreover, the

system's $1,000 default setting (in effect a level specifically recommended by the system's supplier) would have caused the challenge questions to be answered just as often, and undisputed evidence showed in any event that "keylogging" can capture answers to challenge questions if they are entered only once. The absence of the additional features that Patco claims should have been employed is immaterial because the legal standard is whether the procedure is commercially reasonable, not whether it is the best system available.

Third, any claim that Ocean Bank did not act in compliance with its security procedures is waived. Prior to the Magistrate Judge's Recommendation, Patco did not argue that Ocean Bank had not acted in compliance with its security procedures. Were this Court to consider Patco's late-blooming argument to the contrary, it should be rejected because it is factually incorrect as well. As the District Court specifically found, Ocean Bank accepted the allegedly fraudulent May 2009 payment orders in compliance with its security procedures.

Finally, Patco's five common law claims—negligence, breach of an implied contract, breach of fiduciary duty, unjust enrichment, and conversion—are preempted by Article 4A because it is the "*exclusive means*" of determining the rights, duties, and liabilities of the parties in any situation involving allegedly fraudulent electronic transfers. U.C.C. § 4A-102 cmt. (emphasis added).

## STANDARD OF REVIEW

At the recommendation of the Magistrate Judge, the District Court granted summary judgment in favor of Ocean Bank. *See Patco II*, 2011 WL 3420588 at *1. This Court "review[s] a grant of summary judgment de novo, applying the same criteria as the trial court." *Vineberg v. Bissonnette*, 548 F.3d 50, 55 (1st Cir. 2008). This court will affirm the District Court where the record reflects "no genuine issue of material fact," and that the prevailing party was "entitled to judgment as a matter of law." *Vinerberg*, 548 F.3d at 55 (quoting Fed. R. Civ. P. 56(c)) (internal quotation marks omitted).

Article 4A specifically provides that "[c]ommercial reasonableness of a security procedure is a question of law," U.C.C. § 4A-202(c), making claims governed by it particularly appropriate for resolution on summary judgment. *See, e.g.*, *Braga Filho v. Interaudi Bank*, No. 03 Civ. 4795 (SAS), 2008 WL 1752693, at *4–5 (S.D.N.Y. Apr. 16, 2008) (granting summary judgment for defendant bank because its security procedures were commercially reasonable); *Centre-Point Merch. Bank Ltd. v. Am. Express Bank Ltd.*, No. 95 Civ. 5000 LMM, 2000 WL 1772874, at *4–6 (S.D.N.Y. Nov. 30, 2000) (granting bank's motion for summary judgment because the bank's security procedures were commercially reasonable and bank complied with the security procedures).

**ARGUMENT**

Article 4A of the U.C.C. governs funds transfers through banks, and it contains specific provisions that allocate losses from fraudulent electronic transfer orders on commercial accounts. Section 202(b) provides that the customer will bear the loss if: (1) the bank and the customer have agreed that the authenticity of payment orders issued in the name of the customer will be verified by a security procedure; (2) the bank employed a commercially reasonable security procedure; and (3) the bank accepted the payment orders in good faith and in compliance with its security procedure. U.C.C. § 4A-202(b).[5] All three elements were satisfied in this instance, and therefore the District Court's judgment must be affirmed.

**I.    PATCO AND OCEAN BANK AGREED THAT PAYMENT ORDERS WOULD BE VERIFIED BY A SECURITY PROCEDURE.**

Patco maintains that it did not agree with Ocean Bank that its payment orders would be authenticated by the security procedure in place in May 2009. More particularly, Patco argues that the District Court erroneously concluded that "Patco fairly can be said to have agreed to the use of the Premium Product security system *in toto.*" Aplt. Br. at 50–52. Actually, the relevant test is not whether Patco agreed to every feature of Ocean Bank's security procedure; the test is whether Ocean Bank and Patco "agreed that the authenticity of payment orders

_____

[5]    Article 4A has been codified in the Maine Revised Statutes. Section 202 can be found at 11 M.R.S.A. § 4-1202.

29

issued to the bank in the name of [Patco] will be verified pursuant to a security procedure." U.C.C. § 4A-202(b). There is undisputed evidence that Patco agreed that the authenticity of payment orders issued in its name would be verified pursuant to a security procedure. Although it is not crucial to the decision, there is also undisputed evidence that Patco agreed to Ocean Bank's security procedure "*in toto*."

First, Patco agreed to the Original eBanking Agreement, which it signed, and several of its officers and employees initialed. *See Patco I*, 2011 WL 2174507, at *4; *see also* J. App. at 509–15. In that Agreement, Patco agreed that the authenticity of payment orders would be authenticated pursuant to a security procedure—namely, "use of *Ocean National Bank's eBanking for Business* password constitutes authentication of all transactions performed by you or on your behalf." *Patco I*, 2011 WL 2174507, at *4; *see also* J. App. at 507.

Second, Patco agreed that payment orders would be authenticated pursuant to a security procedure in the Modified eBanking Agreement as well. The Original Agreement specifically provided that the Bank could unilaterally modify the Agreement, and the Bank did so, publishing the Modified eBanking Agreement continuously on Ocean Bank's website, where it is readily available to Internet

banking customers.[6] *Patco I*, 2011 WL 2174507, at \*5. The Modified eBanking

Agreement provided, among other things, for "Security Passcodes," which were

comprised of a customer ID and password, and a user ID and password for each

authorized user of the customer. J. App. at 522. And like the Original Agreement,

the Modified eBanking Agreement specifically provided that use of the customer

and individual IDs and password constituted authentication of payment orders. *Id.*

at 524.

Patco claims that it did not agree to the Modified eBanking Agreement,

because it never actually saw it. Aplt. Br. at 53–54. That contention is dubious at

best. The Modified Agreement was readily available to Patco online at Ocean

Bank's eBanking site. *Patco I*, 2011 WL 2174507, at \*5. Moreover, it does not

really matter. In the Original Agreement, which Patco plainly reviewed, signed,

and initialed, Ocean Bank reserved the right to modify the Original Banking

Agreement at any time effective on publication. *Patco I*, 2011 WL 2174507, at \*5;

*see also* J. App. at 514 ("The Bank may make changes to this Agreement at any

time. . . . Changes to this Agreement will be effective immediately after we make

them, except those we are required by applicable law to notify you about in

---

[6] Ocean Bank published the Modified eBanking Agreement on its website starting on August 21, 2008, some nine months before the alleged fraudulent transactions. J. App. at 1175 (2d Suppl. Jeffrey R. Tarte Decl., dated Nov. 3, 2010).

31

advance."). The online publication of the Modified eBanking Agreement was therefore binding on Patco. *See*, *e.g.*, *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F. Supp. 2d 696, 708 (D. Md. 2008) (unilateral modification of Internet-based service contract held effective when prior agreements permitted modification at any time and stated modification would be effective after being posted for 30 days); *Transamerica Logistic*, 2008 U.S. Dist. Lexis 112708, at *2 (same).

Furthermore, Patco agreed to these security procedures by choosing the customer and user IDs and passwords and then using them each time it accessed its eBanking account—literally hundreds of times over the period from 2004 through early May 2009. *See* J. App. at 518 ("If you use Ocean Bank eBanking, or permit another to use Ocean Bank eBanking, each party agrees to the terms and conditions stated in the [Modified eBanking] Agreement.").

Third, Patco agreed, by its course of conduct over several years of use, to the use of both challenge questions and customer and individual IDs and passwords as part of the security procedures. *See Leshine Carton Co., Inc. v. Matik, N. Am.*, No. CV054007636S, 2006 WL 1359651, at *1 (Conn. Super. Ct. Mar. 9, 2006) ("[T]he UCC parol evidence rule permits contract terms to be explained or supplemented (a) by course of dealing or usage of trade . . . or by course of performance . . .; and (b) by evidence of consistent additional terms." (internal quotation marks omitted)). Patco's use included its initial selection of the challenge questions, its input of the answers to

those questions, and its use of the system that required answers to the questions when prompted. That continued use evidences agreement to the Modified eBanking Agreement. *See Regatos v. N. Fork Bank,* 257 F. Supp. 2d. 632, 646 (S.D.N.Y. 2003) (for purposes of Article 4A, commercial customer and bank agreed upon security procedure when, "regardless of whether there was an explicit agreement, [their] unvaried course of conduct over a period of four years evince[d] a clear understanding among the parties").

Thus, as the Magistrate Judge explained:

> [T]here is no genuine dispute that [Patco] agreed to the core security procedures visible to users that comprised the key elements of the integrated security package used by the Bank. Patco expressly agreed to the use of security passcodes, which consisted of a customer ID and a customer password and a user ID and a user password for each authorized user of the customer, and it agreed by course of performance to the use of challenge questions, having cooperated in setting up answers to such questions and having answered them in the course of conducting eBanking.

*Patco I*, 2011 WL 2174507, at *24 (citations omitted).

The Magistrate Judge also correctly held that Patco's agreement by course of dealing included the invisible elements of the Premium Product, such as invisible device authentication, IP Geo location, transaction monitoring, and risk-profiling (including development of a customer profile and risk scoring for transactions), an eFraud Network subscription, and reporting. *Id.* at *24–25. These "invisible" elements were integrated with and largely operated in the service of the visible

elements.  *Id.* at \*25.  While Patco may not have specifically known of all of such elements, it was clearly on notice that they existed.  Ocean Bank's eBanking for Business User Guide includes a screen shot entitled "Security System," which states that Ocean Bank's eBanking "security system works *behind the scenes* to help guard against identity theft."  J. App. at 543 (emphasis added).  Section 202(b) requires that the "bank and its customer have agreed that the authenticity of payment orders . . . will be verified pursuant to a security procedure."  U.C.C. § 4A-202(b).  It does not require that the customer agree to every feature of the procedure, nor would that make sense from a security standpoint.

In addition, because the Modified eBanking Agreement was binding on it, Patco also agreed to monitor its commercial accounts on a daily basis.  J. App. at 523.  Patco's agreed-upon obligation to monitor its accounts daily constitutes part of the "security procedure." [7]  *See* U.C.C. § 4A-201 (defining a "security procedure" as "a procedure established by agreement of customer and a receiving bank for the purpose of . . . detecting error in the transmission or the content of the payment order or transmission."); *see also Patco I*, 2011 WL 2174507, at \*25.

Finally, Patco agreed to—although it did not utilize—the Bank's offered procedure of providing contemporaneous email alerts to Patco for each of its

---

[7]   Patco, of course, breached this obligation.  It monitored its commercial accounts only "a couple times a month."  *Patco I*, 2011 WL 2174507, at \*19.

34

transactions.  The Bank offered and actively promoted email alerts to its customers

beginning on December 1, 2006, well before the May 2009 transactions at issue.

*Patco I*, 2011 WL 2174507, at \*15.  Ocean Bank's offer to provide the email alerts

was contained in the Modified eBanking Agreement which, as shown above, was

binding on Patco, and also posted on Ocean Bank's website continuously beginning

in December 2006.  *Id.*; *see also* J. App. at 523.  The eBanking for Business User

Guide, available online on Ocean Bank's website, provided instructions on how to set

up email alerts.[8]  *Patco I*, 2011 WL 2174507, at \*15.  A user only had to click on a

tab visible on the eBanking web page in order to set up email alerts.  *Id.*  Diana Pierce,

the Patco employee primarily responsible for Patco's eBanking, navigated to the

email tab on the website at least once.  *Id.*  Nevertheless, Patco never opted to set up

email alerts.  *Id.*  Although Patco claims not to have seen the email alert

notification, Patco must be held to have agreed to those email alerts as part of Ocean

Bank's overall security system because the email alerts were contained in the

Modified eBanking Agreement and posted on Ocean Bank's website continuously

beginning in December 2006.  *See Harold H. Huggins Realty, Inc.*, 575 F. Supp. 2d

at 708; *Transamerica Logistic*, 2008 U.S. Dist. Lexis 112708, at \*2; *see also Patco*

*I*, 2011 WL 2174507, at \*29 n.133 ("By posting the availability of email alerting in

---

[8]  Ocean Bank had also referred Patco to the User Guide as early as February 2004, in its cover letter enclosing a copy of the Original eBanking Agreement.  J. App.

several forms online, the Bank sufficiently notified Patco of its availability."). Email

alerts would have provided prompt notice of the alleged fraudulent transactions

had Patco had chosen to receive them.

In summary, Patco indisputably agreed that its payment orders would be

authenticated by a security procedure, as required by Section 202(b). In addition,

although there is no legal requirement that Patco agree to each element of the

security procedure, the District Court's conclusion that it agreed to Ocean Bank's

system *in toto* is unassailable. It expressly agreed to the use of customer and user

IDs and passwords in the Modified eBanking Agreement. It also agreed to those

IDs and passwords and to the use of challenge questions and answers through its

continuous use of Ocean Bank's eBanking system over several years. It agreed to

the "invisible elements" of Ocean Bank's security procedure—device cookies, IP

Geo location, risk scoring, eFraud networking—because those elements were part

and parcel of the security procedure as a whole, and because it had specific notice

of the existence of such invisible elements through the User Guide and it never

objected nor asked for additional features during its several years of use of the

system. *Patco I*, 2011 WL 2174507, at *11. Although it chose not to elect them,

Patco further agreed to email alerts as an additional security procedure because the

option to receive email alerts was contained in the Modified eBanking Agreement

at 501.

and because it was on notice that Ocean Bank continuously offered them.  Finally,

it agreed to monitor its account daily in the Modified eBanking Agreement and by

its use of electronic transfers for debits as well as credits.

## II.   OCEAN BANK'S SECURITY SYSTEM WAS COMMERCIALLY REASONABLE.

### A.   Standards For Determining Commercial Reasonableness.

"The issue of whether a particular security procedure is commercially

reasonable is a question of law."  U.C.C. § 4A-203, cmt. 4.  Article 4A provides

certain guidance for determining whether a security procedure is commercially

reasonable:

> Commercial reasonableness . . . is to be determined by considering the wishes of the customer expressed to the bank, the circumstances of the customer known to the bank, including the size, type and frequency of payment orders normally issued by the customer to the Bank, alternative security procedures offered to the customer and security procedures in general use by customers and receiving banks similarly situated.

U.C.C. § 4A-202(c).  In addition, the official commentary provides that

> [a] security procedure is not commercially unreasonable simply because another procedure might have been better or because the judge deciding the question would have opted for a more stringent procedure.  The standard is not whether the security procedure is the best available.  Rather it is whether the procedure is reasonable for the particular customer and the particular bank, which is a lower standard.  On the other hand, a security procedure that fails to meet prevailing standards of good banking practice applicable to the particular bank should not be held to be commercially reasonable.

U.C.C. § 4A-203, cmt. 4.

By any measure, Ocean Bank's security procedures satisfied and indeed exceeded the "commercially reasonable" standard.

First, Ocean Bank's security procedures were consistent with the wishes of Patco expressed to Ocean Bank.  Patco expressly agreed to Ocean Bank's security procedures when it entered into the Agreements and continued to use eBanking on at least a weekly basis using the security procedures in place.  *See, e.g.*, *Regatos*, 257 F. Supp. 2d. at 646 (agreement can be shown by continued use of a period of years).  Prior to the allegedly fraudulent transfers in May 2009, Patco did not seek any additional protections or express dissatisfaction with the eBanking security procedures offered.  *Patco I*, 2011 WL 2174507, at *11.

Second, Ocean Bank's security procedures took into account "the circumstances of the customer known to the bank, including the size, type and frequency of payment orders normally issued by the customer to the Bank." U.C.C. § 4A-202(c).  The RSA/Cyota Premium Product risk profiling system was specifically designed to take these circumstances into account.  *Patco I*, 2011 WL 2174507, at *10.  It had several features that specifically considered the characteristics of Patco's customary payment orders, including an "invisible Device ID" and "a risk-scoring module that collected data on every customer's use of eBanking in order to create a unique profile of his or her typical behavior."  J. App. at 156.

Patco argues that particularized customer features of Ocean Bank's procedure were rendered ineffective because the setting of the Dollar Amount Rule at $1 meant that challenge questions were already asked in every transaction. *See* Aplt. Br. at 19–40. But the Premium Product was specifically designed to respond to unusual or high risk transactions by issuing challenge questions.[9] Ocean Bank operated the system in accordance with its parameters: the system permitted a Dollar Amount Rule of $1 to provoke challenge questions and did not require manual review of high risk transactions. *See infra* at 9–14. Ocean Bank cannot be said to have lacked a commercially reasonable procedure when it purchased a system that included customer-specific features and then operated that system in accordance with its parameters.

Third, alternative security procedures such as e-mail alerts were made available to Patco by Ocean Bank, although of course Patco chose not to receive e-mail alerts.

Fourth, the security procedures used by the Bank equaled or exceeded security procedures in general use by customers and receiving banks similarly situated at the relevant time. The undisputed evidence on this point is detailed in Section B *infra.*

---

[9] The system did, however, have different responses to different potential threats. When it detected certain activity, for example, activity from IP addresses identified and reported as suspicious by any financial institution belonging to the eFraud Network, the transaction would be immediately blocked without posing the challenge questions at all. *Patco I*, 2011 WL 2174507, at *10; *see also* J. App. at 639.

**B.     Ocean Bank Purchased and Employed a Security Procedure That Equaled or Exceeded Those In Use By Similarly Situated Banks.**

Ocean Bank's security procedure was unquestionably commercially reasonable as measured by comparison with those of similarly situated banks. It purchased and employed the Premium Product of industry leading provider Jack Henry & Associates. It then added other security features, including email alerts, independent anti-phishing features, and daily monitoring by commercial customers. It complied with the FFIEC Guidance for authentication of electronic banking transactions. Its security procedures were audited by multiple federal agencies and independent auditors. Ocean Bank's procedures were labeled "more than commercially reasonable" by a leading industry expert.

Jack Henry's Premium Product. Ocean Bank's online banking platform, NetTeller, is provided by Jack Henry, a leading provider of computer systems and services, including a suite of online banking security and authentication solutions, to financial institutions nationwide. J. App. at 635. Jack Henry provides this online banking platform to 1300 of its 1500 bank clients. *Id.* at 635. Jack Henry's products integrate a multi-factor authentication system from RSA/Cyota, the industry leader in protecting online identities and digital assets. *Id.* at 446. When Ocean Bank purchased the Jack Henry authentication solution in 2006, it was marketed as "the most robust and effective solution available." *Id.* at 646.

When selecting its security package, Ocean Bank chose the Jack Henry Premium Product, at a substantial additional cost. *Patco I*, 2011 WL 2174507, at *9; *see also* J. App. at 640–41. That product augmented basic security features, such as customer and user IDs, passwords, and challenge questions, with more advanced features, such as device ID cookies, individual customer risk profiles, IP Geo location, and a subscription to the eFraud Network. *Patco I*, 2011 WL 2174507, at *9; *see also* J. App. at 638–39. In addition to the Jack Henry Premium Product, Ocean Bank implemented numerous other controls that reduced the risk of account fraud and identity theft, including SSL encryption and commercial third-party anti-phishing services. *Id*. at 491–92. In particular, Ocean Bank offered e-mail alerts that would provide Patco with contemporaneous updates on transactions in its accounts. *Id.* at 491. Had Patco chosen to receive e-mail alerts, it would have received contemporaneous e-mail alerts of the fraudulent transactions and could have reported the alleged fraud before Ocean Bank processed the transactions on the following business days. These facts alone are sufficient to warrant a finding that Ocean Bank's security procedures were commercially reasonable.

Governmental Audits. Beyond this, however, there is even more evidence supporting such a finding. Ocean Bank is audited by the Office of the Comptroller of the Currency. J. App. at 923 (Suppl. Jeffrey R. Tarte Decl., dated Oct. 8, 2010). This

41

audit includes a review of the Bank's security procedures.  *Id*.  Jack Henry's security systems are also audited by federal regulatory authorities for adherence with regulatory mandates and by Jack Henry's internal auditors and third parties to ensure that its security systems are working as designed.  *Patco I*, 2011 WL 2174507, at *7.

Expert Testimony.  Peter Makohon, one of the nation's leading experts on Internet banking security, testified that "[t]he Bank's security procedures in May 2009 were *more than* commercially reasonable," and that "Ocean Bank's security procedures were *well-above* the standards employed by similarly situated banks at that time."  J. App. at 599, 603.  Mr. Makohon relied on many factors for these opinions, including the Bank's use of the Jack Henry Premium multifactor authentication product, its use of SSL encryption, and its use of "pop-up" fraud alerts.  *Id*. at 603–04. He particularly noted that some larger national banks were not using SSL encryption at that time, and that hundreds of other small to regional sized banks used Jack Henry's Basic Product rather than the much more fully featured Premium Product that Ocean Bank employed.  *Id*.

FFIEC Compliance.  Ocean Bank's procedures also satisfied or exceeded the FFIEC's 2005 Guidance. The Guidance explains that existing authentication methodologies involve three basic "factors": (i) "[s]omething the user *knows*"; (ii) "[s]omething the user *has*"; and (iii) "[s]omething the user *is,*"  J. App. at 846, and it indicates that "multifactor" authentication procedures are "more difficult to

compromise than single-factor methods" and therefore are "are more reliable and stronger fraud deterrents." *Id.*

The Guidance does not endorse any particular technology, however, nor does it require multifactor authentication, but states instead that "where risk assessments indicate that the use of single-factor authentication is inadequate, financial institutions should implement multi factor authentication, *layered security*, *or other controls* reasonably calculated to mitigate those risks." *Id.* at 847 (emphasis added).

Ocean Bank's security procedures satisfied the FFIEC Guidance for a number of reasons. First, it employed at least two of the three basic authentication factors, that is, "something the user *knows*" and "something the user *has*," and thus provided "multifactor authentication." The user had to know two separate user IDs and passwords (a company ID and password and an individual user ID and password), which satisfies the requirement for "something the user knows."[10] The device cookie planted on the customer's computer constitutes "something the user has."

Patco admits that Ocean Bank's system uses: (1) usernames, passwords and challenge questions; (2) an "Invisible Device ID;" and (3) "a risk-scoring module that collected data on every customer's use of eBanking in order to create a unique profiling of his or her typical behavior." J. App. at 155–56. Nevertheless, Patco

---

[10]    In addition, the system used challenge questions, also "something the user knows."

argues, incorrectly, that, as "configured," Ocean Bank's security procedures did not satisfy the FFIEC Guidance because, when the Dollar Amount Rule was set at $1, they constituted only single-factor authentication, that is, the IDs, passwords and answer to challenge questions. Aplt. App. at 39–40.. Essentially, Patco attempts to manufacture an additional "requirement" for multifactor authentication—that a bank must respond to in a particular way, for example, by blocking a transaction, in the event that one of the factors detects an anomaly. The FFIEC Guidance has no such requirement.

Furthermore, Ocean Bank's security procedure was also multifactor, because, according to the FFIEC Guidance, "[a] multifactor authentication methodology may also include "out-of-band" controls for risk." J. App. at 846. In addition to the Jack Henry Premium Product, Ocean Bank added email alerts, which are one form of out-of-band authentication to its procedures. *See id.* ("Out-of-band generally refers to additional steps or actions taken beyond the technology boundaries of a typical transaction. Callback (voice) verification, e-mail approval or notification, and cell-phone based challenge/response processes are some examples.").

Second, Ocean Bank's security procedure satisfied the FFIEC Guidance because it has "layered security." The FFIEC Guidance does not require multifactor authentication, but instead states that "where risk assessments indicate

that the use of single-factor authentication is inadequate, financial institutions should implement multifactor authentication, ***layered security***, or other controls reasonably calculated to mitigate those risks." *Id.* at 847; *see also id.* at 1015–16 (Suppl. Peter A. Makohon Decl., dated Oct. 8, 2010); *id.* at 1020 (Suppl. Debra L. Edwards Decl., dated Oct. 7, 2010).

The security procedures constitute layered security because they employed challenge questions as well as ID/passwords. *Id.* at 1015–16; *id.* at 1020. Had Ocean Bank's security procedures only included user IDs, passwords, and challenge questions, they would still constitute layered security in compliance with the FFIEC Guidance, and therefore be commercially reasonable. *Id.* at 1016.

Third, Ocean Bank's security procedure satisfies the FFIEC Guidance because it employed "other controls reasonably calculated to mitigate [assessed] risks," including SSL encryption, invisible device authentication (device cookies), IP Geo location, transaction monitoring, scoring engine for transactions, customer profile, an eFraud Network subscription, reporting, commercial third-party anti-phishing services, posting of fraud alerts on the eBanking website, and email alerting. *Id*. at 1015–16.

Therefore, Ocean Bank's security procedures satisfied the FFIEC Guidance, whether they were multifactor or not, because they embodied "layered security" and had "other controls reasonably calculated to minimize those risks."

District Court's Conclusion of Commercial Reasonableness. This extensive evidence, according to the Magistrate Judge, established that the "[Jack Henry] Premium Product, when measured against the FFIEC Guidance yardstick that both parties have treated as a critical factor in this case, is commercially reasonable, incorporating not only at least two factors but also multiple layers (challenge questions in addition to passwords/IDs.)" *Patco I*, 2011 WL 2174507, at *32. Noting that Ocean Bank also implemented additional security measures beyond the Jack Henry Premium Product, including making email alerts available and requiring commercial customers who accepted ACH defaults to monitor their accounts daily, the Magistrate Judge found that "[t]he Bank's adoption of these additional security procedures as of May 2009 weighs in favor of a finding that its security procedures as a whole were commercially reasonable." *Id.*

Courts have found security procedures far inferior to Ocean Bank's to be "commercially reasonable" as a matter of law. For example, in *Transamerica Logistic, Inc. v. JPMorgan Chase Bank, N.A.*, Transamerica used the online wire transfer services offered through Chase's customer website, chase.com. 2008 U.S. Dist. Lexis 112708, at *2. This service was subject to Chase's Online Services Agreement and Addendum, which provided that Transamerica would have to use its user ID and password to make online wire transfers. *Id.* It also cautioned,

> You should not discuss or disclose . . . your User ID and password, your service activation codes or any other

> items of personal information that we may utilize to confirm your identity, with any person not authorized to access your accounts. You acknowledge and agree that the security procedures described in this Section 9 are commercially reasonable.

*Id.* at *2–3. The court held "as a matter of law that Chase's procedures were, in fact, commercially reasonable." *Id.* at *3 n.1.[11] Plainly, Ocean Bank's security procedures far exceed the use of a single ID and password held to be commercially reasonable in *Transamerica. See also Centre-Point Merch. Bank,* 2000 WL 1772874, at *5 (finding security procedure commercially reasonable where "all of the 'unauthorized' telexes tested properly," and plaintiff was in a much better position to identify the fraud than defendant).

## C. The Dollar Amount Rule Threshold Of $1 Did Not Render The Bank's System Commercially Unreasonable.

Despite the evidence of the extensive features of Ocean Bank's security procedures and its superiority to procedures in use by similarly situated banks, Patco argues that the Bank's system was unreasonable because when the Dollar Amount Rule at which challenge questions were posed was $1, authorized users would enter answers to challenge questions frequently, making them more susceptible to capture by a fraudster. *See* Aplt. Br. 19–40. The Magistrate Judge

---

[11] The Court relied not only on the fact that the Addendum contained the stipulation to that effect quoted above, but also on Chase's evidence that the procedures were commercially reasonable. *Id.* at *3 n.1.

considered this argument at length and rightly rejected it.

After first finding that the Bank's security procedures were commercially reasonable, *Patco I*, 2011 WL 2174507, at \*32, the Magistrate Judge then found that the Bank did not neutralize this otherwise commercially reasonable security procedure system by setting the Dollar Amount Rule at $1. *Id.* at \*33. First, Jack Henry permitted the Bank to set the threshold at that level, having determined that its system would operate effectively at any configuration, including $1. *Id..*[12] Thus, Ocean Bank operated the system in accordance with its parameters. If the system the Bank purchased was commercially reasonable, and the Bank operated it in accordance with its parameters, then the Bank's security procedure was commercially reasonable.

Second, as the Magistrate Judge found, Patco's "premise that the adjustment in question [to $1] materially altered the properties of the Premium Product security system is flawed." *Id.* at \*33. Not only did the Premium Product permit

---

[12] Jack Henry's testimony that its system was designed to function at any level, including $1, *see* J. App. at 641, is unrebutted and, therefore, undisputed. Patco claims RSA Security, Inc., which designed the system, contradicted Jack Henry, but its statements do no such thing. In its written materials, RSA counsels only that "decision rules must be edited carefully, slowly, with great caution," and that "[t]hese rules are very powerful, directly affecting the customer experience of genuine users as well as playing a major role in fraud prevention." *See id.* at 111 (RSA Security's Rules Management User Guide, dated May 2006) (emphasis removed). RSA does not say that the rule should not be set at $1, nor does it recommend any particular amount.

the Dollar Amount Rule to be set at $1, other clearly permitted levels—including

the default setting of $1,000, *see* J. App. at 1021—would have caused Patco to

enter answers to challenge questions a similar number of times. From February

2009 until the unauthorized transactions in May 2009, Patco made 12 electronic

funds transfers. With the Dollar Amount Rule at $1, it was prompted for challenge

question answers 12 times. If the Dollar Amount Rule had been at the $1,000

default setting,[13] then Patco would have been prompted for challenge question

answers 11 of the 12 times that it made electronic funds transfers in that period,

since 11 of Patco's 12 transactions exceeded $1,000. At the threshold of $1,000,

endorsed by Jack Henry, Patco's theoretical key logger would have had "virtually

the same level of opportunity for interception of [Patco's] answers to challenge

questions as when the threshold was set at $1." *Patco I*, 2011 WL 2174507, at

*33.

Furthermore, the premise for Patco's argument is indisputably factually

wrong. Patco first argued that a fraudster had to be online monitoring activity on

the customer's computer when the customer answered challenge questions in order

to capture the answers. This position was plainly wrong, and Patco abandoned it.

*See id.* at *27 n.129. Patco then conceded that key logger malware could capture

---

[13]    Jack Henry's default setting for the Dollar Amount Rule was $1,000 which
       constitutes an unqualified endorsement by Jack Henry of that number.

49

answers to challenge questions *if they were entered only once.  Id.* at \*27 ("Patco does not dispute, as the Bank's expert Peter Makohon points out, that a computer infected with key logger malware will capture the answers to challenge questions if they are used even once.").  Thus, Patco's contention that the $1 setting for the Dollar Amount Rule made the answer to challenge questions too susceptible to capture has no merit.  Setting the Dollar Amount Rule at the $1,000 default setting, or at $10,000, or even at $100,000 would still have caused Patco users to have entered answers to challenge questions in the several months before May 2009.[14] Confronted with that unassailable fact, Patco retreated further to rank speculation—that although a fraudster could capture answers to challenge questions entered once, the likelihood of such capture remained higher if they were entered more than once, because there *might be intervening events* that would save the customer from the fraud, that is, a new antivirus software *might* be introduced, the customer *might* buy a new computer or the fraudster *might* be captured for committing prior crimes.  These speculative scenarios are not evidence; they are wishful thinking.

In summary, the Bank selected a commercially reasonable system and operated that system according to the parameters permitted by the vendor.  Had the

---

[14]    As Patco concedes, on March 3, 2009, it authorized a transaction that would have triggered the challenge questions even had the threshold been set at

Bank set the challenge question level at $1,000, which was the default level plainly endorsed by the vendor, challenge questions would have been posed almost exactly as often as they were at the $1 level. The factual bases for Patco's theory are wrong and criticism of the $1 Dollar Amount Rule has no merit at all.

### D. The Bank's Selection Of The Dollar Amount Rule Was Considered And Deliberate.

Patco also attacks the Magistrate Judge's decision because it claims that he did not consider that the Bank, in Patco's words, made configuration decisions "in a decidedly haphazard manner." Aplt. Br. at 44. Patco's point is both factually incorrect and immaterial.

Ocean Bank's decision to set the Dollar Amount Rule at $1 was not haphazard. It lowered the Dollar Amount Rule to $1 in order to combat instances of ACH fraud that had targeted low dollar amount transactions. *Patco I*, 2011 WL 2174507, at *12; *see also* J. App. at 490. There was no fraud in the approximately one-year period following the setting of the Dollar Amount Rule at $1 until the alleged frauds at issue. *Patco I*, 2011 WL 2174507, at *13; *see also* J. App. at 490. In any event, since it is clear that the Jack Henry Premium Product permitted the Dollar Amount Rule to be set at $1, it is immaterial how the Bank arrived at its decision. Significantly, as the Magistrate Judge noted, "Patco does not say at what

---

$100,000. Aplt. Br. at 35–36.

level the Bank should have set its Dollar Amount Rule." *Patco I*, 2011 WL

2174507, at *33.  Undoubtedly, had Patco been the target of a low dollar amount

fraud, and the Bank had set the Dollar Amount Rule at a level above the fraud,

Patco would be arguing that the Dollar Amount Rule had been set too high.

**E.      The Issue Is Whether Ocean Bank's Security System Was Commercially Reasonable, Not Whether It Was The Best System Available.**

Patco's second argument is that the Bank's system would have been better

had it also adopted other security procedures, such as manual review, tokens, and

out-of-band authentication.  *See* Aplt. Br. at 46–50.  By that argument, however,

Patco "in effect demands that Ocean Bank should have adopted the best security

procedures then available," which the Magistrate Judge observed "is not the law."

*Patco I*, 2011 WL 2174507, at *34.  The standard is not whether a different

security procedure would have worked better.  It is whether the security procedures

that Ocean Bank did use were commercially reasonable for a bank of its size.

U.C.C. § 4A-203, cmt. 4; *see also Regatos*, 257 F. Supp. 2d at 646 (S.D.N.Y.

2003) (security procedures had three elements: a signed order, a confirmatory

phone call, and a signature comparison; court found the security procedures

commercially reasonable as a matter of law "*[d]espite the absence of other*

*procedural safeguards* such as telephone logs, recorded conversations and

passwords" (emphasis added)).

Patco struggles to avoid this plain conclusion by claiming that its point is not that such additional security procedures are required for commercial reasonableness, but only that such security procedures are required as a consequence of the Bank's decision to set the Dollar Amount Rule at $1. *See* Aplt Br. at 47. In other words, Patco's argument that the Bank should have employed such additional security procedures also depends upon its argument that the Bank's configuration of the Dollar Rule at $1 made its system unreasonable. Since, as shown above, that argument fails, Patco's "additional procedures" argument also fails.

Patco's argument is also wrong because Ocean Bank's security procedure did include out-of-band authentication: beginning in December 2006, and continuously thereafter through May 2009, Ocean Bank offered email alerts independent of the Jack Henry product. *Patco I*, 2011 WL 2174507, at *15. Emails are one form of out-of-band authentication. *See* J. App. at 846.

Despite the Bank's continuous offer of email alerts, Patco never opted to receive them. *Patco I*, 2011 WL 2174507, at *15. Had it done so, it would have received immediate email notice of the first unauthorized transaction. That transaction, which was not paid by the Bank until the following day, could have been blocked, and all subsequent unauthorized transactions would have been prevented as well.

A token-based solution, also suggested by Patco, was not available from Jack Henry in May 2009.[15] *Id.* at *16. Jack Henry did not begin to make tokens available until January 2009, when it began testing them with a few customers. *Id.* In May 2009, less than 2 percent of Jack Henry NetTeller customers were using tokens. *Id.* It would have taken Ocean Bank six months or more from January 2009 to roll out tokens to its customer base, meaning that tokens were effectively unavailable to Ocean Bank in May 2009. J. App. at 495. Furthermore, banks that were using tokens in May 2009 were still experiencing ACH fraud primarily due to security weaknesses on the customers' personal computer and supporting IT infrastructure, and fraudsters were able to compromise a token within seconds of a user entering the token into the bank's web page. *Patco I*, 2011 WL 2174507, at *21.

Patco also apparently asserts that the $750,000 "ACH limit" on Patco's Account was set at an "imprudently high level." Aplt. Br. at 40 n.16. That the ACH limit—which represents that maximum dollar amount that may be transferred from Patco's Account via ACH—was set at $750,000 is of no consequence in this case. As Patco concedes, none of the allegedly fraudulent withdrawals was for an

---

[15] Tokens are physical devices (something the person has) and may be part of a multifactor authentication software. The FFIEC Guidance provides three examples: a UBS token device, a smart card, and a password-guiding token. J. App. at 851–52.

amount over $115,620.  *See* Aplt. Br. at 6–9 (describing the alleged fraudulent transfers).  Accordingly, the $750,000 ACH limit is irrelevant, a mere red herring.  Moreover, the ACH limit, which was originally set at $100,000, was increased multiple times at Patco's request, to meet Patco's stated need to make ACH transactions of increasing amounts.  J. App. 165, 465.

Patco's argument that the Bank should have conducted manual reviews is yet another suggestion for improving what was already a commercially reasonable procedure.  The Premium Product did not require manual reviews, and Ocean Bank personnel did not perform them.  *Patco I*, 2011 WL 2174507, at *34; *see also* J. App. at 921.  Patco's repeated observation that Ocean Bank *today* employs manual reviews of suspect transactions, along with tokens and out-of-band authentication, as a part of its security package, *see* Aplt. Br. 15, is wholly irrelevant to the question of what was "commercially reasonable" in May 2009, and that is the question posed by Article 4A § 202(b)—*viz.*, was the security procedure commercially reasonable at the time of the contested transactions?  That the Bank later enhanced its security has no bearing on whether its security procedure was commercially unreasonable at the relevant time.  Considering subsequent enhancements to bank security procedures when determining the commercial reasonableness of the system as it existed at some point in the past would have the unfortunate effect of potentially discouraging financial institutions from updating

their security protocols, something that was surely not envisioned by Article 4A's drafters. *Cf. Lust v. Sealy, Inc.,* 383 F.3d 580, 586 (7th Cir. 2004) (observing that allowing evidence of subsequent remedial measures to prove causation "would discourage the taking of remedial measures").

## III. OCEAN BANK ACTED IN COMPLIANCE WITH ITS SECURITY PROCEDURE.

In his Recommended Decision, the Magistrate Judge observed that:

> Patco does not argue, either in support of its own motion for summary judgment or in opposition to that of the Bank, that the Bank failed to act in good faith and in compliance with its security procedures when it processed the allegedly fraudulent transfers. Indeed, the undisputed evidence is that the Bank processed those transfers only after its system authenticated that the proper IDs, passwords, and answers to challenge questions were provided.

*Patco I*, 2011 WL 2174507, at *24.

After the Magistrate's Recommended Decision, however, and now again on appeal, Patco argues that Ocean Bank did not accept the order in compliance with its security procedures. *See, e.g.*, Aplt. Br. at 52 (asserting that "Patco is entitled to summary judgment because the evidence is undisputed that the Bank *did not comply* with these other procedures in processing the fraudulent transactions."). This Court, however, has "h[e]ld categorically that an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate." *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990–91 (1st Cir. 1988); *see Fireman's Ins. Co. of Newark, N.J.*

*v. Todesca Equip. Co., Inc.*, 310 F.3d 32, 38 (1st Cir. 2002) (deeming waived a claim first raised in an objection to the magistrate judge's report); *Borden v. Sec'y of Health & Human Servs.*, 836 F.2d 4, 6 (1st Cir. 1987) ("Parties must take before the magistrate, not only their best shot but all of their shots." (internal quotation omitted)).

Because Patco did not present this argument to the Magistrate Judge (and effectively conceded the issue in earlier filings), it has waived the argument. As Patco failed to take its "shot" before the Magistrate Court, it did not take its "shot" below, and therefore it cannot take it now.

In any event, Ocean Bank accepted the allegedly fraudulent payment orders in compliance with its security procedures. *Patco I*, 2011 WL 2174507, at *19. It authenticated those transfers with Patco's company ID and password and Pierce's proper credentials, including her ID, password, and answers to the challenge questions. While Patco complains about the Bank's Dollar Amount Rule, there is no dispute that the Jack Henry system permitted Ocean Bank to set the Dollar Amount Rule at any dollar amount, from $1 up. Ocean Bank, therefore, acted in total compliance with its security procedures when processing the challenged transfers.

## IV. PATCO'S COMMON LAW CLAIMS ARE PREEMPTED.

Finally, Patco maintains that the District Court erred in finding that its common law claims (Counts II–VI) are preempted by Article 4A. *See* Aplt. Br. at 55–56. Article 4A, however, provides the exclusive remedy here; it explicitly states that its provisions "are intended to be the exclusive means of determining the rights, duties, and liabilities of the affected parties in any situation covered by particular provisions of the Article." U.C.C. § 4A-102, cmt.

In resisting Article 4A's plain directive, Patco relies on two inapt cases: *Regions Bank v. The Provident Bank, Inc.,* 345 F.3d 1267 (11th Cir. 2003), and *Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265 (S.D.N.Y. 2006). Importantly, in both cases (which dealt with the same wire transfer), the court ruled on the applicability of Article 4A where the wire transfer in question had been effectuated *as intended* by the owner of the initiating account. *See Provident Bank*, 345 F.3d at 1276; *Wieder & Mastroianni*, 423 F. Supp. 2d at 268–269. Furthermore, the *Provident Bank* decision is also distinguishable because it involved a claim for a disgorgement of funds from a bank that knew or should have known *that funds that it had received were fraudulently obtained*. 345 F.3d at 1275 (emphasis added). In contrast, the basis for all of Patco's common law claims is that Ocean Bank should be liable for Patco's losses incurred as a result of Ocean Bank's unknowing acceptance of unauthorized payment orders

made on Patco's account. Those circumstances are exclusively governed by Article 4A.

Thus, courts have held common law causes of action preempted when (i) the circumstances giving rise to the common law claims are specifically covered by the provisions of Article 4A or (ii) the common law claims would create rights, duties, or liabilities inconsistent with the provisions of that article. *See, e.g., Travelers Cas. & Sur. Co. of Am. v. Bank of Am., N.A.*, No. 09 C 06473, 2010 WL 1325494, at *2 (N.D. Ill. Mar. 30, 2010); *Zengen, Inc. v. Comerica Bank*, 158 P.3d 800, 808 (Cal. 2007); *see also Ma v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 597 F.3d 84, 89–90 (2d Cir. 2010) ("For Article 4A purposes, the critical inquiry is whether its provisions protect against he type of underlying injury or misconduct alleged in a claim.").

Counts II (negligence), III (breach of contract), and IV (breach of fiduciary duty) are therefore clearly displaced by Article 4A. The gravamen of all three counts is precisely the same as that of Count I: that the Bank failed to employ proper security procedures, and, as a result, Patco suffered the loss in question. *Compare* J. App. at 21–23 (Second Amended Compl. ¶¶ 49–59) *with id*. at 23–25 (Second Amended Compl. ¶¶ 60–73).

Counts V (unjust enrichment) and VI (conversion) implicate a different transaction: the Bank's alleged improper drawing on Patco's line of credit to cover

the alleged fraudulent withdrawals, as a result of which additional interest was assessed on that line of credit. *See id.* at 26–27 (Second Amended Compl. ¶¶ 74–82). Nevertheless, as with Counts II–IV, the thrust of these causes of action is that Ocean Bank should be liable for Patco's losses incurred as a result of the fraudulent payment orders. As Patco itself acknowledges, the viability of these two counts hinges on the success of Count I. *See* Pl.'s Opposition to Def. People's United Bank's Mot. for Summary J., at 25 (attached hereto). If the Bank employed commercially reasonable security procedures, it cannot have been unjustly enriched, or have wrongly converted Patco's funds, when it drew on Patco's line of credit pursuant to the Sweep Agreement to cover the allegedly unauthorized withdrawals.

## CONCLUSION

For the reasons stated, the District Court's Order Affirming Recommended Decision should be affirmed in all respects.

Respectfully submitted,


PEOPLE'S UNITED BANK
d/b/a OCEAN BANK

By its attorneys,



/s/ Brenda R. Sharton
Brenda R. Sharton (1st Cir. #59154)
*bsharton@goodwinprocter.com*
Don M. Kennedy (1st Cir. #36874)
*dkennedy@goodwinprocter.com*
Katherine A. Borden (1st Cir. #1148873)
*kborden@goodwinprocter.com*
GOODWIN PROCTER LLP
Exchange Place
Boston, MA 02109
Tel.:  617-570-1000
Fax:  617-523-1231

*Attorneys for Defendant-Appellee*
*People's United Bank*

# CERTIFICATE OF COMPLIANCE

The undersigned, Brenda R. Sharton, counsel for People's United Bank, hereby certifies pursuant to F.R.A.P. 32(a)(7)(C) that the Brief for Defendant-Appellant complies with the type-volume limitations of F.R.A.P. 32(a)(7)(B). According to the word count of Microsoft Word for Windows, the word-processing system used to prepare the brief, the brief contains 13,968 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

/s/ Brenda R. Sharton
Brenda R. Sharton

Dated:  February 15, 2012

**<u>CERTIFICATE OF SERVICE</u>**

I, Brenda R. Sharton, hereby certify that on February 15, 2011, the foregoing brief was served via the ECF system upon the following counsel of record:

Daniel James Mitchell
Eben Albert-Knopp
Bernstein Shur
100 Middle St
PO Box 9729
Portland, ME 04104-5029

Teresa M. Cloutier
Lambert Coffin
477 Congress St.
PO Box 15215
Portland, ME 04112-5215

I further certify that the foregoing brief was served via first-class mail, postage prepaid, upon the following counsel of record:

John F. Lambert, Jr.
Lambert Coffin
477 Congress St.
PO Box 15215
Portland, ME 04112-5215

/s/ Brenda R. Sharton
Brenda R. Sharton

2

No. 11-2031

---

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

---

PATCO CONSTRUCTION CO., INC.

Plaintiff-Appellant,

v.

PEOPLE'S UNITED BANK,

Defendant-Appellee.

---

On Appeal from Judgment in the
United States District Court for the District of Maine

---

**ADDENDUM**

---

## TABLE OF CONTENTS

ITEM                                                                    PAGE

Opposition to Defendant's Motion for Summary Judgment with
    Incorporated Memorandum of Law ……………………………………...1

PATCO CONSTRUCTION COMPANY, INC.,  )
                                    )
         Plaintiff,                 )
                                    )
                v.                  )    Civil Action No. 2:09-cv-00503-DBH
                                    )
PEOPLE'S UNITED BANK d/b/a OCEAN    )
BANK,                               )
                                    )
         Defendant.                 )

**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
**WITH INCORPORATED MEMORANDUM OF LAW**

Plaintiff Patco Construction Company, Inc. ("Patco"), by and through undersigned counsel,

respectfully submits this Opposition to the Motion for Summary Judgment with Incorporated

Memorandum of Law of Defendant People's United Bank d/b/a Ocean Bank ("Ocean Bank" or the

"Bank") pursuant to Federal Rule of Civil Procedure 56. This Opposition is supported by Patco's

Opposing Statement of Material Facts and the Supplemental Declarations of Sari Sterne Greene

("Greene Supp. Decl.") and Thomas P. McDowell ("McDowell Supp. Decl."), submitted herewith, as

well as Patco's own Motion for Summary Judgment ("PMSJ"), filed August 27, 2010 (Document No.

74) and the filings associated thereto, all of which are incorporated herein by reference.

**INTRODUCTION**

To be entitled to summary judgment on Patco's Article 4A claim, Ocean Bank must prove

*inter alia* that its security procedures in May of 2009 were commercially reasonable. This it cannot

do. Any meaningful analysis of the Bank's security procedures in May of 2009 – such as the analysis

presented by Internet data security expert Sari Greene – reveals significant flaws in the Bank's

system, and particularly in the manner that system was implemented and configured by the Bank. As

discussed in more detail below, the Bank's misguided decision to configure its system to prompt

challenge questions on every transaction left those questions unreasonably vulnerable to keylogging malware, the likely culprit in this case. Because challenge questions provided effectively the sole means of enhanced authentication beyond mere user IDs and passwords, it was critical that the Bank's system be configured in such a way as to safeguard this sensitive information. Instead, the Bank's configuration significantly increased the susceptibility of its challenge questions to fraudulent capture and thus dramatically undermined the Bank's authentication security procedures. In addition, the Bank failed to incorporate other measures available to it that would have helped to mitigate the risk created due to the vulnerability of the Bank's challenge-question system. For all these reasons, the Bank's security procedures were not commercially reasonable as of May of 2009.

## I. The Bank Undermined The Effectiveness Of Its Security Procedures When It Configured Its System to Ask Challenge Questions On Every ACH Transaction

As noted in the parties' respective motions for summary judgment, Ocean Bank's security procedures for authenticating online banking customers consisted of a company ID and password, individual user IDs and passwords, and Jack Henry's "Premium" authentication product which revolved around the use of challenge questions.[1] Defendant's Statement of Material Facts ("DSMF") ¶¶ 75-77. Challenge questions were triggered in one of several ways. First, an invisible device ID system identified the computer from which users attempted to initiate transactions, and triggered

---

[1] Other security procedures listed by the Bank – such as the device identification system, cookies, transaction monitoring and risk scoring systems, and IP geo location – all served merely as triggers for the challenge questions. DSMF at ¶¶ 83-88, 114-119. Still others – namely the user-selected picture and reporting functions – were not utilized by the Bank in May of 2009. *See* Plaintiff's Statement of Additional Material Facts (hereinafter "PSAMF") ¶ 2; Plaintiff's Statement of Material Facts (hereinafter "PSMF") ¶¶ 37, 86-88 (noting that the Bank did not review reports until late 2009). As for the anti-phishing and SSL-encryption controls, *see* PUB Motion for Summary Judgment at 7, these are not security procedures for authenticating the identity of eBanking customers and therefore should not play a significant role in the Court's analysis under Article 4A. Greene Supp. Decl. ¶ 17; *see also* 11 M.R.S.A. § 4-1201 ("'Security procedure' means a procedure established by agreement of a customer and a receiving bank for the purpose of . . . [v]erifying that a payment order or communication amending or cancelling a payment order is that of the customer . . . ."). SSL is a commonly used and relatively inexpensive encryption method that protects data as it is being transmitted over the Internet. Greene Decl. ¶ 17. Because keyloggers operate prior to the transmittal of information, SSL encryption provides no additional protection against keyloggers, nor is it the function of SSL encryption to authenticate the identity of users. *Id.* Anti-phishing controls combat only phishing schemes – not keyloggers – and it is not their function to authenticate users attempting to log on to eBanking. *See* Tarte Decl. ¶ 36 (describing phishing).

challenge questions if a user attempted to initiate transactions from an unrecognized device. *Id.* ¶¶ 85-86. Second, the risk scoring engine continually monitored legitimate transactions and built a profile of customer behavior. *Id.* ¶¶ 83-84, 88, 117-120. It then assigned a risk score for all user activity on an account, and triggered challenge questions when the risk score for a particular login attempt or transaction exceeded a predefined threshold.[2] *Id.* Third, the system allowed the Bank to create challenge-question "rules," which triggered challenge questions when a predefined condition occurred. *Id.* ¶¶ 115-116. In particular, the Bank configured a "dollar-amount rule" in August of 2007 that triggered challenge questions every time an ACH transaction was initiated in an amount exceeding $100,000. Plaintiff's Statement of Material Facts ("PSMF") ¶ 41. It should be noted that these systems did not cause any additional action to be taken to authenticate customers beyond triggering challenge questions. *See generally* DSMF ¶¶ 83-88, 114-120.

In June of 2008, the Bank made a crucial error in configuring its system. It reconfigured the dollar-amount rule such that challenge questions would thereafter be triggered whenever an ACH transaction exceeded just $1. PSMF ¶ 43. In practice, this was every transaction. *Id.* ¶¶ 44-45. Since the Bank simplistically believed that challenge questions would "increase security when asked," it wrongly assumed that its overall security would be proportionally enhanced as it increased the frequency with which such questions were asked. *See* Makohon Decl. ¶ 24. The truth is not so simple, and this change in the Bank's system undermined the effectiveness of the challenge questions as a security procedure.

The problem with the Bank's configuration was as follows. Challenge questions increase security only when unauthorized users are prompted to answer challenge questions they cannot correctly answer. Greene Supp. Decl. ¶ 2. As one might expect, challenge questions provide no

---

[2] The Ocean Bank system also included a subscription to RSA's so-called eFraud network, which examined and blocked transactions with characteristics (*e.g.,* IP address) that matched those of known instances of fraud. PSMF ¶ 36. The eFraud network had no impact with regard to the fraudulent transactions at issue in this case.

additional security against a fraudster equipped to answer those questions. Thus, for challenge questions to offer effective security, they must be configured so as to minimize the chances that a fraudster will be able to steal the answers to the questions. *Id.* First and foremost, this is achieved by asking those questions *selectively*. *Id.* ¶¶ 2-3. Theft of login information including challenge questions is frequently accomplished through keyloggers, i.e. malicious software ("malware") inserted onto computers of Internet users without their knowledge that record the users' keystrokes when inputting information into bank websites. *Id.* ¶ 2. In May of 2009, keyloggers were widely regarded as one of the predominant threats facing the online banking community. *Id.* Because a keylogger records everything the customer inputs through his or her computer, asking challenge questions of legitimate users actually *increases* the opportunities of a fraudster to compromise the answers to those questions, and therefore *decreases* the effectiveness of such questions as a security procedure. *Id.* Indeed, challenge questions that are asked on *every* transaction offer virtually no additional protection beyond a mere user ID and password, since a fraudster equipped with a keylogger can readily capture all necessary login information – user IDs, passwords, and the answers to the challenge questions – on any given transaction. *Id.*

Challenge questions should instead be asked selectively, when unusual or uncharacteristic activity is detected. Greene Supp. Decl. ¶ 3. When configured in this manner, challenge questions are prompted when fraudsters attempt to initiate transactions, but are rarely prompted for legitimate users. *Id.* Thus, while a fraudster monitoring the customer's keystrokes might capture the customer's user ID and password, the fraudster would be far less likely to capture the answers to the customer's challenge questions and would be unable to proceed when prompted to answer those questions. *Id.* This is how the Bank's system, as originally configured, was designed to operate. *Id.*

Indeed, challenge questions increase security precisely because – when properly configured – they protect a customer in the event a fraudster gains access to the customer's user ID and password. Greene Supp. Decl. ¶ 3. Compared to IDs and passwords alone, the primary advantage of challenge questions is not simply that they are one more piece of information the fraudster must have – as the Bank seems repeatedly to assert – but rather that they constitute a piece of information the fraudster is *unlikely* to capture even in the event the fraudster is able to compromise the customer's other login information. *Id.* Thus, when challenge questions are prompted on every transaction, they lose their primary advantage because a fraudster with the ability to compromise login credentials via a keylogger will capture *all* such information. *Id.* This is why challenge questions that are always asked become little more than extensions of a customer's password, and offer little or no additional protection. *Id.* In May of 2009, it was virtually universally recognized – as it is today – that a system offering a level of protection no greater than user IDs and passwords alone was not commercially reasonable for high-risk transactions.[3] FFIEC Guidance at 1 (PUB App. 19).

The Bank attempts to justify its decision to lower the dollar-amount threshold by arguing, incorrectly, that challenge questions are no less secure when asked frequently. *E.g.*, Makohon Decl. ¶ 24. The crux of the Bank's argument is its assertion that once a keylogger is installed on a system, it will capture the answers to challenge questions sooner or later, and thus the system will at some point be compromised. *Id.* As Mr. Makohon states: "[T]hat the challenge questions were asked frequently or even every time did not increase the likelihood that a cybercriminal would capture the responses. Once a PC is infected with malware, cybercriminals are able to capture answers to

---

[3] Ms. Greene initially said to Patco in an email on May 26, 2009, the same day she had been formally retained by Patco to consult with it regarding the circumstances surrounding the fraudulent withdrawals, that the Bank's security seemed to conform to generally accepted banking practices. Greene Supp. Decl. ¶¶ 29-30. However, at that time, she was not yet aware of the fact that Ocean Bank had configured its system to ask challenge questions on every transaction, nor had Ms. Greene been given any specific information about the underlying technical characteristics of the Bank's authentication security procedures. *Id.* Ms. Greene's initial views changed significantly once she had more complete knowledge of the Bank's authentication security procedures. *Id.*

challenge questions if they are used even once."[4]  *Id.*  In other words, the Bank assumes that once a user's machine is compromised, the fraudsters will necessarily capture the answers to the challenge questions *eventually*, regardless of timing or of subsequent events, and ends its analysis there.  *Id.*

The Bank's argument is wrong, because subsequent events are important.  On a properly configured system, the fraudster would have to wait until the customer initiates an atypical transaction and thus himself triggers the challenge questions, which in the Bank's own words "should be a *very rare occurrence*."  Greene Supp. Decl. ¶ 4; Maxwell Dep., Exhibit 21, at PUB_0012775; PMSJ at 20 (emphasis added).  This might postpone the fraudster for months, years, or even indefinitely.  Greene Supp. Decl. ¶ 4.  The Bank and its expert seem to suggest there is no security advantage to be derived from delaying a fraudster's ability to exploit an account in this manner.  *Id.*  In fact, such a delay provides substantial security benefits.  *Id.*

Much can happen between the time a machine is infected with a keylogger and the time the customer is finally prompted to answer challenge questions, giving the fraudster his first opportunity to compromise an account.  Greene Supp. Decl. ¶ 4.  For one, the longer the delay between the time the customer's computer is compromised and the time the customer is prompted to input challenge questions, the greater the chances that the customer's antivirus software will detect and eliminate the Trojan from the customer's machine.  *Id.*  Indeed, keylogging Trojans – being one of the chief threats to online banking security – are a top priority of antivirus companies.  *Id.* ¶ 5.  Developers of antivirus programs continually enhance their programs' ability to detect and eliminate specific malware from customers' machines.  *Id.*  Due to the sophistication of the malware involved, there is usually a time lag between the time at which a particular piece of malware (or variant thereof) first manifests itself and the time by which antivirus programs become capable of dealing with the threat.

---

[4] It is precisely *because* of the ease with which challenge questions can be captured once a computer is infected that it is so crucial challenge questions be asked no more frequently than necessary.  Mr. Makohon's logic is completely backwards.

6

*Id.* Delaying the fraudster's ability to compromise an account thus greatly improves the chances that malware on the customer's machine will be detected and removed before the fraud is actually able to be perpetrated.[5] *Id.* On the other hand, the Bank's decision to regard theft as inevitable and admit defeat the moment a user's machine is compromised by a banking Trojan – without giving other security measures the time needed to function – does not constitute effective security. *Id.* ¶¶ 5-6.

Ocean Bank further attempts to justify its decision to lower the dollar-amount threshold by asserting an alleged concern that, without such a threshold, frauds in low dollar amounts might "fly under the radar." Makohon Decl. ¶ 23. The Bank states: "Ocean Bank lowered the dollar amount rule to this threshold to enhance security for its customers after the occurrence of ACH frauds at Ocean Bank that targeted low dollar amount ACH transactions." Tarte Decl. ¶ 32. The Bank's argument is unfounded considering that such transactions, despite their low dollar amounts, were nevertheless being identified and challenged by the device ID and profiling systems, and thus were not in fact "flying under the radar." Greene Supp. Decl. ¶ 7; PSAMF ¶ 3. Indeed, with respect to the prior frauds on the Bank's system which the Bank offers as a primary justification for lowering the dollar-amount rule, the perpetrators were in fact prompted to answer challenge questions. PSAMF ¶ 3. The system apparently recognized these transactions as unusual, and challenged them appropriately. *Id.* There was absolutely no need for the Bank to lower the dollar-amount threshold in response to these frauds, as the issue was not one of fraudsters being able to proceed unchallenged, but rather one of fraudsters compromising the answers to those challenge questions in the first instance. Greene Supp. Decl. ¶ 7. Far from increasing security, the Bank's decision to lower the

---

[5] In addition, delaying the fraudster may prevent frauds against the Bank's customers in other ways. Greene Supp. Decl. ¶ 6. For instance, the fraudster might, after monitoring information captured from a customer's computer for months without success, cease monitoring that customer's activity or the activity of all customers from that particular financial institution. *Id.* In addition, the fraudster might be brought to justice before he is able to compromise the customer's account. *Id.* Moreover, the customer might reformat or replace the machine in question before the account is compromised. *Id.* The Bank's configuration allowed for none of these possibilities, and instead resulted in near-immediate compromise of customer accounts. *Id.*

dollar-amount threshold actually increased the probability that fraudsters would be able to capture the challenge-question responses and compromise the system, at any dollar amount. *Id.*

The Bank's other justifications for lowering the dollar-amount threshold similarly fail. Mr. Makohon, to support his erroneous argument that asking challenge questions on every transaction is secure, simplistically analogizes the Bank's security system to an "obstacle course" that is made more difficult by the addition of more obstacles. *See* Makohon Decl. ¶ 24 ("The series of IDs and passwords and challenge questions are akin to a security obstacle course. An obstacle course with two hurdles is easier to get through than an obstacle course with three hurdles, etc."). This rudimentary analogy is inapt, for several reasons. First, configuring the dollar amount rule to prompt challenge questions on every transaction did not *add* any hurdle to the system. Greene Supp. Decl. ¶ 8. The hurdle already existed, it was simply configured in such a way as to differentiate between legitimate users and fraudsters, and challenge only the latter. *Id.* The Bank's configuration prompted challenge questions without any such differentiation, and thus its primary effect was to increase challenge-question prompts for *legitimate* users, not for the fraudsters who were already being challenged. *See id.*

Second, while challenge questions are a hurdle the fraudster must overcome, such a hurdle provides little or no additional security if the fraudster already knows – because he is able to capture – the answers to those questions. Greene Supp. Decl. ¶ 8. By way of analogy, just as placing an additional hurdle in the path of a professional hurdler does little to prevent the trained athlete from reaching the finish line, imposing a security obstacle in the path of a fraudster readily able to compromise that obstacle does nothing to increase security. Effective security is achieved only when appropriate attention is given to ensuring the *integrity* of security procedures, such that the obstacles employed – no matter the number – actually succeed in obstructing the fraudster. *Id.* In the context

of challenge questions, this necessarily includes due care in minimizing the fraudster's opportunity to compromise those questions through the use of keyloggers. *Id.* Unfortunately, in this case, the Bank did precisely the opposite. *Id.*

The Bank further claims that "the dollar amount rule was lowered to add an additional layer of security . . . *and to throw off cybercriminals.*" Tarte Decl. ¶ 33 (emphasis added). The Bank appears to believe that periodically changing the dollar-amount threshold somehow confuses banking malware. Tarte Decl. ¶ 32.[6] Whatever unspecified malware the Bank may be referring to, this argument has no merit in the context of the primary malware involved in online banking fraud – keylogging Trojans. Greene Supp. Decl. ¶ 9. As the Court by now well understands, keyloggers function by recording the keystrokes entered by users on the websites of financial institutions and transmitting that information back to the fraudster. *Id.* A keylogger is not concerned with the specific threshold at which challenge questions are prompted, it merely captures the keystrokes entered in response to those questions. *Id.* Far from foiling fraudsters, the Bank's configuration greatly increased fraudsters' opportunities to compromise *all* needed login information through the use of such malware.[7] *Id.*

---

[6] The Bank's statement in this paragraph of Mr. Tarte's declaration that it changed the dollar-amount threshold "from time to time" is incorrect. The Bank changed the threshold once, in June of 2008, when it lowered it from $100,000 to $1. PSMF ¶ 43. After an additional instance of ACH fraud that occurred on the Bank's system in January of 2010, it changed the threshold once more, this time to increase it to $6,000. *Id.* ¶ 49.

[7] The Bank's argument might have merit in the context of a hypothetical system that triggers challenge questions based *solely* on the dollar amount of the transaction. Greene Supp. Decl. ¶ 10. In this situation, the fraudster might attempt to ascertain the dollar-amount threshold and initiate transactions below this amount to bypass the challenge questions entirely. *Id.* However, this would not be possible here, as fraudsters on Ocean Bank's system would be unable to avoid challenge questions simply by initiating transactions in low dollar amounts because the invisible device ID and profiling system would challenge fraudsters regardless of dollar amount. Fraudsters needed to capture the answers to customers' challenge questions no matter where the threshold was set, and could similarly access the system assuming they possessed those answers no matter where the threshold was set. *Id.* Far from "throwing off" cybercriminals, therefore, lowering the dollar-amount rule actually worked to the advantage of cybercriminals by increasing the opportunities of keyloggers to capture the login information they needed to compromise accounts. *Id.*

The Bank attempts to downplay the security implications of lowering the dollar-amount threshold by asserting that *any* configuration set by the Bank would result in effective security. Mr. Makohon states:

> The decision about the transaction threshold at which challenge questions would be asked was a business decision for the bank. The specific threshold at which the dollar amount rule was set fell outside the security parameters of the RSA/Cyota product. . . . The configurations that Jack Henry allows its customers to change would at any setting chosen by the Bank result in the effective operation of the multi-factor authentication product. With the Premium offering of the Jack Henry multi-factor authentication product, the customer could set the dollar amount rule at any particular amount and its product would operate effectively at the amount chosen.

Makohon Decl. ¶ 21; *see also* Edwards Decl. ¶ 26 (asserting that the configuration of the challenge questions by the Bank was a matter of "business discretion rather than security").

This argument must fail. The Bank's choice to treat this decision as a business one is completely immaterial to a determination of its impact on security, which is the only issue of any import under Article 4A. Regardless of what the Bank or Jack Henry & Associates may have believed, the challenge-question rules played an integral role in the effectiveness of the security procedures. Greene Supp. Decl. ¶¶ 15-16. Information available to the Bank in the system manual published by RSA Security – the company that actually designed the security components of Jack Henry's system – directly contradicts Mr. Makohon's assertions. The RSA manual regarding management of the challenge-question rules by financial institutions includes the following prominent warning, conspicuously displayed on the manual's second substantive page:

> **Warning:** Decision rules must be edited **carefully**, slowly, with great caution. These rules are very powerful, directly affecting the customer experience of genuine users *as well as playing a major role in fraud prevention.*

Maxwell Dep., Ex. 55, at PUB_0016391 (italics added; bold in original).[8] Such a warning cannot be squared with the Bank's position that editing the user-definable rules does not – indeed cannot – detrimentally affect security.[9] The Bank's assertion that it treated critical configuration decisions as "business" decisions only evidences the lack of informed consideration the Bank gave to the security implications of its actions.[10]

## II. Ocean Bank Failed To Configure Its Security Settings In A Manner Appropriate To The Threats Facing Online Banking Security In May of 2009

While the Bank expends great effort to justify retroactively its security decisions, it simultaneously all but admits that its system was ineffective against a predominant threat facing the online banking community in May of 2009—a compromise of the end-user's machine by a banking Trojan. By 2009, the ability of malicious Trojans to compromise the computers of end-users had become well known, and the threat posed by the keyloggers such Trojans can carry was widely recognized.[11] Greene Supp. Decl. ¶ 2. As Jack Henry itself states: "It has been Jack Henry's experience that *virtually all* of the fraud incidents involving banks that utilize the Jack Henry products *relate back to a compromise of the end-user's machine*." Edwards Decl. ¶ 31 (emphasis added).[12] Given that the risk posed to bank security from a compromise of the end-user's machine was so prevalent, it was the bank's responsibility to adopt security procedures appropriate to dealing

---

[8] This cautionary statement is preceded by a warning icon – consisting of a bold exclamation point within a triangle – that the RSA manual denotes as a "*critical warning* notice." Maxwell Dep., Ex. 55, at PUB_0016397 (emphasis added). This is the only notice in the entire manual that is denoted as a *critical* warning. *See generally id.*

[9] The Bank's position that this was purely a business decision is further contradicted by its own argument that it lowered the dollar amount threshold to prevent fraudsters from perpetrating low dollar-amount frauds that would "fly under the radar." Makohon Decl. ¶ 23; Tarte Decl. ¶ 32. The Bank cannot have it both ways. Either this was a decision the Bank understood had serious security implications, or it was not.

[10] Indeed, the record in this case demonstrates that the Bank made its configuration decisions in a decidedly haphazard manner, without due care to the security implications of its actions. *See* PMSJ at 22-23.

[11] Mr. Makohon confirms that "cyber criminals were able to increase their capabilities from 2005-2009 to regularly bypass many security controls . . . ." Makohon Report at 6 (PUB App. 2A).

[12] Indeed, in both prior instances of eBanking fraud on Ocean Bank's system, the Bank and customer believed that a compromise of the customer's machine via a keylogger was one of two possible explanations for the fraud, the other being insider fraud. PSMF ¶¶ 93-96.

with that threat. Security procedures should be chosen and configured in light of the threats actually present. FFIEC Guidance at 1 (PUB App. 19).

The Bank, however, concedes that its security system was entirely ineffective once the end-user's machine was compromised. As Mr. Makohon states: "The challenge questions became ineffective as soon as the integrity of the computer used to enter the challenge questions was allegedly compromised by a banking Trojan." Makohon Decl. ¶ 25. This is because the challenge questions were asked so frequently that a fraudster who compromised the user's ID and password would almost always compromise the challenge questions as well, which provided the only layer of additional authentication on the Bank's system. Greene Supp. Decl. ¶ 11. For this reason, the Bank's configuration was immediately undermined in the event of a compromise of the end user's machine. *Id.* In other words, the Bank's security procedures were ineffective, in May of 2009, against a predominant threat facing online banking, if not *the* predominant threat. *Id.* In light of this, the Bank's declaration that its security procedures were nevertheless "***more than commercially reasonable***" is simply untenable. PUB Motion for Summary Judgment at 2 (bold and italics in original). A banking security system that is totally ineffective once the end user's machine is compromised cannot be considered commercially reasonable. Greene Supp. Decl. ¶ 11; *compare* FFIEC Guidance at 1 (PUB App. 19) (noting that Banks should adopt authentication methodologies appropriate to the threats actually present) *with* Edwards Decl. ¶ 31 (noting that the primary threat presented to online banking systems is a compromise of the end-user's machine) *and* Makohon Decl. ¶ 25 (noting that the Bank's system was totally ineffective once the end user's machine was compromised).

**III.    In May of 2009, Ocean Bank's Security Procedures Relied on Single-Factor Authentication**

Another illustration of the insufficiency of the Bank's security procedures as of May of 2009 is the fact that, once configured to ask challenge questions on every transaction, Ocean Bank's system employed no more than mere single-factor authentication.[13]  Greene Supp. Decl. ¶ 12.  To wit, in May of 2009, only two things were needed to access a commercial account through Ocean Bank's eBanking website: (1) the customer's user ID/password combinations; and (2) the answers to the customer's challenge questions.  DSMF ¶¶ 196–197.  This information comprises a single factor, namely something the user knew.  FFIEC Guidance at 8 (PUB App. 19).  The Bank does not and cannot deny that, assuming a user had this information, it could access a customer's accounts.  This is single-factor authentication.

Ocean Bank erroneously asserts that its authentication was multi-factor.  The Bank states: "The Premium multi-factor authentication product incorporates three forms of authentication: (1) user ID and password (something the user knows); (2) invisible device ID (something the user has); and (3) a unique profile of the user (something the user is).  Thus, in May 2008 [*sic*], Ocean Bank utilized multi-factor authentication through its use of the Jack Henry Premium product."  Tarte Decl. ¶ 42; *see also* Makohon Decl. ¶ 17 (PUB App. 2) (arguing that the Bank used multi-factor authentication).  What the Bank and Mr. Makohon both ignore is that the systems allegedly incorporating additional factors – the invisible device ID and profiling engine – acted only as triggers for the challenge questions.  DSMF ¶¶ 83-88; Edwards Decl. ¶ 19.  The result of an unrecognized device or a high risk score was not that the user would be denied access to the system, but instead that the user would be prompted to answer challenge questions.  DSMF ¶¶ 83-88.  In other words, even if a fraudster

---

[13] As far back as 2006, the FFIEC had declared single-factor authentication alone to be insufficient security for high-risk transactions involving the movement of funds.  FFIEC Guidance at 1 (PUB App. 19).  Certainly by 2009, without additional controls such as manual reviews or out-of-band authentication in place, a system employing no more than single-factor authentication was not commercially reasonable. *Id.*

initiated a transaction from an unrecognized device (the alleged second factor), and even if the transaction did not fit the customer's profile (the alleged third factor), the fraudster still could proceed so long as he could answer correctly the customer's challenge questions (part of the first factor). Greene Supp. Decl. ¶¶ 12-13.

Even more to the point, as of May of 2009, the Bank had configured its system to ask challenge questions on every transaction *irrespective of device recognition or risk score*. PSMF ¶¶ 44-45. In so doing, the Bank completely deprived the invisible device ID and risk profiling engine – the alleged second and third factors – of any practical effect whatsoever, since triggering a challenge question that was already triggered on every transaction did nothing.[14] Greene Supp. Decl. ¶ 13. In other words, the fraudster initiating an atypical transaction from an unrecognized device was treated no differently than the legitimate customer initiating a routine transaction from the customer's ordinary device—both were always prompted for user IDs, passwords, and answers to challenge questions. *Id.* Assuming the fraudster possessed such information – all of which comprises a single factor – the fraudster could access the customer's account.[15] *Id.*

---

[14] For this reason, the Bank is also incorrect in its assertion that "Ocean Bank's security procedures take into account the circumstances of the customer known to the Bank, including the size, type, and frequency of payment orders normally issued by the customer to the Bank." *See* Defendant's Motion for Summary Judgment at 16 (citing DSMF ¶ 157). In May of 2009, the Bank's profiling system – which provides the basis for the Bank's assertion – was effectively inoperative due to the Bank's decision to trigger challenge questions on every transaction regardless of risk score. Greene Supp. Decl. ¶ 13. Thus, contrary to the express mandate of Article 4A, the Bank's security procedures did *not* take into account the aforementioned circumstances of the customer in May of 2009. 11 M.R.S.A. § 4-1202(3); *see also* PMSJ at 23-27.

[15] Mr. Makohon seems to suggest that Patco ignores those security procedures that operated in the background, invisible to the user. Makohon Report at 10 (PUB App. 2A) ("Not all the security procedures used by Ocean Bank are visible to customers. Security measures like device ID, GeoIP, cookies, etc., all happened in the background in order to minimize disputing the customer's experience. There were few exceptions, such as User IDs, passwords, and challenge questions."). Patco has never ignored these "background" security procedures, rather it is Mr. Makohon that ignores that those systems operated only as triggers for the challenge questions, and thus that those systems were rendered useless when the Bank decided to trigger challenge questions on *every* transaction. *See* DSMF ¶¶ 85-86 (noting that the device ID and cookies contributed to the risk score, which resulted in the user being prompted to answer challenge questions); *id.* ¶ 114 (noting that the IP geo location system resulted in users being prompted to answer challenge questions); Greene Supp. Decl. ¶ 13.

14

The Court need look no further than the fraudulent transactions at issue for an illustration of the above points. On May 7, 2009, fraudsters logged on to Patco's accounts from a device unrecognized by Ocean Bank's system (thereby failing the Bank's alleged second factor, device ID). PSMF ¶ 58. The fraudsters initiated a transaction that did not fit Patco's profile, triggering a very high risk score (thereby failing the Bank's third alleged factor, the customer's behavioral profile). *Id.* ¶¶ 57-63. Nevertheless, the Bank's system allowed the fraudulent withdrawals to proceed because the fraudsters possessed proper user IDs and passwords and correctly answered the challenge questions. All such information constitutes part of a single factor, namely "something the user knows." FFIEC Guidance at 8 (PUB App. 19). The Bank cannot legitimately claim that its system employed multi-factor authentication where fraudsters failing two of the three alleged factors were nevertheless permitted access to customer accounts on the basis of a single factor. Greene Supp. Decl. ¶ 13. Even if the Bank's system had possessed some semblance of multi-factor authentication when first implemented by Jack Henry, the Bank had effectively "turned-off" both allegedly multi-factor components of the system prior to May of 2009, when it configured the challenge questions to be triggered on every ACH transaction without regard to device recognition or risk score. *Id.* Correctly analyzed, Ocean Bank's system in May 2009 authenticated users based on user IDs, passwords, and answers to challenge questions. This is the very definition of single-factor authentication. FFIEC Guidance at 3, 8 (PUB App. 19).

### IV. Other Measures – Such As Tokens Or A True Out-Of-Band Option – Would Have Increased the Effectiveness Of Ocean Bank's Security Procedures

The Bank's expert Mr. Makohon goes on to make the untenable claim that "[o]ther security measures such as tokens, IP blocking, and out-of-band authentication would have had little or no impact on the type of fraud that Patco alleges occurred here." Makohon Decl. ¶ 20. This position is meritless. With respect to tokens, while it is true that they can and have been compromised, they still

offer increased security over challenge questions alone for at least two reasons. First, bypassing tokens requires a much greater level of sophistication on the part of the fraudster. Greene Supp. Decl. ¶ 19. As Mr. Makohon himself recognizes, when a fraudster compromises the computer of a customer utilizing a token, the fraudster must utilize that information *within seconds* of acquiring it, before the system generates a new password to replace the old. *Id.*; Makohon Decl. ¶ 20. Once a new password is generated, the old login information is invalid and no longer affords the fraudster any access to the customer's account. Greene Supp. Decl. ¶ 19. Challenge questions, on the other hand, have no similar time restraints, and the answers to the questions may be used at the fraudster's leisure.[16] *Id.* Second, Mr. Makohon outright ignores one of the primary advantages of tokens and other devices generating one-time passwords—once compromised, the stolen login information may be used by the fraudster only *once*. *Id.* ¶ 20. The password generated by a token changes every thirty seconds to one minute. *Id.* The fraudster is unable to use the compromised information outside of this timeframe, and the system disregards the one-time password after its first use. *Id.* Use of a token in this case likely would have meant that even if the fraudsters had been successful in intercepting the token's one-time password when initiating the May 7 payment order, the fraudsters would not have been permitted any further access to the account and would have been unable to initiate the additional transactions that took place between May 8 and May 14. *Id.* Thus, had a token been used here, the magnitude of the resulting fraud would have at least been greatly reduced if not eliminated altogether.[17] *Id.* While Mr. Makohon is correct that it is possible to compromise a token, it does not follow that use of a token would have made no difference here. *Id.*

---

[16] This is particularly true of Ocean Bank's challenge questions, which were "static," i.e. they never had to be changed by users. PSMF ¶ 52. "Shared secrets" such as challenge questions are more secure when they are periodically changed. FFIEC Guidance at 8 (PUB App. 19).

[17] The FFIEC Guidance – as well as statements by Jack Henry & Associates itself – directly contradicts Mr. Makohon's dismissive opinion regarding tokens. The FFIEC Guidance states that "[p]assword-generating tokens are secure because of the time-sensitive, synchronized nature of the authentication. The randomness, unpredictability, and uniqueness of the [one-time passwords ("OTPs")] substantially increase the difficulty of a cyber thief capturing and using OTPs gained

With respect to out-of-band authentication, Mr. Makohon states that "[r]eceiving passwords or tokens over out-of-band technologies are not effective if the passwords are entered into the banking portal using a compromised personal computer." Makohon Decl. ¶ 20. Mr. Makohon's statement is again misplaced, for at least two reasons. First, true out-of-band authentication does *not* entail entering passwords into the banking portal using a personal computer. Greene Supp. Decl. ¶ 25. Rather, additional authentication information is entered using the out-of-band channel itself. *Id.* In this way, even though the fraudster is able to compromise a customer's computer, the fraudster is unable to capture the information that was transmitted out-of-band. *Id.* While the *Jack Henry* out-of-band option may have used the less-effective method that Mr. Makohon describes, other options were widely available in May of 2009 that offered true out-of-band authentication. *Id.*[18]

Second, even systems employing the type of hybrid out-of-band authentication Mr. Makohon describes can and do offer increased security over challenge questions alone. Such systems are often used to transmit a one-time password to the customer via the out-of-band channel. Greene Supp. Decl. ¶ 25. While these systems do not offer all the advantages of true out-of-band authentication, as the one-time password is susceptible to compromise once inputted by the user, they do offer the other advantages of one-time passwords such as minimization of losses because the password is used only once. *Id.* Thus, these systems still offer enhanced security over challenge questions alone, and Mr. Makohon's blanket statement – that all such systems "are not effective" if the user's computer is compromised – is unsupportable. *Id.*

---

from keyboard logging." FFIEC Guidance, at 9 (PUB App. 19). Jack Henry & Associates, in marketing tokens to its customers, stated that token-based authentication "is a very secure option that virtually eliminates the risk of an unauthorized user accessing your customer's accounts." Maxwell Dep., Exhibit 23, at PUB_0018181. Ocean Bank now offers tokens to customers that originate ACH transfers. PSMF ¶ 117.

[18] The Bank may not disclaim liability simply by pointing out weaknesses in the security procedures offered by its chosen vendor. *See* Frequently Asked Questions on FFIEC Guidance, Maxwell Dep. Exhibit 15, at 6 ("The [financial] institution remains ultimately responsible for the adequate authentication of transactions involving access to customer information or movement of funds to other parties. This responsibility includes ensuring that the authentication techniques chosen by its service providers are appropriate for the institution's services.")

Finally, Ocean Bank could have but failed to conduct manual reviews of suspicious transactions in May of 2009, which by this time had become a common practice in the banking industry. Greene Supp. Decl. ¶ 26. The Bank began conducting such reviews only in late 2009, after the fraud at Patco occurred. PSMF ¶¶ 86-88. Had the Bank conducted such reviews in May of 2009, it quickly would have noticed the unusual characteristics of the fraudulent withdrawals at issue, particularly since those characteristics were conspicuously identified in the NetTeller reports. Greene Supp. Decl. ¶ 26; PSMF ¶¶ 61-62. For this reason as well, Mr. Makohon's statement that other measures would have made no difference in this case is untenable.[19]

## V. The Availability Of Email Alerts On The Bank's System Does Not Render The Bank's Security Procedures Commercially Reasonable Under 11 M.R.S.A. § 4-1202(3)

The Bank further argues that under Connecticut's analog to 11 M.R.S.A. § 4-1202(3), its security procedures should be deemed commercially reasonable because the Bank offered, and Patco "opted not to employ," email alerting. PUB Motion for Summary Judgment at 20 (citing Conn. Gen. Stat. § 42a-4A-202(c)).[20] The Bank misreads the statute. The U.C.C. provision at issue applies only in the situation in which a security procedure is "chosen by the customer after the Bank offered and the customer refused" a commercially reasonable security procedure. *See* 11 M.R.S.A. § 4-1202(3); Conn. Gen. Stat. § 42a-4A-202(c). The customer must further have "expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name and accepted by the

---

[19] Furthermore, Mr. Makohon's statement that IP blocking would have made no difference here is incorrect. *See* DSMF ¶ 174. Even if IP blocking controls can theoretically be bypassed – for example, by "spoofing" the IP address used – the fact remains that the fraudsters here logged onto Patco's system from an IP address never before used by Patco. PSMF ¶ 58. Thus, IP blocking may very well have prevented the transactions at issue from occurring. Greene Supp. Decl. ¶ 24.

[20] Ocean Bank contends that Connecticut law applies to all of Patco's claims because § 30 of the ACH Agreement states: "This agreement shall be construed with and governed by the laws of the State where Bank's principal place of business is located." PUB Motion for Summary Judgment at 12, n. 11. The Bank overlooks that on the same day the parties entered into the ACH Agreement, September 5, 2003, they also entered into the Credit Sweep Agreement. Tarte Decl., Exhibit D (PUB App. 1D). The Sweep Agreement provides explicitly that Ocean Bank was "a nationally chartered bank headquartered in Maine, with its principal place of business in Kennebunk, State of Maine." *Id.* at PUB_0000839. There can be no doubt that Ocean Bank's "principal place of business," as referenced in the ACH Agreement, was Maine; thus, Maine law clearly applies to Patco's claims.

bank in compliance with the security procedure chosen by the customer." *See* 11 M.R.S.A. § 4-1202(3); Conn. Gen. Stat. § 42a-4A-202(c).[21] As the official comment clarifies:

> Sometimes an informed customer refuses a security procedure that is commercially reasonable and suitable for that customer and insists on using a higher-risk procedure because it is more convenient or cheaper. In that case . . . the customer has voluntarily assumed the risk of failure of the procedure and cannot shift the loss to the bank. But this result follows only if the customer expressly agrees in writing to assume that risk.

11 M.R.S.A. § 4-1203 cmt. 4. This provision has no application here. Patco never expressly agreed to use passwords and challenge questions after refusing to use email alerting. While Ocean Bank's website may have contained references to email alerting, Ocean Bank never gave customers any affirmative notice of those procedures. PSAMF ¶ 4. Patco was, in fact, unaware that email alerts were available through Ocean Bank's eBanking portal. *Id.* Patco cannot be deemed to have *refused* something it was not aware existed in the first instance.[22]

Furthermore, despite the Bank's claims, Patco unquestionably never expressly agreed in writing to be bound by any payment order, whether or not authorized, issued in its name and accepted by the bank in compliance with a security procedure Patco had chosen. On this point, the Bank musters only narrow language in the eBanking agreement regarding signature authorization and Patco's actual use of the challenge questions, and attempts to argue this constitutes the requisite express written agreement that it would be bound by the Bank's use of those procedures to the exclusion of all others. PUB Motion for Summary Judgment at 21. The Bank's argument is

---

[21] The Bank also tries to lay blame at the feet of Patco by stating erroneously that "Patco chose to have notices sent by regular, U.S. mail to Patco co-owner and treasurer Mark Patterson's home." PUB Motion for Summary Judgment at 10, n. 9. This is a mischaracterization. In actuality, Patco had requested that *bank statements only* be sent to Mark Patterson's home address rather than to Patco's office. *See* Supplemental Declaration of Thomas P. McDowell (hereinafter "McDowell Supp. Decl."), Exhibit 1, at PATCO 8220. It is somewhat absurd for the Bank even to suggest that this request relieved it of the responsibility to provide notice to Patco of the fraud in this case by means other than regular mail.

[22] A refusal is – under both Article 4A and common usage – an affirmative act that involves conscious deliberation and rejection. *See* 11 M.R.S.A. § 4-1203 cmt. 4 (noting that section 4-1202(3) applies where an informed customer decides to use a higher-risk procedure because it is more convenient or cheaper).

unavailing.  The provision Ocean Bank cites is intended merely to obviate the need for a customer's signature on electronic transactions, by acknowledging that the customer's use of a password serves that function.  *See, e.g.*, Modified eBanking Agreement § XIV (section entitled "**No Signature Required**") (PUB App. 1B).  In no way does this provision constitute express agreement by Patco that passwords were to be the sole security procedure employed on Patco's accounts.  As to Patco's use of challenge questions, a course of conduct in using challenge questions does not constitute the express *written* agreement required by the statute.  11 M.R.S.A. § 4-1202(3).[23]

### VI.    The Bank Improperly Seeks To Disclaim Liability For The Fraudulent Withdrawals By Focusing On Patco's Conduct and Security Procedures

Rather than take any responsibility for the numerous failures of its own security procedures – which are the primary focus of Article 4A – the Bank instead seeks to place the blame entirely on Patco.  Relying on language from the comment accompanying Article 4A, the Bank argues that Patco is wholly responsible for its loss for the simple reason that Patco's computer system was able to be compromised by a banking Trojan.  The Bank's argument fails, for at least two reasons.  First, as Patco explained in its own Motion for Summary Judgment, Article 4A considers the security procedures of the customer only to the extent the Bank first proves its own security procedures were commercially reasonable, which the Bank cannot do in this case.  *See* Patco's Motion for Summary Judgment at 13-15.  Second, Patco's security procedures – while not perfect – were comparable to the security procedures of other small businesses of Patco's size, configuration, and line of business.

---

[23] Moreover, it is difficult to understand how the Bank expects to prevail on its argument in light of the fact that Patco *specifically requested* that the Bank provide email alerts to Patco, and the Bank agreed but failed to do so.  As Patco noted in its own Motion for Summary Judgment, on March 23, 2004, Patco sent an email to the Bank in which CFO Thomas McDowell asked the Bank to send Patco "an email notification upon the transfer of any monies from our bank accounts at Ocean . . . to serve as an additional notification from the person that has initiated the transfer."  PSMF ¶ 111.  The Bank emailed back to say that it would provide such alerts to Patco.  *Id.* ¶ 112.

Greene Supp. Decl. ¶¶ 35-36. The Bank cannot convincingly claim that the vulnerabilities typical of its small-business customers should insulate it from liability. *Id.*[24]

The Bank also tries repeatedly to shift the focus from itself to Patco by arguing that Patco had a contractual duty to monitor its accounts on a daily basis, and that this duty was "part of [the Bank's] security procedures . . . ." PUB Motion for Summary Judgment at 8, 24.[25] This argument is meritless for a number of reasons. First, as a matter of law, the Court should find that the so-called "Modified eBanking Agreement,"[26] which is the only place in which a daily monitoring reference appears, is not effective against Patco. There is no dispute that the Bank never provided a copy of this agreement to Patco or otherwise provided any individual notice to Patco that the Original eBanking Agreement (dated September 2003, the same as the parties' ACH Agreement) had been modified. PSAMF ¶ 1. The Bank alleges only that it made the modified agreement available generically on its website. Without some specific notice of the amendment (other than a generic website posting), or language in the original agreement specifying *how* the Bank would provide notice of amendments, Patco is not bound by the terms of the Modified eBanking Agreement. *See Douglas v. U.S. Dist. Court for the Central Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007) (finding that a generic website posting of a contractual amendment was ineffective because it did not provide proper notice). The

---

[24] From a security perspective, the focus of this case should not be on how Patco's computer system became infected, which could have happened in any number of ways; rather, the question is why Ocean Bank essentially deactivated key features of it security system that were designed to respond to the well-known threat posed by keylogging malware. Ocean Bank's aberrant configuration decision left the door open to the very type of fraud that eventually resulted in this case. Greene Supp. Decl. ¶ 36.

[25] As a related argument, the Bank also contends that Patco should bear the loss because it logged into its account six times between May 7th and May 13th, 2009, "but failed to report any suspicious activity." PUB Motion for Summary Judgment at 6. This statement paints a misleading picture of the actual events. A Patco employee did log into the account on those occasions, but for the purpose of performing activities unrelated to ACH transactions. PSAMF ¶ 5. In any event, these facts have nothing to do with the shortcomings of the Bank's security procedures in this case.

[26] Remarkably, the Bank is unable to assign a date to this "Modified eBanking Agreement," Tarte Decl. ¶ 10, and the printed version of the document proffered by the Bank does not include any date (we are not even told when it was printed in hard copy form). Thus, we are told nothing by the Bank as to how long this agreement supposedly was in existence or how long it had been posted on Ocean Bank's website (whether for days, weeks or months prior to the time of the fraudulent withdrawals). Mr. Tarte, the Bank's information security officer, only says that the agreement "has been continuously available on Ocean Bank's website since it was modified," and it was "in effect in May 2009 when the allegedly fraudulent withdrawals occurred." *Id.*

Bank fails to explain how Patco would have been aware of amendments to the original agreement. Patco would have had to check the website on a daily basis, comparing whatever agreement was posted that day line-by-line with the last version Patco had in its possession. Without receiving some form of notice that a change had been made – such as a letter or an email[27] – Patco would have had no way of knowing *when* to look for amendments. The Bank's position is untenable.[28]

Also, the Bank ignores the fact that the language in the Modified eBanking Agreement on which it seeks to rely relates specifically to ACH *debit* transactions, not ACH *credit* transactions. Modified eBanking Agreement ¶ 2. These are two distinct types of transactions with different characteristics. Thomas Decl. ¶¶ 7-8. The fraudulent transactions at issue in this case were ACH *credit* transactions, Thomas Decl. ¶ 8, which was the usual mechanism by which Patco issued its weekly payroll orders to the Bank. The language cited by the Bank in the Modified eBanking Agreement simply would not have had application to the facts of this case. Thomas Decl. ¶ 9. The language would not have been intended to impose on Patco a general contractual obligation to monitor all its online transactions on a daily basis. *Id.* Nor would it be accurate for the Bank to characterize such an obligation – if it did exist – as a form of authentication security procedure, and it certainly would not take precedence over the *Bank's* obligation to provide a commercially reasonable set of authentication procedures in the first instance. Greene Supp. Decl. ¶ 28.[29]

---

[27] Sari Greene points out that the industry standard is that notice of important account agreement changes should be accompanied by some form of individual notice, such as a letter or email. Greene Supp. Decl. ¶ 31. In fact, when Ocean Bank sought to make changes to the ACH Agreement in late 2009, it sent a letter to Patco specifically describing the changes. *Id.*; McDowell Supp. Decl., Ex. 3.

[28] The Bank's reliance on *Transamerica Logistic, Inc. v. JPMorgan Chase Bank*, 2008 WL 8053509 (S.D. Tex. 2008) is misplaced. In that case, the court found specifically that the bank had revised its agreement and then "provided proper notice of the amendment" to the customer. *Id.* at *1.

[29] The Bank also claims that Patco was obligated to monitor its accounts on a daily basis because the Bank provided a generic "pop-up" notice on its website, in June 2008, advising customers to "monitor all account daily activity." PUB Motion for Summary Judgment at 8-9. Such a generic form of notice cannot be effective to impose a legal obligation on customers. Moreover, pop-up notices are a poor means of providing any form of important information because many browsers and anti-malware programs are configured to block pop-up messages. Greene Supp. Decl. ¶ 32.

The Bank goes so far as to state that "[g]iven the extensive and elaborate security procedures utilized by Ocean Bank, to rule otherwise [than to grant summary judgment in favor of the Bank] would be a determination that banks are essentially guarantors of their commercial customers' deposit accounts . . . an outcome the U.C.C. expressly prohibits."  PUB Motion for Summary Judgment at 4.  This argument is a straw horse.  To rule against the Bank in this case would amount to no more than a finding that its unusual and ill-advised decision to trigger challenge questions on every transaction rendered its system unreasonably vulnerable to fraud.  Banks would not be made guarantors of fraud because few, if any, banks have made similar configuration decisions.  Sari Greene – who advises numerous community banks throughout New England on their security procedures – knows of no other banks that have configured their system in this manner.[30]  Greene Supp. Decl. ¶ 33.  Furthermore, Ocean Bank itself now uses an entirely different set of security procedures, which includes the use of tokens.  PSMF ¶ 117.  A ruling in favor of Patco here would have no repercussions in future suits against the Bank.  On the other hand, finding against the Bank would uphold and reinforce the U.C.C.'s primary mandate that banks provide security procedures that are actually effective at combating fraud.

## VII. The Court Should Deny Summary Judgment on Patco's Remaining Common Law Claims (Counts II-VI)

### A. Patco's Common Law Counts Are Not Displaced By Article 4A

Courts have noted that "parties whose conflict arises out of a funds transfer should look first and foremost to Article 4-A [of the U.C.C.] for guidance in bringing and resolving their claims," as Patco has done here, but that "the article has not completely eclipsed the applicability of common law in the area."  *Sheerbonnet, Ltd v. Am Express Bank, Ltd.*, 951 F. Supp. 403, 407 (S.D.N.Y. 1995).

---

[30] Mr. Makohon himself testified that while $700 billion Wachovia utilized challenge questions, there was no dollar-amount threshold used to trigger challenge questions on its system.  Makohon Dep. at 221:8-12.  Rather, those questions were triggered selectively, when unusual activity was detected.  *Id.* at 220:4-9.

Indeed, "Article 4A is not the 'exclusive means by which a plaintiff can seek to redress an alleged harm arising from a funds transfer.'" *Regions Bank v. The Provident Bank, Inc.*, 345 F.3d 1267, 1274–75 (11th Cir. 2003); *see also Regions Bank v. Wieder & Mastroianni, P.C.*, 423 F. Supp. 2d 265 (S.D.N.Y. 2006) ("Nowhere does Article 4A expressly or impliedly preclude common law claims for conversion."). Rather, where Article 4A applies, the "only restraint on a plaintiff is that 'resort to principles of law or equity outside of Article 4A is not appropriate to create rights, duties and liabilities *inconsistent* with those stated in this Article." *Regions Bank v. The Provident Bank*, 345 F.3d at 1275 (emphasis in original) (quoting U.C.C. § 4A-102 cmt., codified in Maine at 11 M.R.S.A. § 4-1102 cmt.).[31] Here, Patco's Negligence, Breach of Contract, and Breach of Fiduciary Duty claims seek no relief inconsistent with Article 4A. Patco asks only that this Court – whether under Article 4A or pursuant to these common-law theories – order the return with interest of the monies wrongfully withheld by Ocean Bank to fund the fraudulent payment orders. This relief is entirely consonant with Article 4A, *see* 11 M.R.S.A. § 4-1204, and thus there is no proper basis on which to displace these counts.

With respect to Patco's Unjust Enrichment and Conversion claims, these claims concern Ocean Bank's unjust collection and retention of interest payments on amounts drawn against Patco's line of credit, a subject not dealt with by the provisions of Article 4A. Thus, these claims are similarly not displaced by the U.C.C. *See Regions Bank v. The Provident Bank, Inc.*, 345 F.3d at 1274 ("The rules that emerged during the drafting of the U.C.C. 'are intended to be the exclusive means of determining the rights, duties and liabilities of the affected parties *in any situation covered by particular provisions of the Article*.'") (emphasis in original) (quoting U.C.C. § 4A-102 cmt).

---

[31] *Donovan v. Bank of America*, 574 F. Supp. 2d 192 (D. Me. 2008), is not to the contrary because, *inter alia*, it concerns a wholly separate article of the U.C.C.

**B.     Patco's Common Law Counts Should Survive a Summary Judgment Challenge**

The focus of this case is Patco's claim for relief under Article 4A of the U.C.C.  The resolution of Patco's common law claims (Counts II-VI) is dependent to a large extent on the question of the commercial reasonableness of the Bank's authentication security procedures in regard to the fraudulent withdrawals.  The resolution of that question will have a significant impact on the status of Patco's remaining claims.  If the Court finds in Patco's favor on the issue of the commercial reasonableness of the Bank's security procedures, Patco submits that there are no genuine factual disputes that would prevent the Court from entering a judgment in Patco's favor on these remaining counts,[32] or, at the very least, these counts properly should proceed to trial.

<u>CONCLUSION</u>

For all the foregoing reasons, the Court should deny Defendant People's United Bank's Motion for Summary Judgment on all counts, and should grant summary judgment in favor of Plaintiff Patco Construction Company, Inc. on Count I of its Second Amended Complaint.

Dated:  October 8, 2010                                              Respectfully submitted,


                                                                     /s/ Daniel J. Mitchell
                                                                     Daniel J. Mitchell
                                                                     Eben M. Albert-Knopp
                                                                     BERNSTEIN SHUR
                                                                     100 Middle Street
                                                                     Portland, ME 04104-5029

                                                                     Attorneys for Plaintiff
                                                                     Patco Construction Company, Inc.

---

[32] The few cases cited by the Bank in its brief argument on the remaining counts, *see* PUB Motion to Dismiss at 26-28, are all Connecticut cases and have no application in this case, as it is governed by Maine law.